```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
 2                        MARSHALL DIVISION

 3   ORANGE ELECTRONIC, CO., LTD.,   (   CAUSE NO. 2:21-CV-240-JRG
                                     )
 4            Plaintiff,             (
                                     )
 5   vs.                             (
                                     )
 6   AUTEL INTELLIGENT TECHNOLOGY    (
     CORP., LTD,                     )   MARSHALL, TEXAS
 7                                   (   JUNE 5, 2023
              Defendant.            )   9:00 A.M.
 8   _____

 9
                              VOLUME 1
10

11   _____

12                      TRIAL ON THE MERITS

13            BEFORE THE HONORABLE RODNEY GILSTRAP
                UNITED STATES CHIEF DISTRICT JUDGE
14   _____and a jury_____

15

16

17

18

19

20

21

22            SHAWN McROBERTS, RMR, CRR
                 100 E. HOUSTON STREET
23             MARSHALL, TEXAS  75670
                   (903) 923-8546
24        shawn_mcroberts@txed.uscourts.gov

25
```

```
 1                    A P P E A R A N C E S

 2       FOR THE PLAINTIFF:     SUGHRUE MION, PLLC - DC
                                2100 PENNSYLVANIA AVE NW
 3                              SUITE 800
                                WASHINGTON, DC 20037
 4                              (202) 293-7060
                                BY: MR. JOHN RABINA
 5                                  MR. CARL PELLEGRINI
                                    MR. WILLIAM MANDIR
 6
                                THE HEARTFIELD LAW FIRM
 7                              2195 DOWLEN ROAD
                                BEAUMONT, TEXAS  77706
 8                              (409) 866-3318
                                BY:  MR. THAD HEARTFIELD
 9
         FOR THE DEFENDANTS:    MAYER BROWN, LLP - DC
10                              1999 K STREET, NW
                                WASHINGTON, DC 20006-1101
11                              (202) 263-3266
                                BY:  MR. BRYAN NECE
12                                   MR. CLARK BAKEWELL
                                     MR. GARY HNATH
13
                                ARCH & LAKE, LLP
14                              203 N. LASALLE STREET
                                SUITE 2100
15                              CHICAGO, ILLINOIS  60601
                                (312) 404-2330
16                              BY:  MR. CHRISTOPHER FAHY

17                              PATTON TIDWELL & CULBERTSON,
                                LLP - TEXARKANA
18                              2800 TEXAS BOULEVARD
                                TEXARKANA, TEXAS  75503
19                              (903) 792-7080
                                BY:  MR. GEOFFREY CULBERTSON
20
         OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
21                              100 E. HOUSTON STREET
                                MARSHALL, TEXAS  75670
22                              (903) 923-8546

23

24

25
```

## INDEX

**Opening Statements**                                           **Page**
MR. RABENA                                                        155
MR. CULBERTSON                                                    170

**EXAMINATION**

**Witness Name**                                                 **Page**
HUNG CHIH YU
    Direct By MR. RABINA ............................................ 187
    Cross By MR. HNATH ............................................. 218

1          THE COURT:  Thank you.  Be seated, please.

2      Good morning, ladies and gentlemen.  Thank you for being

3  here.

4      My name is Rodney Gilstrap.  I am the chief United States

5  district judge for the U.S. District Court for the Eastern

6  District of Texas.  I've lived in Marshall since 1981.  I

7  practiced law in this area for 30 years before I was nominated

8  by the president and confirmed by the Senate as a U.S.

9  district judge.

10      But I have a confession to make.  I was not born in

11  Florida -- excuse me.  I was not born in Texas.  I was born in

12  Florida, but I got to Texas as quick as I could.  Came to

13  Texas at the ripe old age of 18 to attend college at Baylor

14  University.  I stayed there and attended and graduated from

15  Baylor Law School.

16      I am married.  I've had two grown children.  My wife owns

17  and operates a retail floral business here in Marshall.

18      Now, I tell you all these things because in a few minutes

19  I'm going to ask each of you to tell me and the rest of us the

20  same kind of information about each of you, and I think you're

21  entitled to know as much about me as I'm about to find out

22  about each of you.

23      We're about to engage in the selection of a jury in a

24  civil case involving allegations of patent infringement.  But

25  if you will indulge me, ladies and gentlemen, before we

1    proceed any further, I'd like to give you a brief overview, a

2    historical overview, of how we came to have our American civil

3    jury trial system.  I think it's appropriate, and I think it

4    will be helpful for you to have that.

5        If you go back in ancient history and if you begin with

6    the Pentateuch, the first five books of the Old Testament,

7    you'll see that the ancient Hebrew nation impaneled juries to

8    decide issues of property ownership and property value.

9        The ancient Greeks began using a jury system about 1500

10   BC.  The Romans, as in many other areas, copied the jury

11   system from the Greeks, and the ancient Romans began using a

12   jury system during their time of prominence and, in fact, it

13   was the Romans that brought the jury system to what we now

14   know to be the United Kingdom, or England, when they crossed

15   the English Channel and conquered that island in the 4th

16   century AD.

17       And the jury system followed the Romans to what we now

18   know as England, and it took root there and it flourished for

19   800 years until the 12th century AD when a rather tyrannical

20   king came to the throne of England.  His name was King John.

21   And King John became embroiled in many different disputes with

22   his nobles that led that country to the brink of a civil war.

23       But a civil war was avoided because a document was drawn

24   up between the king and his nobles that resolved their many

25   disputes.  One of their disputes was the king's efforts to

1    curtail the right to trial by jury.  That document that was

2    signed by King John and resolved those disputes, including the

3    dispute over the right to trial by jury, you've probably all

4    heard of.  It's called the Magna Carta.

5        And so it should be no surprise to any of you that the

6    concept of the right to trial by jury crossed the Atlantic

7    Ocean with our British forefathers when they came to this

8    continent to establish the British colonies that later became

9    our country.  And they brought with them the right to trial by

10   jury.

11       And it flourished in colonial America for over a hundred

12   years until another rather tyrannical king came to the throne

13   of Great Britain, and this time his name was King George III.

14   And like King John, King George III became embroiled with his

15   American colonial subjects in many, many different areas.  One

16   of the areas that King George became in conflict or came into

17   conflict with his American subjects was, again, his efforts to

18   curtail the right to trial by jury.

19       As a matter of fact, ladies and gentlemen, when Thomas

20   Jefferson wrote the Declaration of Independence, which at its

21   base level is a letter from the American colonies to the king

22   explaining all the various areas of dispute that were leading

23   the American colonists to the conclusion that they had no

24   other alternative than to rebel and separate and form their

25   own independent nation, in the Declaration of Independence,

1    Thomas Jefferson spells out explicitly the king's efforts to

2    curtail the right to trial by jury as one of those problems

3    leading his American colonists to reach the conclusion that

4    they must form their own independent country.

5         And, in fact, as you all are aware, we did rebel, we did

6    form our own independent nation.  And shortly after we

7    achieved our independence, we adopted a document to be the

8    supreme law of the land, the governing document for all

9    matters in the United States of America, the Constitution of

10   the United States.

11        And shortly after the ratification of the Constitution,

12   the Congress adopted and the people confirmed 10 amendments to

13   our Constitution.  You've all learned in school about those

14   first 10 amendments as we know them to be called the Bill of

15   Rights.  In the Bill of Rights, in the first 10 amendments to

16   the Constitution, the Seventh Amendment guarantees the right

17   to every American citizen to resolve their civil disputes

18   through a trial by jury.  And the Seventh Amendment along with

19   the other nine that form the Bill of Rights were all ratified

20   and added to the Constitution in 1791.

21        So since 1791, ladies and gentlemen, every American

22   citizen has had a constitutionally-guaranteed right to resolve

23   their civil disputes through a trial by jury.  So by being

24   here today, in a very real and tangible way each of you are

25   doing your part as American citizens to support and defend

1   this constitutional right of trial by jury and our Seventh

2   Amendment to the Constitution.

3       I always tell citizens who appear for jury duty, as you

4   have this morning, that in my personal view jury service is

5   the second highest form of public service that any American

6   can render for their country.  In my personal view, the

7   highest form of public service are those young men and women

8   that serve in our armed forces.

9       Now, later in the process this morning, the lawyers for

10  the two parties are going to address each of you, the members

11  of the venire panel, and they're going to ask you questions,

12  ladies and gentlemen.  I want you to understand that none of

13  them will be seeking to pry into your personal affairs, to

14  inquire unduly into your personal affairs.  They are simply

15  trying to obtain relevant and appropriate information to help

16  the Court secure a fair and an impartial jury to hear the

17  evidence in this case.  But they are entitled to ask the

18  questions of you that they will ask this morning.

19      Both sides are represented by very experienced trial

20  lawyers, and they understand the rules of the Court and the

21  Court's expectations.  I do not expect any inappropriate or

22  improper questions to be asked.  If there are, I certainly

23  won't hesitate to jump in and stop any such questions, but I

24  don't expect that to happen.

25      The important thing for each of you to remember when

1    you're asked a question later by the lawyers for the parties

2    is that there are no wrong answers as long as your answers are

3    full, complete, and truthful.  As long as your responses are

4    full, complete, and truthful, there are no wrong answers to

5    any questions that you will be asked.

6        Now, sometimes there will be, and this is a very rare

7    occurrence, but sometimes there will be a question asked that

8    some member of the panel based on their own personal

9    circumstances believes is so personal and so private that they

10   are not comfortable answering that question in front of

11   everyone else on the panel.  If that should happen, and I will

12   tell you, I can count on one hand the time it's happened in 12

13   years, but if that should happen, you always have the right to

14   simply respond by saying, I'd like to talk about that with

15   Judge Gilstrap.

16       If that's your answer, I'll provide an opportunity where

17   you can answer that question outside of the presence of

18   everyone else on the panel.  But, again, that is a very rare

19   occurrence, but if it should arise, you have that right,

20   ladies and gentlemen.  But I don't think it will, but I wanted

21   to go over that with you.

22       Now, the trial in this case is going to begin today after

23   the jury is selected, seated, and sworn.  So we will go

24   directly into the trial after the jury is selected.  And the

25   trial of this case will go through today.  In all likelihood,

1    we will be finished on Friday of this week.  So today is the

2    5th of June, Friday is the 9th of June.

3        If there are any of you on the panel who, between now and

4    Friday of this week, have a surgical procedure scheduled for

5    yourselves or an immediate family member that can't be easily

6    rescheduled, if any of you have airline tickets that are

7    non-refundable or travel arrangements that are non-refundable,

8    if there is something that would be a very serious impediment

9    to you being able to be here throughout the week if you were

10   selected to serve on the jury, then that's something I need to

11   know about now.

12       If there's anybody that has a very serious reason why, if

13   selected, they couldn't be here all week, if you'll raise your

14   hand and let me make a note of it.  Okay.  I see No. 16 and

15   No. 15 and 23.  Thank you.  It's hard to see some of those

16   numbers in the back of the room.

17             UNIDENTIFIED PANEL MEMBER:  28.

18             THE COURT:  28.  Okay.  No. 28, No. 23, No. 16, and

19   No. 15.  Did I miss anybody?  I don't see any other hands.

20   Thank you.

21       At this time I'm going to call for announcements in the

22   case of Orange Electronic Company, Ltd., versus Autel

23   Intelligent Technology Corp, Ltd.  This is Civil Case No.

24   2:21-CV-240.

25       And, counsel, as you give your announcements on the

1    record, please identify yourselves, the members of your trial

2    team, and any corporate representatives that you have with you

3    this morning.

4        We'll begin with the Plaintiff.  What says the Plaintiff?

5        MR. HEARTFIELD:  Good morning, Your Honor.

6        Ladies and gentlemen, I am Thad Heartfield, counsel for

7    Orange Electronic.  With me is John Rabena, William Mandir,

8    and Carl Pellegrini.

9        Our corporate representative is Mr. Hung Chih Yu, and he

10   will be here on behalf of the company.

11       And we are ready.

12       THE COURT:  All right.  Thank you, counsel.

13       What says the Defendant?

14       MR. CULBERTSON:  Thank you, Your Honor.

15       Good morning, ladies and gentlemen.  Geoff Culbertson for

16   Autel Intelligent Technology.

17       Trying the case with me this week will be Christopher

18   Fahy, Gary Hnath, Bryan Nese.  Actually have some other

19   members of the trial team that aren't here right now.

20       But our corporate representative that we're glad to

21   introduce to you this morning is Ms. Huang.

22       We're ready, Your Honor.

23       THE COURT:  All right.  Thank you, counsel.

24       As I told you, ladies and gentlemen, this is a case

25   arising under the patent laws of the United States, and what

1    the Plaintiff is claiming is that its patent has been

2    infringed by the Defendant.  Now, the Defendant denies that it

3    infringes any of the claims in the Plaintiff's patent, and it

4    contends that the Plaintiff's patent is invalid.

5         Now, what I've told you in those couple of sentences is a

6    very limited and informal way of describing the case in

7    layman's terms.  I know you've all seen the patent video film

8    prepared by the Federal Judicial Center and, having seen that,

9    you know more than most people do when they appear for jury

10   duty about our patent system.

11        Now, the lawyers on both sides, as I've mentioned, are

12   going to question the panel in a few minutes to gather

13   information so that they can exercise their peremptory

14   challenges and help the Court complete the process of securing

15   a fair and an impartial jury to hear the evidence in this

16   case.

17        Again, let me remind you, ladies and gentlemen, your

18   answers to any questions that may be asked of you are not

19   wrong as long as your responses are full, complete, and

20   truthful.

21        One thing I do want to talk with you about before the

22   lawyers begin their questioning is the burden of proof because

23   it's quite possible that one or both sides will ask you about

24   your ability to apply the burden of proof that applies in this

25   case if you're selected on this jury.

1          The jury in this case will apply a burden of

2     proof -- actually the jury in this case will apply two

3     different burdens of proof.  The first burden of proof is

4     called the preponderance of the evidence, and the second

5     burden of proof that the jury will apply is called clear and

6     convincing evidence.  Let me say those again--the

7     preponderance of the evidence and clear and convincing

8     evidence.

9          Now, when you're responding to any lawyer's questions

10    about your ability to apply the burden of proof here, you need

11    to understand that when a party has a burden of proof on any

12    claim or defense by a preponderance of the evidence, it means

13    that you, the jury, must be persuaded by the credible or

14    believable evidence that the claim or defense is more probably

15    true than not true.  Let me say that again for emphasis--more

16    probably true than not true.  This is sometimes talked about

17    as being the greater weight and degree of credible testimony.

18         Let me give you an example that I hope will be helpful to

19    you.  In front of me is our court reporter, Mr. McRoberts.  In

20    front of him, you'll see a statue of the Lady of Justice.

21    She's blindfolded.  She holds lowered at her right side the

22    sword of justice.  She holds raised on her left side the

23    scales of justice.

24         I want you to focus on those scales because they are

25    exactly balanced and equal, and that's where these parties

1    must start out at the beginning of this trial--in the same

2    positions, exactly balanced and equal.  But over the course of

3    the trial, the Plaintiff is going to put -- think about it

4    this way.  The Plaintiff's going to put their evidence on one

5    side of those scales, and then the Defendant's going to put

6    their evidence on the other side of those scales.  And when

7    all the evidence from both sides has been placed on the

8    scales, if a party has the burden of proof by a preponderance

9    of the evidence and the scales tip in that party's favor, even

10   if they tip ever so slightly, then that party has met its

11   burden of proof by a preponderance of the evidence.

12       On the other hand, ladies and gentlemen, when a party has

13   the burden of proving any defense by clear and convincing

14   evidence, that second burden of proof that I mentioned to you,

15   it means that you, the jury, must have an abiding conviction

16   that the truth of the party's factual contentions are highly

17   probable.  I'll say that again--an abiding conviction that the

18   truth of the party's factual contentions are highly probable.

19   That's a higher standard than the first burden of proof that I

20   mentioned to you.  It's a higher standard than the

21   preponderance of the evidence.

22       Let's go back to the same example.  The scales of justice

23   start out at the beginning of this trial empty and completely

24   balanced.  The parties start out exactly in the same position

25   and equal.  Over the course of the trial, the Plaintiff puts

1    all their evidence on one side of the scales, the Defendant

2    puts all their evidence on the other side of the scales.

3        And when all the evidence has been presented, if a party

4    has a burden of proof by clear and convincing evidence on any

5    defense, then if those scales tip in that party's favor and

6    they must definitely tip, it is not sufficient that they tip

7    ever so slightly, but if those scales definitely tip in that

8    party's favor, then they've met the burden of proof by clear

9    and convincing evidence.

10        Now, I want to be clear with you, ladies and gentlemen.

11   Neither of these two burdens of proof has anything to do with

12   or should be confused by you with a third and altogether

13   different burden of proof called beyond a reasonable doubt.

14   Beyond a reasonable doubt is the burden of proof applied in a

15   criminal case, and it has absolutely no application whatsoever

16   in a civil case such as this.

17        You should not confuse clear and convincing evidence with

18   beyond a reasonable doubt.  It is not as high a standard as

19   beyond a reasonable doubt, but clear and convincing evidence

20   is a higher standard than the preponderance of the evidence.

21        And I give you these instructions, ladies and gentlemen,

22   in case you're asked by the lawyers whether you will be able

23   to apply those two burdens to the evidence in this case if

24   you're selected to serve on this jury.

25        Now, before the lawyers address you and ask their

1    specific questions, I'm going to ask each of you to give me

2    the same kind of information about yourselves that I gave you

3    about myself when we started this morning.  Each of you should

4    find a copy of nine standard questions.  You have them in

5    writing.  I think they're also on the monitors in front of

6    you.

7         And here's what we're going to do, ladies and gentlemen.

8    We have two Court Security Officers in the courtroom.  They

9    each have handheld microphones, and we're going to have a

10   Court Security Officer bring the handheld microphone to each

11   member on the panel.

12        When you get the microphone, if you will first stand up,

13   then take the microphone and hold it up to your mouth so that

14   it will amplify adequately.  You don't know how many people

15   show up on jury duty and they put their microphone down at

16   their belt and it doesn't do any good.  So don't hold it at

17   your waist, hold it at your mouth.  And then if you'll answer

18   those nine questions for us, and then we'll pass the

19   microphone to the next member of the panel and the next member

20   of the panel, and we'll do that this one at a time throughout

21   the panel so everyone here can answer those nine questions.

22        Also, so you'll know, later in the process when the

23   lawyers are at the podium, if they ask you a specific

24   question, you should answer it the same way--wait until the

25   Court Security Officer brings you a microphone, stand up, hold

1    the microphone where it's appropriate, and then answer the

2    question.

3        We've got a large room, we've got a lot of people here,

4    it's important that everybody hears your answers.  So I'm

5    going to ask you to answer all the questions in that way.

6    Wait until you get a microphone, stand up, hold it

7    appropriately, and then answer the question.

8        All right.  With that, we'll begin with Panel Member No.

9    1.  And if our Court Security Officer will take Mr. Kelley a

10   microphone.

11       If you'll please answer those nine questions for us, sir.

12           THE PANEL MEMBER:  Good morning.  My name is Thomas

13   Kelley.  I live in Longview on the Harrison County side.  I

14   have four children.

15       I've just completed -- I'm a special education math

16   teacher.  I just completed a one-year contract at Longview ISD

17   and will be teaching at Gladewater Middle School next year.

18       I graduated from high school at Red Mountain High School

19   in Mesa, Arizona.  I have a Bachelor's in special education

20   and a Master's in business management and leadership from

21   Western Governor's University.

22       My spouse is Sarah Kelly.  She is a stay-at-home mom, and

23   she has been able to stay at home for the last 12 years.

24       And I do not have any prior jury service.

25           THE COURT:  Thank you, Mr. Kelley.

1          Let's go next to Panel Member No. 2, Mr. Huggins?

2               THE PANEL MEMBER:  Good morning.  My name is William

3     Huggins.  I have -- I live in Hallsville, Texas.  I have two

4     kids.

5          Let's see.  I work for a (unintelligible) specialist in

6     Gilmer.  I am the quality manager, been there about 20 years.

7     I have a business degree from LeTourneau.

8          My wife is Kyla Huggins.  She is a dental hygienist here

9     in Marshall.  Let's see.  About 19 years there.

10         And zero jury services.

11              THE COURT:  All right, sir.  If you'll hand the

12    microphone to the next member of the panel, No. 3, Mrs.

13    Schafer?

14              THE PANEL MEMBER:  My name is Jennifer Schafer, and

15    I live in Gilmer, Texas.  I have four children, ages 9, 12,

16    16, and 20.

17         My place of work is Shinesty, Incorporated.  It's a small

18    business based out of Denver that is a clothing retail

19    business and specializes with a patent-protected and

20    trademarked men's underwear line.  I've worked there for two

21    years in October.

22         High school graduate and currently in a program for

23    software quality assurance.

24         And my husband's name is Mike Schafer.  He works at

25    Octapharma in Tyler, Texas, and he's worked there for two

1    years in July.

2         And I have no prior jury service.

3              THE COURT:  Thank you, ma'am.

4         Next is No. 4, Mr. Hatten.

5              THE PANEL MEMBER:  I'm Ronald Hatten.  I live in

6    Hughes Springs, Texas.  I have two girls.

7         I'm retired.  I worked at the U.S. Steel for 44 years.

8    Graduated high school there in Hughes Springs.

9         My spouse is Deborah Hatten.  She works for the Hughes

10   Springs ISD, and she's been there 15 years.

11        And I have no prior service.

12             THE COURT:  Thank you, sir.

13        Next is No. 5, Miss Pemberton?

14             THE PANEL MEMBER:  Hi.  My name is Jaycie Pemberton.

15   I live in Daingerfield, Texas.  I have no kids.

16        I work at Pet Smart in the grooming salon.  I'm a

17   grooming trainee.  I've worked there for about a year and a

18   half.

19        I graduated from Hughes Springs High School two years

20   ago.

21        I'm not married, and I have had no prior jury service.

22             THE COURT:  Thank you.

23        Next is No. 6, Ms. Siler.

24             THE PANEL MEMBER:  My name is Laura Siler.  I live

25   in Jefferson.  I have one grown son.

1        I worked 25 years as a paralegal.  I'm retired.  And

2   attending school, I have an Associate's degree, working on my

3   Bachelor's.

4        I do not have a spouse, and I have had no prior jury

5   service.

6            THE COURT:  All right.  Thank you.

7        Next is Panel Member No. 7?

8            THE PANEL MEMBER:  My name is Aaron Lewis.  I live

9   in Hallsville, Texas.  I have no children.

10       I work at AC Contractors in Longview.  I'm an HVAC

11   installer.  I've worked there about four years.  Went to high

12   school.

13       Don't have a wife or anything like that, and I've never

14   served.

15           THE COURT:  All right.  Thank you.

16       We'll take the microphone around to No. 8, Mr. Rust.

17           THE PANEL MEMBER:  Sammy Rust.  I live in Hughes

18   Springs, Texas.  I have two grown children.

19       I'm retired from Trinity Logistics Group.  I was a driver

20   there.  I've graduated from Hughes Springs High School.

21       My spouse's name is Nancy.  She's retired from Nix Law

22   Firm.  She was there 20 years.

23       No previous jury experience.

24           THE COURT:  Thank you, sir.

25       Next is No. 9, Mr. Maxwell.

1          THE PANEL MEMBER:  My name is Gary Maxwell.  I live

2    in Woodlawn, Texas.  I have two girls.

3          My place of employment is Marshall Collision Center.  I

4    work on wrecked cars.  I've been there nine years.  I got a

5    high school graduation in 1980 from Marshall.

6          My spouse's name is Gilleon.  She works at Davey Crockett

7    Elementary for 19 years.

8          And I have civil and criminal jury duty.

9          THE COURT:  All right, sir.  How long ago were you

10   on a civil case as a juror?

11         THE PANEL MEMBER:  It's been probably 30 years.

12         THE COURT:  And where was that, sir?

13         THE PANEL MEMBER:  Jefferson, Texas.

14         THE COURT:  In state court in Jefferson.

15         THE PANEL MEMBER:  Yes, sir.

16         THE COURT:  Thank you very much, Mr. Maxwell.

17   Next is No. 10, Mr. Luther?

18         THE PANEL MEMBER:  My name is Freddie Luther.  I

19   live in Hallsville, Texas.  I have four kids.

20         I work at Komatsu Mining.  I've been there for 17 years.

21   I'm a heat treat operator.  I have my GED.

22         My wife's name is Holly.  She's a ministry coordinator.

23   She's worked at Pathway Church for four years.

24         And I have no jury service.

25         THE COURT:  All right, sir.  Thank you.

1    Next is No. 11.

2        THE PANEL MEMBER:  My name is Vesta Soper, and I

3    live on Lake of the Pines.  My mail comes from Avinger, but I

4    do not live in Avinger.  I have two grown children.

5        I'm a retired secondary math teacher.  I worked for 28

6    years.  I graduated high school from Burnet High School, went

7    on to University of Texas in Austin and completed my degree at

8    University of Texas in Tyler.

9        My husband is Michael Soper.  The end of his career, he

10    was a planner at U.S. Steel.  Before that, he was a welder in

11    maintenance, and he had 40 years working in that type of work.

12        And I've been called for jury duty many, many times, but

13    only once was I picked to be on a jury, and it was a criminal

14    case in Jefferson, Texas, about two or three years ago.

15        THE COURT:  Thank you, ma'am.

16    If you'll hand the microphone to No. 12.

17        THE PANEL MEMBER:  Good morning.  I'm Kevin Vrooman.

18    I've got three kids.

19        I work for Coastal Chemical.  We haul chemicals to these

20    various gas companies.  I've been there for 20 years.  I

21    graduated from Daingerfield High School in '89, got some

22    college for the fire department.

23        My spouse's name is Iona Vrooman.  She's a stay-at-home

24    mom.  She's been doing it for 20 years and -- because, you

25    know, kids are a handsful.

1       And I got called several times for jury duty but never

2   got picked.

3               THE COURT:  Thank you, sir.

4       Next is No. 13, Mr. Bradshaw?

5               THE PANEL MEMBER:  Michael Bradshaw.  I live in

6   Gladewater, Texas.  No wife, no children.

7       I went to Pine Tree High School and UT Tyler.  And I work

8   at Coastal Chemical in Kilgore, Texas.  I haven't met this man

9   until just now.

10      I was on -- 2020, I was on the grand jury in Upshur

11  County.

12              THE COURT:  Ever been on a petit jury like this?

13              THE PANEL MEMBER:  No, sir.

14              THE COURT:  Okay.  Thank you, sir.  If you'll hand

15  that to No. 14, Mrs. York?

16              THE PANEL MEMBER:  My name is Cheryl York.  I have

17  two children, one deceased, one still living.

18      I'm a retiree.  I was retired three different times, but

19  my last one was head teller at a bank.  I was there for

20  11-and-a-half years.  I have a high school education.

21      My spouse's name is Bobby.  He was -- he's retired.  He

22  was a technician with -- he retired as a technician with Arco

23  Gas, which is Center Point Energy.  He was retired at 38

24  years.

25              And I have been called for jury duty several times, been

1  picked once, and it was, I guess you call it, criminal.  I

2  think I wrote down civil, but it was criminal.

3          THE COURT:  Where was it, ma'am?

4          THE PANEL MEMBER:  Right here in Jefferson.

5          THE COURT:  In Jefferson?

6          THE PANEL MEMBER:  I mean Marshall --

7          THE COURT:  Okay.

8  ]    THE PANEL MEMBER:  -- right over here.

9          THE COURT:  At the county courthouse?

10         THE PANEL MEMBER:  Yes.

11         THE COURT:  Okay.  Thank you, ma'am.

12      All right.  Next is No. 15, Miss Singleton?

13         THE PANEL MEMBER:  I am Tina Singleton.  I have no

14  kids.

15      I work for the city of Marshall as a court administrator.

16  I've been there for 16 years.  I have a Bachelor's degree in

17  information systems.

18      I'm not married, and I've never been picked for jury

19  duty.

20         THE COURT:  Thank you.

21      If you'll pass that microphone to No. 16, Mr. Jones.

22         THE PANEL MEMBER:  All right.  My name is Derrian

23  Jones.  I live in Pittsburg, Texas.  I have one son.

24      My place of employment, my dad started a trash company in

25  2009.  He recently got diagnosed with cancer in April, and

1    I've taken over for him.

2        I don't have no spouse.  I have some college, and I

3    received my CDL at TSTC here in Marshall.  And no prior jury

4    experience.

5            THE COURT:  All right, sir.  Thank you.

6        No. 17 is next, Mr. Waldon?

7            THE PANEL MEMBER:  Yes.  My name is Jason Waldon.  I

8    have two children, 19 and 16.

9        I work for AEP/SWEPCO.  I work in the engineering

10   department.  I've been there for 16 years.  Graduated from

11   TSTC college down here in Marshall.

12       My spouse's name is Shelly Waldon.  She works for Region

13   8 Co-op Center in Pittsburg, Texas.  She's been there for

14   three or four years.  I don't really know what she does, but

15   she works there.

16       Prior jury service, I was on a criminal case in Linden,

17   Texas, for a methamphetamine charge.

18            THE COURT:  How long ago was that, sir?

19            THE PANEL MEMBER:  It was pre-COVID.  So five,

20   seven, eight years, something like that.

21            THE COURT:  All right.  Thank you.

22       Next is No. 18, Mr. Ivery?

23            THE PANEL MEMBER:  Good morning.  I'm James Ivery.

24   I have three kids--one, 40; one, 35; and one, 18.

25       I work for the Department of the Army at Red River Army

1    Depot.  I volunteered for the Gulf War during Desert Storm.

2    My educational background is that I'm high school diploma.  I

3    have some Texarkana Community College for a year.

4                THE COURT:  Mr. Ivery, can you hold that microphone

5    up near your mouth?  Yes, sir.

6                THE PANEL MEMBER:  Can you hear me now?

7                THE COURT:  I can hear you now.

8                THE PANEL MEMBER:  My spouse's name, my wife's name

9    is Angela Stephens Ivery.  They own A+B Farms, which are

10   chicken houses, and they also do cattle.

11       My place of employment, again I say was Red River Army

12   Depot.  And my spouse, like I said, is chicken houses.  And

13   she's been doing this all of her life, which she's 56 years

14   old.

15       And prior jury duty was that I was on a criminal case in

16   Marsh County, Texas, a murder.

17                THE COURT:  Thank you, sir.

18       All right.  If you'll take that next to No. 19, Mrs.

19   Carey?

20                THE PANEL MEMBER:  My name is Trisha Carey, and I

21   live in Hughes Springs.  I have one daughter that's headed off

22   to SFA in the fall.

23       I work at Daingerfield High School as the business

24   teacher.  I just finished my second year kind of an accident

25   being there.  I graduated from Daingerfield in '93, and then I

1    graduated from SFA.

2         My husband's name is Danny, and he also works at the high

3    school.  He is Special Ed coordinator.  He actually has an

4    interview for a principal job in the elementary today at 2:00.

5    He's been there -- I think he's starting his eighth year in

6    Daingerfield.

7         And have no prior jury services.

8              THE COURT:  All right.  If you'll pass that to No.

9    20, Mrs. Zimmerman?

10             THE PANEL MEMBER:  My name is Amy Zimmerman.  I live

11   in Atlanta, Texas.  I have three children.

12        I work kind of for elderly.  I help them to stay in their

13   homes comfortably, cooking and cleaning, that sort of thing.

14   I've done that for many years, ever since I was a teenager.

15   My educational background, I have a Bachelor's.

16        My spouse's name is Daniel Zimmerman.  He is

17   a -- he -- not graduated -- what do you call that --

18   retired military.  He's a Navy lieutenant commander.  And then

19   he went on to federal corrections.  He was a chaplain in the

20   Navy, and he's also a chaplain.  He's currently a chaplain

21   who's been for nine years in the federal corrections, and he's

22   currently serving in Texarkana FCI as the head chaplain there.

23   Oh, I've already told you that.

24        Prior jury service, I've been called up for one county

25   and one here in Marshall, but never had to show up.  But it

1    was canceled or something before then, and that's it.

2              THE COURT:  What's your Bachelor's degree in, ma'am?

3              THE PANEL MEMBER:  It's a Bachelor of Arts.  It's

4    a -- it's a double with secretarial and elementary education.

5              THE COURT:  All right.  Thank you very much.  If

6    you'll pass that to Panel Member No. 21.

7              THE PANEL MEMBER:  I'm Angela Mayeaux.  I live down

8    the street, and I have one son who's 23.

9         I work for Longview Independent School District.  I teach

10   children who are blind and visually impaired.  This is my 33rd

11   year in special education.

12        I have graduated from Marshall High School.  I went to

13   Stephen F. Austin, and I have a Master's degree in special

14   education from Middle Tennessee State University.

15        I am divorced, and I have been called for jury duty twice

16   and sent home both times.

17             THE COURT:  All right.  Thank you, ma'am.

18        Next is No. 22, Mrs. Eddington?

19             THE PANEL MEMBER:  My name is Rhonda Eddington.  I

20   have three children.

21        I own my own business, JR Works.  We do specialize in

22   flooring, showers, and back splashes.  Prior to that, I worked

23   for Gilmer Lumber for about 20 years.  My business has been

24   opened for about two.  I have a high school education.

25        My spouse is Jason Eddington.  He works for me.

1        And I have served on a criminal case and an alternate for

2   grand jury in Upshur County.

3              THE COURT:  In Upshur County.  How long ago?

4              THE PANEL MEMBER:  Probably about 10 years ago.

5              THE COURT:  All right.  Thank you, ma'am.

6              THE PANEL MEMBER:  Uh-huh.

7              THE COURT:  Next is No. 23, Mrs. Sheffield.

8              THE PANEL MEMBER:  Rhonda Sheffield.  I have two

9   grown children.

10        I'm a housewife for 41 years.  High school, 10th grade.

11        My spouse is Donald Sheffield.  He's a pastor at Center

12  Hill Baptist Church for going on eight years in September.

13        And no jury duty.

14             THE COURT:  All right.  If you'll pass the

15  microphone back to No. 24, Mrs. Ingalls.

16             THE PANEL MEMBER:  My name is Beverly Ingalls.  I

17  live in Longview.  I have three children and one stepdaughter.

18        I work at Louis Morgan Drug in Longview.  I am a pharmacy

19  technician.  I've worked there for about four years.  I have a

20  high school education with a license in pharmacy technician.

21        My spouse's name is Jason Ingalls.  He owns IRP race cars

22  where he sells parts for race cars along with building the

23  race cars themselves.  He's been doing that for roughly 10

24  years.

25        And I have no prior jury services.

1           THE COURT:  Thank you, ma'am.

2      Next is No. 25, Mrs. Hightower.

3           THE PANEL MEMBER:  Doris Hightower.  I live in

4   Avinger.  I have three grandchildren.

5      I work for Campbell Concrete as a payroll person for 12

6   years and worked at Tarkington High School for about 20.  I

7   have a high school education.

8      My husband is Robert.  He was a plant manager for

9   Maverick Tube, which is a pipe company in Conroe, for 25 years

10  and then worked for the County of Liberty for eight years as

11  an equipment operator.

12     And I had previous prior service on a jury, a civil case,

13  in Liberty.  It's probably 35 years ago.

14          THE COURT:  In state court?

15          THE PANEL MEMBER:  Yes.

16          THE COURT:  Okay.  Thank you, ma'am.

17     Next is No. 26, Ms. Armstrong.

18          THE PANEL MEMBER:  My name is Reina Armstrong, and

19  I'm from Big Sandy.  I have no children.

20     I work at Truman W. Smith Children's Care Center.  I am a

21  nurse.  I've worked there for I think 12 years in October.  I

22  have a high school education and a vocational nursing

23  certificate.

24     I am not married, and I have no prior jury services.

25          THE COURT:  Thank you.

1          No. 27 is next, Mr. Anderson.

2          THE PANEL MEMBER:  My name is William Anderson.  I

3     go by Bill.  I have one child.

4          I'm retired.  For the last 20 years I've ran a quail

5     hunting operation in South Texas, professional dog trainer and

6     field trialer.  I graduated Elysian Fields High School,

7     Stephen F. Austin.

8          My wife's name is Robbie.  She was an educator.  She is

9     also retired.  Last 10 years, she worked at Texas State

10    Technical College.

11          And I have one prior jury duty, a civil case here in

12    Marshall.

13          THE COURT:  And let me ask you, sir, if you'll get

14    that microphone back.

15          THE PANEL MEMBER:  Yes, sir.

16          THE COURT:  What kind of case was that?

17          THE PANEL MEMBER:  It was a civil case.

18          THE COURT:  And was it this court or was it the

19    county court?

20          THE PANEL MEMBER:  It was county court.

21          THE COURT:  Okay.  All right.  Thank you.

22          Next is No. 29, Mrs. Walker -- I'm sorry, Mrs. Martin,

23    No. 28.  Got ahead of myself.

24          THE PANEL MEMBER:  Carla Martin.  I'm from

25    Hallsville, Texas.  I have two grown children.

1       I'm currently not employed.  I'm retired.  We did own an

2   oil field service business since 2007, and we sold out last

3   year.

4       My husband's name is James Martin, and he has been in the

5   oil field since he started working.  And my education is I

6   have a BBA from LeTourneau and a culinary arts degree.

7       And I did have civil duty in Gregg County.

8               THE COURT:  How long ago was that, ma'am?

9               THE PANEL MEMBER:  Probably 15 years ago.

10              THE COURT:  Okay.  Thank you, Mrs. Martin.

11  Next is No. 29, Mrs. Walker.

12              THE PANEL MEMBER:  Hello.  I'm Rae Nell Walker.  I

13  live here in Marshall, Texas.  I have two grown children.

14      I am retired.  I did retire from Louis A. Williams and

15  Associates.  I was a commercial underwriter assistant for 30

16  years.  I am a high school graduate.

17      My spouse's name is Chuck Walker.  He is retired from

18  Wesco Valve.  He did maintenance mechanic work all of his

19  life.

20      And I have served on two criminal juries.

21              THE COURT:  All right.  Never a criminal case in

22  this court, though.

23              THE PANEL MEMBER:  They were in -- across the

24  street.

25              THE COURT:  County court?

1          THE PANEL MEMBER:  Uh-huh.

2          THE COURT:  Thank you, ma'am.

3      All right.  Next is No. 30, Mrs. Fant?

4          THE PANEL MEMBER:  Hello.  I am Tammye Fant.  I have

5  two children of my own, two stepchildren.

6      I work at Queen City Independent School District.  I've

7  been there 32 years, and I enjoy it.  I get to work with all

8  the children in the school.  I work elementary school, pre-K

9  through 4th grade.

10     I graduated from high school in Atlanta, Texas in 1978.

11 I went to Stephen F. Austin.  I found a guy and I got married

12 to him.

13     My husband, my second husband, he was in the military.

14 He served 36 years.  And when he retired, he went to work at

15 Red River Army Depot, and he worked there for 11 years.  And

16 he come down with kidney cancer and he died.

17     I have had no prior jury services.

18         THE COURT:  All right.

19         THE PANEL MEMBER:  Thank you.

20         THE COURT:  Thank you, Mrs. Fant.

21     Next is No. 31, Mrs. George.

22         THE PANEL MEMBER:  My name is Angela George.  I have

23 three children.  I live in Hallsville.

24     I work for Christus Good Shepherd in Longview.  I work in

25 surgery auditing charts.  I've been there almost 21 years.  I

1    graduated from Pine Tree High School and went and got my EMT

2    license and medical assistant license.

3        My spouse's name is Randy George.  He works for Trinity

4    Rail Industries in Hallsville.  He's been there almost 30

5    years.

6        And I've served on one jury.  It was a civil case in

7    Gregg County, and that was almost 30 years ago.

8        THE COURT:  All right.  Thank you, Mrs. George.

9        Next is No. 32, Mr. Roberts.

10        THE PANEL MEMBER:  My name is David Roberts, and I

11    live in Jefferson, Texas.  I have three children.

12        I work at Earnest Contracting.  It's a construction dirt

13    work, earthwork.  I've worked there for 29 years.  I attended

14    high school and graduated here in Marshall, Texas, and

15    attended college at Kilgore College.

16        I'm divorced, and I've served on two juries, both

17    criminal.

18        THE COURT:  And where were those juries, sir?

19        THE PANEL MEMBER:  One of them was in Smith County,

20    and the other, it was in Marion County.

21        THE COURT:  All right, sir.  Thank you very much.

22        Next is No. 33, Mr. Montgomery.

23        THE PANEL MEMBER:  I am Kenneth Montgomery.  I have

24    one daughter.

25        Retired two years ago as an industrial painter from

1    General Dynamics.  I have three years of college education.

2        I have never been married, and I have never been called

3    to jury duty.

4            THE COURT:  All right.  Thank you, Mr. Montgomery.

5        Thank you, ladies and gentlemen.  I appreciate that

6    information.

7        I do need to say a couple of things additional to you

8    before I turn the questioning over to the lawyers in this

9    case.

10       The jurors who are actually selected to serve in this

11   case will serve in the role as the judges of the facts, and

12   the jury selected in this case will make the sole

13   determination about what the facts are in this case.  Now, my

14   job as the judge is to rule on questions of law, evidence, and

15   procedure that might arise; to maintain the decorum of the

16   courtroom; and to oversee an efficient flow of the evidence

17   and the trial.

18       Also, I want to say a couple of things to you about our

19   judicial system, and I hope these will put things in a proper

20   perspective for you.  In any jury trial, including this one,

21   besides the parties themselves, there are always three

22   participants--the jury, the judge, and the lawyers.

23       Now, with regard to the lawyers, I think it's important

24   for each of you to understand that our American judicial

25   system is an adversary system, which simply means that during

1    the trial each of the parties will seek to present their

2    respective cases to the jury in the very best light possible,

3    and they will present that through their lawyers.

4         Now, it's no surprise to any of you that lawyers are

5    sometimes generally criticized in the media.  But the Court's

6    observed that a fair amount of that criticism is a result of a

7    basic misunderstanding of our adversary system in which the

8    lawyers act as advocates for the competing parties.  And as an

9    advocate, a lawyer is ethically and legally obligated to

10   zealously assert his or her client's position under the rules

11   of our adversary system.  And by presenting the best case

12   possible on behalf of their clients, the lawyers hopefully

13   will enable the jury to better weigh the relevant evidence to

14   determine the truth, and to arrive at a just verdict based on

15   that evidence.

16        This system, this adversary system of justice, has served

17   our nation well for over 200 years, and America's lawyers have

18   always been, are now, and will be in the future an

19   indispensable part of that process.

20        So as we go forward with this trial, even though it's

21   possible that I might occasionally roll my eyes or frown at

22   the lawyers, it simply means I'm trying to keep them within

23   the boundaries of our adversary system.  But please keep in

24   mind they are simply doing their jobs, and it's important for

25   all of you to understand that as we go forward.

1        Also, ladies and gentlemen, I want you to know that for

2   those of you that are selected on this jury, over the course

3   of this trial I am going to do my very best to make sure that

4   you have no idea about what I think about the evidence,

5   because determining the facts from the evidence in this case

6   is the jury's job and it is not my job as the judge.

7        So you should not, if you're on this jury, you should not

8   take any expressions or comments that you see or think you see

9   or hear or think you hear coming from me as something you

10  should consider in making your decision about the ultimate

11  facts in this case.

12       All right.  At this time, counsel for the competing

13  parties will address the panel.  At this time, Plaintiff's

14  counsel may address the panel.

15       Would you like a warning on your time, Mr. Heartfield?

16            MR. HEARTFIELD:  Five minutes, Your Honor.

17            THE COURT:  All right.  You may proceed when you're

18  ready.

19            MR. HEARTFIELD:  Ladies and gentlemen of the jury,

20  good morning, and I'm glad you made it here on this rainy day.

21  Again, my name is Thad Heartfield.  I represent the Plaintiff,

22  Orange Electronic.  And this morning I'm going to visit with

23  you a little bit about my client, also a little bit about the

24  answers that you provided us in this questionnaire.  But,

25  first, I'd like to start by sharing with you a little bit

1    about myself like you were so kind to do about you.

2         Again, I'm Thad Heartfield.  I live in Beaumont,

3    Jefferson County, Texas, with my wife, Melanie.  We've been

4    married 33 years, and I've been practicing law just about as

5    long.

6         When we first got married, my wife started out teaching.

7    She taught for about five years down there in Beaumont, and

8    then she took the incredibly hard job of raising our growing

9    young family.  And we're blessed with four kids.  They're all

10   in their 20s.

11        My three daughters have all gotten out of college, and

12   they're making their way in the world.  My young son has just

13   completed his first year of college.  And if you know from

14   having grown-up children, a big house is -- we miss the noise.

15   We miss the noise and chaos of having the kids there, but

16   we're doing our best trying to be empty nesters.

17        About five years ago, my wife went back into teaching.

18   When I got out of law school, I went to work for a federal

19   judge as a law clerk down in Beaumont.  His name was Joe

20   Fisher, and my job was to travel with him as he presided on

21   cases from Beaumont to Texarkana and Sherman.  Back in those

22   days, they didn't have a judge in every courthouse.

23        And so I have picked a number of juries for my clients

24   over those years.  I've been called and summoned to serve on

25   juries, but I've never been picked.  I guess lawyers don't

1    want other lawyers judging their cases.  Right?

2         So let me also take a moment of my precious time with you

3    to give you a sincere thank you for showing up today.  As you

4    will learn as the evidence comes in in this case, the dispute

5    is very important to my client.  And on behalf of my client

6    and the people that work at Orange Electric (sic) a very

7    sincere thank you.  I know you have busy lives.  I know you

8    have kids that need tending to, a job that needs to be -- you

9    need to go to or loved ones that need to be taken care of.  So

10   your sacrifice being here is not lost on any of us.

11        I'm going to give you a high-level intro to my case.  And

12   as the Judge told you, this is not the time for me to argue,

13   and I don't want you to think that by this high-level

14   presentation that I don't believe in my case, because I do,

15   but there will be plenty of time in the days to follow to

16   argue the evidence that comes in.

17        Now, my client, Orange Electronic makes one product.

18   They make what we call tire pressure monitoring systems.  You

19   might hear it called TPMS.  It's -- and they've been doing

20   this for 18 years.  My client, Orange Electric (sic), is a

21   Taiwanese company.  It has satellite offices here in the

22   United States.

23        The TPMS system is really a combination of two things.

24   It's what I call an intelligent valve stem that, you know,

25   goes on your tire, and it has a monitor inside the tire that

1    monitors the air pressure that then wirelessly signals to a

2    computer on your car, you know, check your tire, there's a

3    pressure issue.

4        There's also a tool that wirelessly programs that sensor

5    when they install them so that it thinks that -- it can

6    communicate readily with the on-board computer of the car.

7    You're going to learn more about this.

8        So does anybody think that they have an experience or

9    have heard of my client Orange Electronic or specifically

10   their tire sensors?  Okay.

11       Now, the Defendant is a company called Autel Intelligent

12   Technology Corporation.  It is a company of the

13   Republic -- the People's Republic of China.  And Autel makes a

14   number of products.  They make, in addition to these tire

15   sensors and the wireless programming tools, they also make

16   drones and other diagnostic tools for engines.

17       Does anybody think they have heard of Autel or their

18   products?

19       Now, let me tell you a little bit about the case.  As you

20   have gathered from the video and the Judge's introductions,

21   this is a patent infringement case, and it involves one

22   patent.  The number of the patent is 8,031,064.  In patent

23   talk for simplicity, we often refer to the last three numbers.

24   So you'll be hearing the '064 Patent when we talk about this

25   patent that was issued by the United States Patent and

1  Trademark Office to my client.

2      It's our allegation that Autel infringes the inventions

3  claimed in the '064 Patent.  We are basically saying that they

4  are trespassing on our invention that was given to us by the

5  Patent Office.  And Autel denies -- oh, and we also say that

6  they owe us money for that trespass and use of the invention

7  without our permission.

8      Autel denies that they infringe.  They also say that the

9  patent is invalid, and that they don't owe any money.

10      If you decide that the patent is infringed, that it is

11  valid, then you have one last dispute to decide as the jury of

12  the facts, and that is how much money does Autel owe Orange

13  Electric (sic) for that trespass.  We are going to show you

14  that we believe it's a lot at $6.6 million for the past use

15  and then, going forward, there's a reasonable royalty for the

16  future sales.  Autel says it's not that much.

17      Now, I want to talk about a couple of words that we use

18  in the court system, and they're not necessarily the kind of

19  words we want to hear outside of the courthouse, and they're

20  called bias and prejudice.  And, you know, outside the

21  courtroom, it's not really kind words, but in the courtroom

22  what it really means is it's kind of like -- think about it as

23  leaning.  When you're biased or prejudiced, you might be

24  leaning one way before you hear all the evidence.

25      And it's okay to lean a little bit because we all have,

1   you know, personal experiences--Right?--out in the real world

2   with companies and people and products and sports teams and

3   things that make us lean a little bit.

4        But what I'm really interested in and what we want to try

5   to find out is, are you leaning so hard that you can't be open

6   to the evidence, you can't be open to the facts that come out.

7   And so you might be thinking, you know, I received the

8   summons, I was filling out that questionnaire, and I want to

9   be fair to both parties in the case.  But something about your

10  personal experience, your leanings, might be telling you that

11  maybe this isn't a case for you.  And that's what I want to

12  explore.

13       I want to explore like maybe there's a personal injury

14  suit or a timber dispute or maybe a contract dispute that you

15  think, that would be where I would like to exercise my civic

16  duty but maybe not in this case.

17       So, for example, maybe you know somebody in the

18  courtroom, and I'll go back through.  My team, I don't see

19  anybody here that I know and you probably don't know me, but

20  again, my team is John Rabena, William Mandir, and Carl

21  Pellegrini, and our corporate rep, Mr. Yu.

22       I assume nobody knows these people.  Right?  Okay.

23       Now, the Defendant is Autel, and they are represented by

24  three law firms.  They are represented by a firm out of

25  Washington, D.C., by the name of Mayer Brown.  They're also

1    represented by a firm out of Chicago by the name of Arch Lake,

2    and they're also represented by a law firm out of Texarkana,

3    the Patton Tidwell & Culbertson firm.

4        Does anybody know those firms or think that you or your

5    family members have been represented by anybody at those

6    firms?  Okay.

7        From those three firms, they have nine lawyers that are

8    representing Autel--Gary Hnath, Mr. James Fussell, Bryan Nese,

9    Clark Bakewell from the Mayer Brown firm.  Anybody think they

10   know them?  Thank you.

11       And the other lawyers with the Arch & Lake firm are Hao

12   Tan, Shen Wang, Peter Curtin, and Christopher Fahy.  Does

13   anybody know those lawyers?

14       Jeff Culbertson is the lawyer from Texarkana with Patton

15   Tidwell & Culbertson.  Does anybody think that they've been

16   represented by him or one of the members of their firm or

17   somebody in your family may have been represented by the

18   Patton law firm?

19       I'd like to talk to you a little bit about lawsuits and

20   how you view lawsuits.

21       And from the questionnaire, I think I saw that, Mr.

22   Kelley, in your -- good morning.  How are you?  In your

23   questionnaire, I think you had an opinion, a strong opinion

24   about lawsuits and the people that bring them.  Am I correct

25   on that?

1          THE PANEL MEMBER:  I mean, I don't know if I'd say

2   strong.  I think there's a lot of things, especially

3   product-wise, that the companies get sued for that seem to be

4   common sense things, that these lawsuits kind of seem

5   frivolous.

6          MR. HEARTFIELD:  Yeah.  Is there anything about that

7   leaning or that view that makes you think that, you know, I'm

8   going to have a problem being fair to both parties in this

9   case and listening to the facts and the evidence?

10          THE PANEL MEMBER:  No, sir, not in regards to patent

11   law.

12          MR. HEARTFIELD:  Okay.  Thank you very much.

13      Is there anybody else in the box that believes they have

14   a strong opinion about lawsuits in general and that we

15   probably need to talk about?

16      Anybody out in the gallery?

17      Okay.  Thank you.

18      Mr. Maxwell, now I don't think you said you had a strong

19   opinion, but you were kind of unsure.  Is that -- am I correct

20   on that?

21          THE PANEL MEMBER:  What now?

22          MR. HEARTFIELD:  That you were unsure about whether

23   you had a strong opinion about lawsuits or the people that

24   bring them.  Did I get that right?

25          THE PANEL MEMBER:  No, I don't have a strong

1    opinion.

2           MR. HEARTFIELD:  Okay.  Thank you much.

3        Mrs. Sheffield, good morning.  How are you?

4           THE PANEL MEMBER:  Fine.

5           THE COURT:  And, counsel, if you would also call out

6    their numbers, that will help the Court Security Officers know

7    which one.

8           MR. HEARTFIELD:  Mrs. Sheffield is No. 23.  Thank

9    you.  Are we working?

10          THE PANEL MEMBER:  Yes.  I just don't think suing's

11   right.  It's in the Bible that we shouldn't, and I just don't

12   think it's right.

13          MR. HEARTFIELD:  Is that a belief you hold so dear

14   that you think you would not be able to decide this case on

15   the facts that are presented?

16          THE PANEL MEMBER:  I really don't know.  I can't say

17   one way or another.  I don't -- you know --

18          MR. HEARTFIELD:  Okay.

19          THE PANEL MEMBER:  I don't know.

20          MR. HEARTFIELD:  Thank you very much.  I appreciate

21   it.

22          THE PANEL MEMBER:  Yes.

23          MR. HEARTFIELD:  Mr. Waldon, and you are No. 17.

24          THE PANEL MEMBER:  Yes, sir.

25          MR. HEARTFIELD:  Good morning.  How are you?

```
 1            THE PANEL MEMBER:  Good morning.  Fine.  How are
 2    you?
 3            MR. HEARTFIELD:  You mentioned you had prior jury
 4    service.  Right?
 5            THE PANEL MEMBER:  Yes, sir.
 6            MR. HEARTFIELD:  And I think you even mentioned you
 7    were the foreperson on that jury or one of them?
 8            THE PANEL MEMBER:  I was.
 9            MR. HEARTFIELD:  How did that come to be.  Did you
10    draw a short straw?
11            THE PANEL MEMBER:  No.  It was just where I got
12    seated, so...
13            MR. HEARTFIELD:  Okay.  Thank you very much.
14    Anything about that experience that would --
15            THE PANEL MEMBER:  I will say that, you know, it's
16    easy on the outside to, you know, we should have gave them 30
17    years.  But until you're in that box and you draw that
18    conclusion, it hits home a little bit harder than what you
19    would realize.
20            MR. HEARTFIELD:  So it kind of makes me think that
21    you were listening to the evidence and everything presented to
22    you when you had to make that final determination?
23            THE PANEL MEMBER:  Yes, sir.
24            MR. HEARTFIELD:  Thank you very much.
25         Mrs. Eddington, I think -- No. 22.
```

```
 1                    THE PANEL MEMBER:  Yes.

 2              MR. HEARTFIELD:  You also had some jury service?

 3                    THE PANEL MEMBER:  Yes, sir.

 4              MR. HEARTFIELD:  I saw you were also the foreperson?

 5                    THE PANEL MEMBER:  No, I don't think I was

 6    foreperson.

 7              MR. HEARTFIELD:  Okay.  Okay.  Anything about that

 8    experience that would impact how you serve if picked on this

 9    case?

10                    THE PANEL MEMBER:  I felt like I was the one that

11    held out.  I was more empathetic, you know, because the

12    guy -- it was also a drug-related, but he had mental issues,

13    and so -- and I didn't think that I would be that one, but I

14    was.

15              MR. HEARTFIELD:  Thank you very much.  I appreciate

16    it.

17         Mr. Hatten, No. 4.  Good morning.  How are you doing?

18                    THE PANEL MEMBER:  Fine.

19              MR. HEARTFIELD:  I saw on your questionnaire that

20    you thought you had knowledge of the Defendant Autel and you

21    said, you know, that you had maybe a favorable view of them

22    or -- it looked like maybe it was mistaken, though.

23                    THE PANEL MEMBER:  It must have been a mistake.

24              MR. HEARTFIELD:  Okay.  Yeah.  Because you didn't

25    know any of the products --
```

1          THE PANEL MEMBER:  No.

2          MR. HEARTFIELD:  -- or anything like that.

3          THE PANEL MEMBER:  No, I did not.

4          MR. HEARTFIELD:  Thank you very much.

5      So I'd like to talk to you a little bit about another

6  concept that comes up in this trial specifically.  And the

7  Defendant Autel is saying that the '064 Patent is invalid.

8  And I hear a lot of people talk about government, government

9  agencies, a lot of people think, you know, the government and

10  agencies can do no right, and they have such a strong feeling

11  that, you know, they just can't trust in our government.

12      Now, the agency that issued this patent is a government

13  agency, the U.S. Patent and Trademark Office, and what I want

14  to know is this:  The Judge, I believe, will instruct you at

15  the appropriate time that when the Patent Office issues a

16  patent that is in litigation, it is entitled to what we call a

17  presumption of validity--that you first start out with

18  presuming that it is valid.  And so he will instruct you that

19  that's how you start out.  And that's why their burden to

20  invalidate the patent is higher than our burden to prove

21  infringement.  Their burden, again, is clear and convincing

22  evidence.

23      So I want to know, does anybody in the jury box right

24  now, No. 1 through 14, have such a strong leaning against

25  governments, that you would have trouble following the Judge's

 1      instruction on the presumption of validity?  Nobody?  Thank

 2      you.

 3           How about in the gallery?  Do you remember my question?

 4      Do you feel so strongly against governments that you wouldn't

 5      be able to follow the Judge's instruction on presumption of

 6      validity?  Anybody?  Thank you very much.

 7           Our first witness in the case is going to be Mr. Yu, and

 8      he is going to be testifying from the stand right there under

 9      oath with the aid of an interpreter.  He is going to be

10      testifying in his most comfortable language of Mandarin.

11           And what I want to know is, knowing that, does anybody

12      think that they would have trouble giving him the same

13      credibility in presentation of his testimony because he's

14      testifying in Mandarin as opposed to somebody who is

15      testifying in English?  Does anybody think they're going to

16      have a problem with that?

17           In the box, I see a lot of shaking of heads no.  Out in

18      the gallery, would anybody have a problem with that?  Thank

19      you very much.

20           Mr. Rust, you're No. 8.  Tell me again, where did your

21      wife work as a legal assistant or secretary?

22               THE PANEL MEMBER:  For Nix Law Firm.

23               MR. HEARTFIELD:  Do you know what kind of work she

24      worked on?  What kind of cases?

25               THE PANEL MEMBER:  I think it was asbestosis.

```
 1              MR. HEARTFIELD:  Yeah.  Anything about that that you

 2    think would impact your ability?

 3              THE PANEL MEMBER:  No, no.

 4              MR. HEARTFIELD:  Thank you, Mr. Rust.

 5        Miss Singleton, you're No. 15?

 6              THE PANEL MEMBER:  Yes.

 7              MR. HEARTFIELD:  You work for the court system.

 8              THE PANEL MEMBER:  Yes, I work for the City of

 9    Marshall municipal court.

10              MR. HEARTFIELD:  Yeah.  Anything about that that

11    thinks would interfere with your ability to be fair to both

12    parties here?

13              THE PANEL MEMBER:  No, it won't.

14              MR. HEARTFIELD:  Yeah.  I also saw you were a -- you

15    had an IT, intellectual technology, degree.

16              THE PANEL MEMBER:  Yes.

17              MR. HEARTFIELD:  Do you think you're the kind of

18    person at work or home that everybody comes to to change the

19    settings in their phone or work on their computers?

20              THE PANEL MEMBER:  No.  That was 20 years ago, so

21    times have changed.

22              MR. HEARTFIELD:  Yeah.  Thank you very much.

23        In the box, I'll ask you a similar question.  Is there

24    anybody in the jury box right now that, you know, you're that

25    guy or that lady at home where everybody comes to you with
```

1    their technical questions?  You know, sync my TV, my phone.

2        Yes, ma'am.  Ms. Schafer?  Mrs.  I'm sorry.

3            THE PANEL MEMBER:  Yes, Mrs. Schafer.

4            MR. HEARTFIELD:  Yeah.  And tell me about that.

5            THE PANEL MEMBER:  I grew up in the time when and in

6    a place where there was nothing to do unless you stayed at

7    home and played your video games.  So I am the person that

8    knows how to break video games and test the bugs and figure

9    out how to fix things and make things work in ways they're not

10   supposed to work.  Yeah, I'm dangerous.

11           MR. HEARTFIELD:  Do you have a fair understanding of

12   circuitry and electronic --

13           THE PANEL MEMBER:  Fair.

14           MR. HEARTFIELD:  Okay.

15           THE PANEL MEMBER:  More so programming and -- and

16   software.

17           MR. HEARTFIELD:  Do you think would that interfere

18   with your ability to start out with a clean slate and listen

19   to the evidence on any technology that is presented during the

20   facts of this case?

21           THE PANEL MEMBER:  Oh, I know absolutely nothing

22   about tire sensors.

23           MR. HEARTFIELD:  Thank you very much.  I appreciate

24   it.

25       How about in the box, does anybody have maybe a job or a

1    hobby that you would describe as requiring a high level of

2    attention to detail?

3         Yes, ma'am.  No. 5, Miss Pemberton.

4              THE PANEL MEMBER:  I mean, my job at work, I have to

5    pay attention to every little hair on the dog because we have

6    picky customers that we won't get paid for if they don't like

7    it.

8              MR. HEARTFIELD:  Yeah, I totally understand that.

9    They're the babies.  Right?

10             THE PANEL MEMBER:  Yes.

11             MR. HEARTFIELD:  Okay.  Thank you.

12        Anybody else?  Yes.  Mr. Kelley, No. 1.

13             THE PANEL MEMBER:  As a special education teacher,

14   just the amount that we have to observe students on a

15   individual basis, the amount of paperwork that we have to fill

16   -- the legal paperwork that has to be documented, the data

17   that is tracked, all those kind of things are inherent in our

18   jobs in order to be successful.

19             MR. HEARTFIELD:  I appreciate it.  Thank you.

20        Anyone else?  Yes.  No. 2, Mr. Huggins?

21             THE PANEL MEMBER:  Yes, sir.  I'm the quality

22   manager, and so I have to pay attention to all the details

23   before we ship them out to the customers.

24             MR. HEARTFIELD:  Okay.  Thank you.

25        No. 12, Mr. Vrooman?

1          THE PANEL MEMBER:  At Coastal Chemical we haul, like

2     I said, various chemicals.  If we mix any of them, well, it

3     could be a bad day for everybody.  We have to make sure we get

4     the right chemical in the right tank.  If we don't, everybody

5     can't go home.

6          MR. HEARTFIELD:  Okay.  Thank you very much.

7        Now, other than you, Mr. Vrooman and Mr. Bradshaw, y'all

8     work at the same place, but y'all didn't know each other

9     before.

10          THE PANEL MEMBER:  I'm in a different area --

11          MR. HEARTFIELD:  Yeah.

12          THE PANEL MEMBER:  -- and I don't handle any

13     chemicals like that.  I'm in transportation and purchasing.

14          MR. HEARTFIELD:  Okay.  And like these two

15     gentlemen, now that you've been in this room together looking

16     around, does anybody think that you know anybody else from --

17     from the outside world?

18        Yes, ma'am.  We have No. 5.  Keep your hands up for a

19     second.  No. 5, 19, 23, 18.  Okay.  Let's start with you,

20     please.

21          THE PANEL MEMBER:  Mrs. Carey, her husband was my

22     elementary principal.

23          MR. HEARTFIELD:  Mrs. Carey?  Okay.  Anything about

24     that, if you're both selected on the same jury, that would

25     prevent each of you from -- yes, Mr. Rust?  It wouldn't

```
 1    prevent --
 2              THE PANEL MEMBER:  I do know somebody.
 3              MR. HEARTFIELD:  Okay.
 4              THE COURT:  You have five minutes remaining,
 5    counsel.
 6              MR. HEARTFIELD:  Thank you, Judge.
 7        Mr. Rust?
 8              THE PANEL MEMBER:  I played basketball in school
 9    with Mr. Hatten.
10              MR. HEARTFIELD:  Uh-oh.  Are you all still on the
11    team?
12              THE PANEL MEMBER:  No.
13              MR. HEARTFIELD:  Nothing about that that would --
14              THE PANEL MEMBER:  I can't run anymore.
15              MR. HEARTFIELD:  I hear you.  I hear you.
16        Yes.  Way in the back, that's No. 33, Mr. Montgomery.
17              THE PANEL MEMBER:  I also know Ronald Hatten.  He
18    and I are cousins.
19              MR. HEARTFIELD:  Okay.  Thank you.
20        I have just a few more minutes left, and I have one last
21    question, and this is kind of like a softball for you.
22        You know that I'm looking for a fair jury, a jury that
23    can be fair to both sides, and you're thinking to yourself,
24    you know, Mr. Heartfield should have asked me that one
25    question, he'd have known something.  He'd have known
```

1     something that was important to both of the parties.

2          Is there anybody in the box that thinks that if there's

3     something I failed to ask that you'd like to share.

4          Yes.  And that's No. 13, Mr. Bradshaw.

5               THE PANEL MEMBER:  25 years ago I sought counsel

6     because I had an idea that I thought deserved to be a patent,

7     and the counsel -- I was educated a bit and found that my idea

8     could be legally changed a bit while maintaining the idea and

9     someone with more abilities financially could take it.

10              MR. HEARTFIELD:  Okay.  And does that sour you in

11    any way to hear the evidence in this case?

12              THE PANEL MEMBER:  Well, it's just -- I feel it's

13    factual that if you have more financial abilities, you're

14    stronger legally.

15              MR. HEARTFIELD:  Thank you much.  Anyone else?

16         So you see, in this -- yes, are you raising your hand,

17    Mr. Ivery?  No. 18.

18              THE PANEL MEMBER:  Yeah.  My sister and I, she

19    developed bikers' menstrual pants, you know.  And like he

20    said, because we didn't have the money to carry it forward --

21              MR. HEARTFIELD:  Yeah.

22              THE PANEL MEMBER:  -- a couple of years ago, then we

23    see those same pants, you know, on the market.  And it kind of

24    hurts.  It really does.

25              MR. HEARTFIELD:  That stung.  I understand.

1    So, ladies and gentlemen, this is a trespass case.

2  Unlike somebody trespassing on your land or in your house

3  where you could call the police and get them out, the Patent

4  Office doesn't have that system.  So when we -- when a company

5  thinks someone is trespassing, the only way to do it is to

6  bring it to court to prevent that trespass.

7    You'll be the first people to hear this case, and we are

8  looking forward to presenting it to you.  I thank you for your

9  time.  My team looks forward to presenting the evidence in the

10  next couple of days to the people that are chosen on this

11  case.

12    Your Honor, thank you.

13    THE COURT:  All right.  Defendants may now present

14  their questions to the jury panel.

15    Mr. Culbertson, would you like a warning on your time?

16    MR. CULBERTSON:  Yes, Your Honor.  If you could warn

17  me at 6 and 2 minutes, if possible.

18    THE COURT:  I'll warn you with 6 and 2 minutes

19  remaining.  You may proceed.

20    MR. CULBERTSON:  Thank you very much.

21    Good morning, ladies and gentlemen.  Again, you probably

22  don't remember from when I spoke a while ago, my name is Geoff

23  Culbertson, and I'm one of the lawyers that's representing

24  Autel.  And we're proud to be here with this team to represent

25  Autel in this case.

1    I have lived and worked in Texarkana since 2005.  I'm

2    married to Maggie.  She's a recovering teacher right now, and

3    we have three kids--19, 18, and 14.  So you got a pretty good

4    idea of what I'm doing when I'm not working.

5    We -- I have never had the privilege of serving on a

6    jury.  I've been called several times but never chosen.  So I

7    think you know about as much about me as we heard from you

8    this morning.

9    Thank you for being here.  Thank you for on behalf of the

10    legal team.  Thank you on behalf of Ms. Huang and Autel.  It's

11    an important case to Autel.  They brought a support team from

12    halfway across the world that will be here for this trial

13    because it means a lot to them.  And so we very much

14    appreciate your service in showing up today and being willing

15    to serve.

16    Real briefly about Autel, they are a manufacturer of

17    automotive diagnostic tools.  They include tire pressure

18    monitoring systems, the products that this case is about.

19    Autel sells their products in 50 countries around the world

20    through distributors and through retailers.

21    And I'm going to not talk about the facts of the case

22    right now much except to say Autel disputes that it infringes

23    this patent.  It doesn't at all believe it infringes its

24    patent.  It believes its products are different.  They don't

25    read all the claims of the patent, and we think the patent's

1    invalid.

2        We think when you hear the evidence, ladies and

3    gentlemen, you'll agree and you'll agree that no damages are

4    appropriate in this case.

5        I heard everyone say that no one had heard of Autel or

6    Orange before today.  Is that right?  If I'm wrong, would you

7    raise your hand?

8        I want to ask you about a different company.  Has anybody

9    heard of the Bosch company?  I'm seeing some heads -- Bosch.

10   Okay.  Could you raise your hands?  Mr. Kelley, Mr. Bradshaw,

11   Ms. Siler, Mr. Lewis, a bunch of folks.

12       Mr. Kelley, would you mind standing up?  Thank you, sir.

13            THE PANEL MEMBER:  I heard about Bosch, Bosch

14   mixers.  My mom was a big baker, and she had to have a Bosch.

15   And then I also worked for Lowe's, and we sold like Bosch

16   dishwashers, appliances, things of that nature.

17            MR. CULBERTSON:  Thank you.  Thank you.

18       Mr. Bradshaw, did I see you raise your hand?

19            THE PANEL MEMBER:  I'm just familiar with the label.

20   It's very famous.

21            MR. CULBERTSON:  Okay.  Anyone have more familiarity

22   with the Bosch company or just sort of familiar with it

23   generally because it's a big company that you've heard about?

24   Anyone know more about the company than that?  Okay.

25       Mr. Bradshaw, since the microphone is near you, could I

1    speak with you a moment?

2        You mentioned in your juror questionnaire that you had

3    strong feelings about companies from China.  Do you recall

4    that?

5            THE PANEL MEMBER:  Well, America is -- the PRC is

6    all over the news.  I mean, we're politically adversaries.

7            MR. CULBERTSON:  Right.

8            THE PANEL MEMBER:  That's really it.  It's not

9    about -- some of the questionnaires didn't really -- I wasn't

10   able to answer as specifically as my thoughts were, but it's

11   more politics than companies and products.

12           MR. CULBERTSON:  Okay.  Let me ask you, are you

13   suspicious of China?

14           THE PANEL MEMBER:  I'm suspicious of everyone.

15           MR. CULBERTSON:  That's probably smart.  But do you

16   have particular concerns or suspicions about -- about China or

17   Chinese companies?

18           THE PANEL MEMBER:  Not Chinese companies.

19           MR. CULBERTSON:  Okay.

20           THE PANEL MEMBER:  Not even Tik Tok.

21           MR. CULBERTSON:  Okay.  You mentioned, though, on

22   your questionnaire that everything there is government-owned.

23   Right?

24           THE PANEL MEMBER:  Seems to be.

25           MR. CULBERTSON:  Okay.  And so it's because there's

1    that connection between the government and the countries, Tik

2    Tok, for example?

3            THE PANEL MEMBER:  Yes.  But I've been educated that

4    a little bit on that.  I am concerned for Taiwan.

5            MR. CULBERTSON:  Okay.

6            THE PANEL MEMBER:  So --

7            MR. CULBERTSON:  Let me ask you about that.  In a

8    credibility race between a company from Taiwan and a company

9    from China, does the company from Taiwan start out a little

10   bit ahead because of your concerns?

11           THE PANEL MEMBER:  Yes.

12           MR. CULBERTSON:  Okay.  You feel pretty strongly

13   about that?

14           THE PANEL MEMBER:  I feel that one's working on

15   being a democracy and one is the opposite.

16           MR. CULBERTSON:  Okay.  But as you sit here today

17   before hearing any evidence, the company from Taiwan would

18   have a lead in terms of credibility in your favor.  Is that

19   right?

20           THE PANEL MEMBER:  Not over the facts of the case.

21           MR. CULBERTSON:  Okay.  I heard you also -- I recall

22   that you also indicated in your questionnaire, Mr. Bradshaw,

23   that you agreed that patents protect innovation.  Is that

24   right?

25           THE PANEL MEMBER:  Yes.

1          MR. CULBERTSON:  This is a patent infringement case.

2    My client's from China.  They're accused of infringing a

3    patent.  Given your feelings about patents and their

4    importance, does the patent holder start out a little bit

5    ahead in your mind?

6          THE PANEL MEMBER:  Yes, they would.

7          MR. CULBERTSON:  Okay.  Thank you.

8          THE PANEL MEMBER:  It's very similar to a sports

9    replay in that one side has the benefit of the doubt going in,

10   even made that comment.

11         MR. CULBERTSON:  Okay.  I appreciate your comments.

12      Who else feels like Mr. Bradshaw does?  Mr. Maxwell?

13         THE PANEL MEMBER:  Yes.

14         MR. CULBERTSON:  Mr. Maxwell, same question.  In

15   terms of if we're starting a race, we've got Orange from

16   Taiwan and Autel from China, is Orange going to start out

17   ahead?

18         THE PANEL MEMBER:  No, I'm kind of like him.  I

19   watch the news and everything, too, and I'm for democracy.

20         MR. CULBERTSON:  Okay.  You have concerns?

21         THE PANEL MEMBER:  Do you know what I'm saying?

22         MR. CULBERTSON:  You have concerns about --

23         THE PANEL MEMBER:  You're asking me that I might

24   lean a bit towards Taiwan?  Maybe so.

25         MR. CULBERTSON:  Okay.  Thank you, Mr. Maxwell.

```
 1              THE PANEL MEMBER:  Yes, sir.

 2              MR. CULBERTSON:  I appreciate your honesty.

 3        And that's what we're here to talk about, you know.  Now

 4    is the time.  Voir dire means speak the truth, and now is the

 5    time to air these things because we're not going to talk about

 6    them again.

 7        Mr. Huggins, No. 2.  Is that right?

 8              THE PANEL MEMBER:  I'm just a friend of the little

 9    guy.  And so I do put the small guy from Taiwan ahead of the

10    other company.

11              MR. CULBERTSON:  Okay.  And you feel strongly about

12    that?

13              THE PANEL MEMBER:  Yes, sir.  All my life.

14              MR. CULBERTSON:  Your whole life?

15              THE PANEL MEMBER:  Yep.

16              MR. CULBERTSON:  Thank you.  I appreciate that.

17        Who else?  Again, now's the time to air these things,

18    ladies and gentlemen, because we're trying to find -- oh, I

19    see in the back -- could you raise your hand again, please?

20    No. 26?  No.  Sorry.

21              THE PANEL MEMBER:  27.

22              MR. CULBERTSON:  No. 27?

23              THE PANEL MEMBER:  Yes, sir.

24              MR. CULBERTSON:  Mr. Anderson.

25              THE PANEL MEMBER:  Yes, sir.  My philosophy is I do
```

1    not buy anything from China --

2            MR. CULBERTSON:  Okay.

3            THE PANEL MEMBER:  -- if I can keep from it.

4            MR. CULBERTSON:  What's your reasoning for that?

5            THE PANEL MEMBER:  I have various reasons.  One is

6    human rights issues.  Another is quality issues.  With my

7    experience, they haven't been -- quality of products from

8    China are not what you can get other places.

9            MR. CULBERTSON:  Would it make it difficult to get

10   that out of your head if you were to sit on a jury in a case

11   like this?

12           THE PANEL MEMBER:  Yes, sir.

13           MR. CULBERTSON:  Okay.  Thank you very much.  I

14   appreciate that.

15       Who else feels like Mr. Anderson?  Do I see some hands in

16   the back?  Mr. 33 -- I'm sorry, No. 33, Mr. Montgomery.

17           THE PANEL MEMBER:  Yes.  I have issues with quality

18   products from China also.  I try to -- like he, I try to avoid

19   parts that are made in China.

20           MR. CULBERTSON:  Would it make it difficult for you

21   to be impartial to a company from China that's been --

22           THE PANEL MEMBER:  I would say no.

23           MR. CULBERTSON:  -- accused of patent infringement?

24           THE PANEL MEMBER:  I would say no.

25           MR. CULBERTSON:  Okay.  Thank you.  I appreciate

1    that.

2        Anyone else have strong feelings or concerns about China

3    or the fact that Autel is based in Shenzhen, China.

4    Thank you.  I appreciate that, ladies and gentlemen.

5        Mrs. Carey, No. 19.  May I ask you a question?

6            THE PANEL MEMBER:  Okay.

7            MR. CULBERTSON:  It may have been an oversight, but

8    I noticed on your questionnaire that you just didn't answer

9    that question whether you had strong feelings about companies

10    from China?

11            THE PANEL MEMBER:  Oh, oversight.  It's hard to say.

12    I'm not familiar with these types of products and who does

13    what when where.  I do know that when I'm shopping and trying

14    to purchase things, and it's not even necessarily just

15    Chinese, it's more -- and this may sound horrible and I'm

16    sorry, I try to look for labels that say Made in America just

17    because I try to think about -- I don't live there so I don't

18    know what it's like over there.  But I live here and I know

19    what it's like here, and so I just try to -- I don't know how

20    to put it into words exactly.

21            MR. CULBERTSON:  Well, I appreciate you sharing

22    that.  Let me ask you another question.  Do you consider

23    yourself more of a detailed-oriented person or a big picture

24    kind of person?

25            THE PANEL MEMBER:  It depends on the situation.

1           MR. CULBERTSON:  Okay.

2           THE PANEL MEMBER:  At school, and like I said, mid

3   life change of career, I have to be very detail-oriented, but

4   I have to look at the big picture to see what details I need

5   to focus on in which order, if that makes sense.

6           MR. CULBERTSON:  It does.  It does.  Thank you.

7   Thank you.

8       This case is going to involve a lot of details.  I think

9   that the Court will instruct you that for Orange to prove

10  patent infringement, they're going to show you patent claims

11  with a lot of words.  And they have to show that every single

12  one of those words is present in the products that it's

13  accusing for there to be infringement.  So the details are

14  going to be critical.

15      And so in the jury box -- I think Mr. Heartfield may have

16  asked this question, and I apologize, I'd like to ask it

17  again, who considers themselves a detail-oriented person as

18  compared to more of a big picture person?  Mr. Kelley, Mr.

19  Huggins, Mrs. Schafer.  No. 12, Mr. Vrooman.  Is that right?

20      Okay.  Mrs. York, No. 14, again, same question to you and

21  it may have been an oversight, but I noticed on your

22  questionnaire there wasn't an answer to the question about

23  whether you had strong feelings about companies from China.

24  Was that an oversight or did you --

25          THE PANEL MEMBER:  It was just an oversight.  I do

1    not have any strong feelings against anything.

2            MR. CULBERTSON:  Okay.  Thank you very much.

3        Ms. Taylor is not here.  Is that right?  All right.

4        Mrs. Ingalls, No. 24, I have the exact same question that

5    I just asked.  It looked like the answer to the question about

6    whether you had strong feelings about companies from China was

7    unanswered.  Was that an oversight --

8            THE PANEL MEMBER:  It must have been.  I did it this

9    morning.  They said they didn't get my questionnaire, so it

10   must have been.

11           MR. CULBERTSON:  I understand.  What are your

12   feelings about companies from China?

13           THE PANEL MEMBER:  I don't necessarily look for

14   labels that don't say that.  I just shop.

15           MR. CULBERTSON:  Okay.  Any concerns --

16           THE PANEL MEMBER:  I don't have feelings one way or

17   the other.

18           MR. CULBERTSON:  Thank you.  I appreciate that.

19       Mrs. Schafer, can I speak with you a moment?

20           THE PANEL MEMBER:  Certainly.

21           MR. CULBERTSON:  Thanks.  I didn't catch your

22   employer's name when you mentioned it?

23           THE PANEL MEMBER:  Oh, boy.  I am a remote customer

24   service representative for a company called Shinesty.  It is a

25   clothing company based out of Denver, Colorado.

1        MR. CULBERTSON:  Okay.  And I think you mentioned

2   that they may hold some patents and other intellectual

3   property rights?

4        THE PANEL MEMBER:  Yes.  So our flagship products --

5   and if you-all laugh, it's fine.  I'm used to it.  We sell

6   ball hammock pouch underwear.  And this is an interesting

7   product because there are several similar designs by other

8   companies.

9        So prior to my tenure at the company, they told us, oh,

10  hey, so there's been -- there's been trademark cases and we

11  have had some patent cases about our product being unique

12  enough to be sold under our name and by us.  And it is a small

13  company so they are fiercely proud of their patents and their

14  trademarks.

15       MR. CULBERTSON:  Okay.  How does that experience and

16  that knowledge sort of affect your views as you sit here

17  today?

18       THE PANEL MEMBER:  I think I actually walked in here

19  with a little bit of interest in both sides.  As our product

20  is a similar design and similar in function to products

21  offered by other companies, I'm aware of how detailed a patent

22  must be and how unique it must be to be sold.

23       And I'm also aware of how carefully and how important it

24  is to maintain the rights of your own property.  We're a small

25  company, as I mentioned.  Despite the fact that I get to live

1    and work in Texas and they are based out of Colorado, we have

2    65 employees for a multi-million dollar international

3    business.  So we're very careful with how we conduct

4    ourselves.  And even down to the lowest rank of customer

5    service phone jockey, we are very protective of our brand and

6    very cognizant of how we handle ourselves and how we discuss

7    our product.

8            MR. CULBERTSON:  Let me ask you this.  Does your

9    experience and knowledge in that area put -- put Orange a

10   little bit ahead in the race today before we've heard any

11   evidence?

12           THE PANEL MEMBER:  Slightly, because, again, smaller

13   company, if something happened to our patent or our trademark

14   was affected and we could no longer sell the product that

15   keeps us in business, well, we'd all be finding something else

16   to do.

17           MR. CULBERTSON:  Did you learn this morning in the

18   patent video that a jury can actually invalidate a patent?

19           THE PANEL MEMBER:  I was tertiary aware of that,

20   yes.

21           MR. CULBERTSON:  Okay.  What are your feelings about

22   that, given your knowledge and your experience and your

23   relationship with your company?

24           THE PANEL MEMBER:  Innovations always happen, and

25   new applications for a product always happen.  Things are

1  always changing and products are always been being innovated.

2  So things happen, things move on, and sometimes older products

3  do get left behind.

4          MR. CULBERTSON:  Okay.  Do you know if your company

5  has any licenses to the patents that it holds?

6          THE PANEL MEMBER:  I believe we do have a license to

7  our pouch design, and the thing I have to deal with mostly is

8  the trademark.

9          MR. CULBERTSON:  Okay.  It wasn't a great question I

10  asked and I apologize.  Do you know if any other companies

11  have paid to take a license to use the patent or the other

12  marks that your company has?

13          THE PANEL MEMBER:  Not on ours, but I believe --

14  again, prior to my starting at the company, I believe that we

15  had to face a case where other companies were concerned that

16  we might be infringing on their design.

17          MR. CULBERTSON:  Okay.  So your company has seen

18  both sides of this coin?

19          THE PANEL MEMBER:  Uh-huh.

20          MR. CULBERTSON:  Great.  Thank you.  I appreciate

21  that very much.

22      Mr. Ivery, I think I heard you testify -- well, excuse

23  me, not testify.  I heard you speak about your experience

24  maybe with a family member in developing a product, and I

25  think I recall seeing on your questionnaire that you had very

1    strong feelings about patents protecting innovation.  Is that

2    fair to say?

3              THE PANEL MEMBER:  Yeah, yeah.

4              MR. CULBERTSON:  Okay.

5              THE PANEL MEMBER:  We did one right here in

6    Marshall, Texas, and we thought we had it, and like I said, we

7    were very excited about it.  And we never did -- they never

8    did just get back with us.  And like I said, a couple of three

9    years ago then we see what we had put together on the market.

10   Yeah, it hurts.

11             MR. CULBERTSON:  I understand.  Given that and given

12   that my client is accused of infringing a patent that Orange

13   owns, does Orange start out a bit ahead today?

14             THE PANEL MEMBER:  I'm going to leave that alone.

15   I'm just going to leave that alone, and we'll see what

16   happens.

17             MR. CULBERTSON:  Okay.  So is the answer, no, they

18   are starting out the same?

19             THE PANEL MEMBER:  Yeah.

20             MR. CULBERTSON:  Okay.  Thank you.  Appreciate that.

21        Mr. Rust, can I speak with you a moment?

22             THE PANEL MEMBER:  Yes.

23             MR. CULBERTSON:  Thank you.  You mentioned that your

24   wife worked at the Nix Law Firm.  Was it only on asbestos

25   work?  Because they do patent infringement work as well.

1          THE PANEL MEMBER:  No, not to my knowledge.  She was

2    involved only in asbestosis and mesothelioma, I think.

3          MR. CULBERTSON:  Representing plaintiffs?

4          THE PANEL MEMBER:  Yes.

5          MR. CULBERTSON:  All right.  Given that experience,

6    do you have any leanings toward the Plaintiff as just a

7    natural consequence of your experiences?

8          THE PANEL MEMBER:  Even.

9          MR. CULBERTSON:  Even.  Thank you.  I appreciate

10   that.

11      Ms. Mayeaux, No. 21, may I speak with you?

12         THE PANEL MEMBER:  Yes.

13         MR. CULBERTSON:  Thank you.  Do you consider

14   yourself a detail-oriented person or more of a big picture

15   person?

16         THE PANEL MEMBER:  I've been teaching Braille for 33

17   years, and there are lots of details that make your brain hurt

18   and your eyes run where they get -- anyway, yes, by the nature

19   of my job in special education, as Mr. -- that guy said.

20         MR. CULBERTSON:  Mr. Kelley.

21         THE PANEL MEMBER:  You know, we write legal

22   documents up all the time, and we -- you know, we do our best.

23   And then they tell us we're wrong, and then we try it another

24   way.  Lots of details in our work, and so, yes, lots of

25   details.

1          MR. CULBERTSON:  Okay.  Thank you very much.  I

2     think that I saw in your questionnaire that you felt pretty

3     strongly that patents are important to protecting innovation.

4     Is that right?

5          THE PANEL MEMBER:  It was a couple of weeks ago, but

6     sure.

7          MR. CULBERTSON:  Okay.  Where does that belief come

8     from?  What's your experience about that?

9          THE PANEL MEMBER:  I just think if somebody comes up

10    with an idea and creates something, that they should have the,

11    you know -- I just would hate to see someone, you know, have

12    their idea stolen.  I'm one of those, you know, fair kind of

13    people.  I like for things to -- and I like -- having worked

14    with children with disabilities, I like for them to get a fair

15    shake at life, too, so...

16         MR. CULBERTSON:  Do you have any feelings about

17    companies from China?

18         THE PANEL MEMBER:  Well, and I was thinking about

19    that while you were asking questions.  I had an air

20    conditioner a few years I bought brand new, and it went out

21    two days after the warranty was out.  Of course, the copper

22    coils were made in Mexico, not China.  At the same time, I'm a

23    teacher, and if I need, you know, 4,000 folder dividers for 25

24    cents, then I'm going to order from Oriental Trading and fill

25    my classroom with things for children.

1          So I say that I prefer American products, especially air

2     conditioners, but I use products from everywhere, whoever's

3     got the best price.

4               MR. CULBERTSON:  As you sit here today, given the

5     fact that Autel is from China, Orange is from Taiwan, do

6     either of them start ahead of the other?

7               THE PANEL MEMBER:  I don't -- I don't think so in

8     this case.

9               MR. CULBERTSON:  Similar question.  The fact that

10    Orange has a patent, they are the patent holder, given your

11    strong feelings about patents, do they start out a little bit

12    ahead before we -- we get going?

13              THE PANEL MEMBER:  Probably honestly a little bit.

14              MR. CULBERTSON:  Okay.  And that's because of these

15    strong feelings you have about patents protecting innovation.

16    Is that right?

17              THE PANEL MEMBER:  I guess so.  I don't know if I

18    would call it strong.  I just, you know, want justice for

19    people and their ideas.

20              MR. CULBERTSON:  Okay.  I appreciate that.  Thank

21    you very much.

22         Anyone else feel like Ms. Mayeaux, that Orange, because

23    it's got a patent and because it's asserting that patent, is

24    starting a little bit ahead today?

25              Anyone -- who's familiar with the term "where there's

1    smoke, there's fire"?  Everybody.  Right?  All right.

2          Who thinks because we're here in a federal courthouse

3    about to start a trial in a patent infringement case that, you

4    know, there must really be something to what Orange is saying

5    so they're probably starting out a little ahead today?

6    Anybody feel that way?  Where there's smoke, there's fire.

7          In the back?  Okay.  No. 33.  Thank you.  Anyone else

8    feel that way?  All right.

9              THE COURT:  Six minutes remaining, counsel.

10             MR. CULBERTSON:  Thank you, Your Honor.

11         Orange, the Plaintiff, got to go first today, and I'll

12   tell you why.  It's because they've got the burden to prove

13   infringement and to prove damages.  And they've got to prove

14   that by a preponderance of the evidence.  And what they have

15   to prove to you is that every single word of the claim is

16   present in the products that they're accusing of infringement.

17   Okay?

18         So it's a lot like bingo.  They have to spell B-I-N-G-O

19   to show that everything's there.  B-I-N-G doesn't get you

20   there, close isn't good enough.  So I want to know if anybody,

21   you know, is the kind of person or as they sit here right now,

22   they think, you know, if they get close, that's probably good

23   enough to show infringement?

24         Anybody feel like, hey, if they can just show me that

25   it's kind of like the patent or it's a lot like the patent, it

1      doesn't have to be exactly like the patent, does anybody think

2      that?  Okay.  Good.  Thank you.

3          Who in here has been accused at some point in their life

4      of doing something serious that they didn't do?  No. 33.

5      Anybody else?  Can I speak with you, please?

6          Mr. Montgomery, thank you for volunteering.  I appreciate

7      that.  And you don't need to get into the details of it.  I'm

8      just curious, at some point in your life you've been accused

9      of doing something that you didn't do?

10                THE PANEL MEMBER:  Yes.

11                MR. CULBERTSON:  Okay.  And how did that feel?

12                THE PANEL MEMBER:  Probably the worst experience in

13     my life.

14                MR. CULBERTSON:  Did you feel like you needed to

15     defend yourself?

16                THE PANEL MEMBER:  Yes, definitely.

17                MR. CULBERTSON:  Did you feel like you needed to

18     fight back?

19                THE PANEL MEMBER:  Yes.

20                MR. CULBERTSON:  Okay.  Thank you.

21         Orange has this patent.  It's their patent, and they have

22     the right to assert it if that's what they want to do, but my

23     client has the right to defend itself.  And I want to know if

24     anyone's concerned about that fact or disagrees with that fact

25     and just thinks, well, if they've got a patent and they're

1    coming to enforce it, you better just comply, you better pay.

2         Does anyone think that there's anything wrong with Autel

3    defending itself here and fighting?  Okay.  Thank you.

4         I wanted to ask you about a couple of more names of

5    lawyers that are on the Plaintiff's team, and these are folks

6    that are from Mr. Rabena's firm in Washington, D.C.:  Fady

7    Kiblawi and Young Kwon.  Anybody know those names?

8         Who's been a plaintiff in a lawsuit before?  Raise your

9    hand, please.  Anyone?  Yes, ma'am.  No. 26.  Is that right,

10   Ms. Armstrong?

11             THE PANEL MEMBER:  Yes, sir.

12             MR. CULBERTSON:  Can you tell us about that?

13             THE PANEL MEMBER:  I'm actually mistaken.  I was a

14   defendant, not the Plaintiff.

15             MR. CULBERTSON:  You were the Defendant.  Okay.  Can

16   you tell us about that?

17             THE PANEL MEMBER:  When I was 16, I wrecked my -- my

18   car, and my insurance company sued me, not my parents who were

19   the insurance holders of the car, because the insurance

20   lapsed, and I didn't pay for insurance.  My parents did, but

21   they came after me.

22             MR. CULBERTSON:  Okay.  Anything about that

23   experience affect your ability to be fair or make you lean in

24   one direction or another today?

25             THE PANEL MEMBER:  No.

1          MR. CULBERTSON:  Okay.

2          THE COURT:  Two minutes left, counsel.

3          MR. CULBERTSON:  Thank you, Your Honor.

4      Thank you very much, Ms. Armstrong.

5      I'm going to conclude with the same question Mr.

6  Heartfield did.  If you're sitting there thinking, if they'd

7  only asked me this, if they'd only thrown out this question,

8  they'd know something really important about me.  Is anybody

9  thinking about that?  Is anybody thinking, I've got something

10 I want to say, but I'm just waiting for the right question?

11 Okay.  I don't see any hands.

12     Ladies and gentlemen, thank you very much on behalf of

13 Autel.  We look forward to working with those of you that are

14 selected for the jury in this case and want to thank you-all

15 very much for being here today.

16     Thank you, Your Honor.

17         THE COURT:  Counsel, approach the bench, please.

18         (The following was had outside the hearing of the

19         jury panel.)

20         THE COURT:  All right.  We'll start with Plaintiff.

21 Mr. Heartfield, does Plaintiff have any challenges for cause?

22         MR. HEARTFIELD:  No. 1 and 23.

23         THE COURT:  All right.  Mr. Culbertson, does

24 Defendant have any challenges for cause?

25         MR. CULBERTSON:  We do, Your Honor.  13, 9 --

1          THE COURT:  Just a minute.

2          MR. CULBERTSON:  Sorry.  I'm going out of order.

3     No. 2, 27, 33, 3, and 21.  Apologies for that.

4          THE COURT:  Okay.  From Defendants, I have 3, 9, 13,

5     21, 27, 33.  Did I miss anything from Defendants?

6          MR. CULBERTSON:  No. 2, Your Honor.

7          THE COURT:  Okay.  Plaintiffs, I have 1 and 23.

8          MR. HEARTFIELD:  Yes, Your Honor.

9          THE COURT:  Okay.  And I also have 15 and 16 and 23

10    and 28 who said they have scheduling issues.

11         MR. CULBERTSON:  Your Honor, we can help a little

12    bit if you like.  We can withdraw No. 3.

13         THE COURT:  That's fine.  I'll let you withdraw your

14    challenge for cause on 3.

15         MR. CULBERTSON:  Thank you.

16         THE COURT:  So that's one, two, three, four, five,

17    six, seven, eight, nine, ten -- that's 11 people to hold back

18    and talk to.

19       All right, counsel.  If you'll take your places, I'm

20    going to let the panel recess except for these people, and

21    then we'll bring them up one at a time and talk to them here

22    at the bench.  Okay?

23              (The following was had in the presence and hearing

24              of the jury panel.)

25              THE COURT:  All right, ladies and gentlemen.  I'm

 1    going to excuse most of you for recess in just a moment.  I

 2    want to go over how that's going to work for you.

 3         When I excuse those of you for recess, that will be

 4    taking a short recess because I'm going to keep some of you

 5    back.  And those that I keep back, I'm going to talk to here

 6    at the bench one at a time with the lawyers.  But if you're

 7    not one of those, then you'll be having a recess in just a

 8    moment.

 9         When I tell you that those of you not being held back may

10    recess, then I want you to exit the courtroom through the

11    double doors in the back.  We'll start with the people in the

12    jury box, and then the people in the gallery will follow.

13         As you go out those double doors, if you take a left and

14    go around the corner, you'll find two important things--the

15    water fountain and the restrooms.  If you need either or both,

16    those are where they are.  Also, I'm going to ask you while

17    you're on recess outside the courtroom not to leave the

18    building and not to go to any different floor.  Stay on this

19    floor.

20         Also, you're perfectly free while you're on recess to

21    talk with anybody that you may know, or if you're like my

22    wife, you may want to talk to a complete stranger.  It's

23    strictly up to you.  But don't talk about anything that's

24    happened in the courtroom this morning.  Talk about this weird

25    stormy weather we had last night, talk about sports teams,

1  talk about your grandkids or your children, talk about

2  whatever you want to, but don't talk about anything that's

3  happened in the courtroom this morning.

4      There's been no evidence presented in this case yet, and

5  you have heard no evidence in this case, so don't discuss

6  anything that happened in the courtroom.  Don't go outside the

7  building, and as I mentioned, please stay on this floor.

8      We will take up the matters I need to with those of you

9  that I'm asking to stay behind as quickly as possible, and

10  then we'll have you back in here as a group so that I can

11  identify who's going to be selected to serve on the jury.  So

12  I appreciate your patience and cooperation as we go through

13  this process.

14      Those of you on the panel that I'm going to ask to stay

15  behind so that I can talk with you one at a time are as

16  follows:  Mr. Kelley, No. 1; Mr. Huggins, No. 2; Mr. Maxwell,

17  No. 9; Mr. Bradshaw, No. 13; Miss Singleton, No. 15; Mr.

18  Jones, No. 16; Ms. Mayeaux, No. 21; Mrs. Sheffield, No. 23;

19  Mr. Anderson, No. 27; Mrs. Martin, No. 28; and Mr. Montgomery,

20  No. 33.

21      If I didn't call your name, then you'll be a part of the

22  group that recesses in just a minute.  If I did call your

23  name, please stay in your seats.  If you need to move out of

24  the way so those around you can get out, that's perfectly

25  fine, but please stay where you're seated.  And as I say, I

1    will visit with each of you that I've identified one at a time

2    here at the bench with the lawyers.

3        So with that, those of you -- and with those

4    instructions, those of you that I did not identify and ask to

5    stay behind are excused for recess, and if you'll exit the

6    courtroom through the double doors at this time.

7        Mr. Lewis, why don't you lead the way.

8        (Whereupon, the jury panel left the courtroom.)

9        THE COURT:  All right.  Be seated, please.

10       Counsel, if you will approach the bench.

11       A couple of ground rules, counsel.  This is the

12   microphone we're going to talk quietly with these venire

13   members at this microphone.  Unless there's some pressing

14   reason, I expect to hear from Mr. Heartfield and Mr.

15   Culbertson who examined the panel.  I don't have time for a

16   committee discussion about each one of those folks.  If you

17   have something to share with your counsel that's examined the

18   panel, either whisper it or write a note, but I expect to hear

19   from two of them.

20       MR. HEARTFIELD:  Can my team this way.

21       THE COURT:  We need to make a path because I'm going

22   to put the witness in front of the microphone or the venire

23   member.

24       Okay.  I'll bring up Mr. Kelley.

25       Mr. Kelley, would you come join us, please?

1          Good morning, Mr. Kelley.

2               THE PANEL MEMBER:  Good morning.

3               THE COURT:  This is the microphone.  We're just

4     going to talk quietly here.

5               THE PANEL MEMBER:  Okay.

6               THE COURT:  You indicated in some of the questioning

7     that there were, in your view, a fair number of frivolous

8     lawsuits out there?

9               THE PANEL MEMBER:  Uh-huh.

10              THE COURT:  Is there anything about that opinion

11    that would cause you to feel like you are leaning toward

12    either the Plaintiff or the Defendant in this case?

13              THE PANEL MEMBER:  No, not at all.  When I talked

14    about that, I think about, you know, people suing when they

15    spill hot coffee on themselves and they sued because the

16    coffee was hot, that kind of thing, more people chasing after

17    lawsuits for money because they misused products.

18         As far as patent law and things of that nature, I

19    genuinely don't have any preconceived notions or opinions

20    based on that.

21              THE COURT:  Mr. Heartfield, do you have questions

22    for Mr. Kelley?

23              MR. HEARTFIELD:  Just one.  Just to confirm, my

24    client did bring the lawsuit and that means you're going to

25    give me a fair chance to present my evidence.  Right?

```
 1                THE PANEL MEMBER:  Absolutely.

 2                MR. HEARTFIELD:  I'm okay.

 3                THE COURT:  Mr. Culbertson, do you have any

 4    questions?

 5                MR. CULBERTSON:  No questions, Your Honor.  Thank

 6    you.

 7                THE COURT:  Mr. Kelley, I'm going to let you join

 8    the rest of the panel outside.  Just don't discuss anything we

 9    talk about in here.

10                THE PANEL MEMBER:  Yes, sir.

11                THE COURT:  Thank you very much, sir.

12                   (The panel member left the courtroom.)

13                THE COURT:  Mr. Huggins, would you come up and join

14    us, please?

15         Good morning, sir.

16                THE PANEL MEMBER:  Good morning.

17                THE COURT:  Mr. Huggins, this is the microphone.  If

18    you will, we're going to talk quietly up here.

19         I noted during the questioning you said you're always for

20    the little guy and have been your whole life?

21                THE PANEL MEMBER:  Yeah.

22                THE COURT:  I went to Baylor.  I'm always for the

23    underdog, too.  But does that mean you can't be fair in this

24    case and listen to both sides before you make up your mind?

25                THE PANEL MEMBER:  No, it does not mean that.
```

1            THE COURT:  I mean, at this point you've heard no
2    evidence.
3            THE PANEL MEMBER:  No evidence.
4            THE COURT:  We don't know which of these companies
5    are bigger or smaller than the other.
6            THE PANEL MEMBER:  Right.  I just have the
7    perception is what gets me.  But, no, I don't mind being
8    impartial.
9            THE COURT:  The important thing is, can you listen
10   to both sides, can you wait until you've heard from the
11   Defendant as well as the Plaintiff and then can you be fair
12   and impartial?
13           THE PANEL MEMBER:  Yes.
14           THE COURT:  All right.  Mr. Culbertson, do you have
15   questions of Mr. Huggins?
16           MR. CULBERTSON:  I don't, Your Honor.  Thank you.
17           THE COURT:  Mr. Heartfield?
18           MR. HEARTFIELD:  No, Your Honor.  Thank you very
19   much.
20           THE COURT:  Mr. Huggins, I'm going to let you join
21   the rest of the group outside.  Just don't discuss anything we
22   talked about in here.
23           THE PANEL MEMBER:  Yes, sir.
24           THE COURT:  Thank you.
25               (The Panel Member left the courtroom.)

1          THE COURT:  All right.  For the record, just so that

2    we can keep up with this as we go, I am denying the challenge

3    for cause as to Mr. Kelley, No. 1, and I am denying the

4    challenge for cause as to Mr. Huggins, No. 2.  They both stay

5    on the panel.

6        And Defendant's withdrawn their challenge for cause to

7    No. 3.  So according to my notes, next would be No. 9, Mr.

8    Maxwell.

9        Mr. Maxwell, will you come up and join us, please?

10       Good morning, sir.

11          THE PANEL MEMBER:  Yes, sir.

12          THE COURT:  How are you?

13          THE PANEL MEMBER:  Fine.

14          THE COURT:  This is our microphone, and which --

15    just don't touch it.

16          THE PANEL MEMBER:  Okay.

17          THE COURT:  It works just fine.

18          THE PANEL MEMBER:  I'm sorry.

19          THE COURT:  That's okay.  It hurts the ears of my

20    court reporter.

21          THE PANEL MEMBER:  My left ear is stopped up right

22    now.  I'm having a hard time hearing.

23          THE COURT:  Okay.  Can you hear me okay?

24          THE PANEL MEMBER:  Barely.

25          THE COURT:  Okay.  Well, I'll speak up.

1          THE PANEL MEMBER:  My ear -- my left ear, I barely

2     can hear out of this morning.  I'm having trouble.

3          THE COURT:  All right.  During the questioning, Mr.

4     Maxwell, you made the comment that I'm for democracy and I

5     appreciate that because I'm for democracy, too.  Now, I know

6     that we have one party from Taiwan and one party from China,

7     the People's Republic of China, but this is not country versus

8     a country.  These are two companies and they are both involved

9     in the international commerce.

10         And the question I have is, given the fact that the

11    Defendant is based out of the People's Republic of China and

12    the Plaintiff is based out of Taiwan, is that fact going to

13    keep you from being able to listen to the evidence and be fair

14    to both sides and treat each side in a way that you think the

15    evidence requires, not the fact of where they might be based

16    out of?  Or is that fact going to override everything else and

17    influence your determination of the facts of this case?

18    That's what I really need to know.

19         THE PANEL MEMBER:  Yes, sir.  And I want to explain

20    to you why.  I work in a shop.  And when they tell me that

21    we're going to put Chinese parts on a car, I get upset because

22    I have to modify them to make them work.  And when the

23    insurance company simply says, we're going to go with OEM, we

24    never have no problem.  But I'm just saying I have to work

25    with that stuff every day.

```
 1              THE COURT:  Do you have --

 2              THE PANEL MEMBER:  And I wish I knew what they were

 3   getting, but that's not what we're talking about.  But --

 4              THE COURT:  Okay.  Do you have a similar experience

 5   with parts that are made in Taiwan?

 6              THE PANEL MEMBER:  No, sir.

 7              THE COURT:  Okay.  And is that experience so --

 8              THE PANEL MEMBER:  That, Canada or Mexico.

 9              THE COURT:  Let me ask this question.  Is that

10   experience about the parts that you use in your business, is

11   that such a strong feeling that you don't think you can be

12   fair to both parties?

13              THE PANEL MEMBER:  I don't.  I don't.  I'll be

14   honest with you, I don't.  That's the reason I'm up here.

15              THE COURT:  Now is the time for us to find out.

16              THE PANEL MEMBER:  Yes, sir.

17              THE COURT:  Mr. Culbertson, do you have questions of

18   Mr. Maxwell?

19              MR. CULBERTSON:  I don't right now, Your Honor.

20   Thank you.

21              THE COURT:  Mr. Heartfield, do you have questions of

22   Mr. Maxwell?

23              MR. HEARTFIELD:  Would it change your mind if you

24   learned in the evidence that Autel supplies some of its

25   products as OEM products to car manufacturers?
```

1          THE PANEL MEMBER:  It's not going to change my

2   thinking, no, sir.

3          MR. HEARTFIELD:  Okay.  Thank you.

4          THE COURT:  All right.  Mr. Maxwell, I'm going to

5   let you join the rest of the group outside for recess.

6          THE PANEL MEMBER:  Okay.

7          THE COURT:  Just don't discuss anything we talked

8   about in here.

9          THE PANEL MEMBER:  Yes, sir.

10          THE COURT:  Thank you, sir.

11          THE PANEL MEMBER:  Thank you.

12          (The Panel Member left the courtroom.)

13          THE COURT:  All right.  I'm going to grant the

14   challenge for cause regarding Mr. Maxwell and excuse him from

15   the panel.

16          MR. CULBERTSON:  Thank you.

17          THE COURT:  Next I have is No. 13.

18      Mr. Bradshaw, would you come up, please, sir?

19      Good morning, sir.  This is our microphone.  We're just

20   going to try to talk quietly here, Mr. Bradshaw.

21      During the questioning, you indicated that you had

22   concerns about China and that you said that the party in this

23   lawsuit based out of Taiwan, Orange, might start out a little

24   bit ahead in your mind, and you indicated according to my

25   notes that in most cases you would think that the holder of

1    the patent might start out a little bit ahead.

2        What I need to know, sir, is, can you treat both of these

3    parties fairly, can you put those concerns and biases aside,

4    can you listen to the evidence and let the evidence to

5    determine what decision you might ultimately make as a part of

6    jury?  Or are those opinions such that you're not going to be

7    able to set those aside and you're not going to be able to be

8    fair and impartial as to both of the parties?  And now's the

9    time for us to find out.

10            THE PANEL MEMBER:  I wish I'd have been more clear.

11    My issues with the People's Republic of China is with the

12    government, the greatest threat to our way of life.  It's not

13    with the people nor the manufacturers that work there.  My

14    statement about ahead, the Taiwanese people are ahead, it's

15    not because I favor Taiwan politically, it's more because of

16    the patent holder starting out ahead.

17        I feel like I tried to -- I don't know if I was clear,

18    but in sports when you see a replay, the call made on the

19    field has the overriding, if you can't tell.  I feel that's

20    the patent holder is the call made on the field.

21            THE COURT:  Let's talk about that.  So what you're

22    telling me is not between China and Taiwan --

23            THE PANEL MEMBER:  Right.

24            THE COURT:  -- but between Orange and Autel, you

25    don't have a problem with being fair and impartial between the

1    two of them.

2              THE PANEL MEMBER:  No.

3              THE COURT:  Okay.  Now, let's turn to the second

4    issue.  In every patent suit, there's a patent holder and

5    there's an accused infringer, and the patent holder has the

6    burden to prove its allegations of infringement.  And if the

7    patent holder decides to challenge the validity of the patent,

8    they have the burden by clear and convincing evidence, that

9    higher burden, to prove the patent's invalid.

10         There is a presumption that the patent is valid because

11   it's issued by the Patent and Trademark Office, and I'm going

12   to tell the jury there's a presumption of validity.  I'm also

13   going to tell the jury that that presumption can be overcome

14   by the Defendant if they put on evidence that shows by clear

15   and convincing standard that that patent is invalid.

16         Now, can you comply with those rules and are any of those

17   things that I've just told you about so inconsistent with your

18   own views that you can't set your own views aside and follow

19   my instructions?

20             THE PANEL MEMBER:  Yes.  Basically what I was saying

21   is my feelings are what the Court is saying and that I would

22   certainly listen to the charges given to me by the Judge on

23   how to render my opinion.

24             THE COURT:  You feel like you can follow my

25   instructions?

1                    THE PANEL MEMBER:  Absolutely.

2                    THE COURT:  Okay.  All right.  Mr. Culbertson, do

3      you have questions for Mr. Bradshaw?

4                    MR. CULBERTSON:  I do, Your Honor.  Thank you.

5          I appreciate you talking with us, Mr. Bradshaw.

6          I'm looking at your questionnaire, and you were asked

7      whether you had strong feelings about companies from Taiwan,

8      and you answered no.  You were asked if you had strong

9      feelings about companies from the People's Republic of China,

10     and you answered yes.  And you said that China has very little

11     oversight in manufacturing because everything is

12     government-owned and run.

13                   THE PANEL MEMBER:  Uh-huh.

14                   MR. CULBERTSON:  And we talked a little bit during

15     voir dire about the fact that the government, you know, runs

16     these companies in China.

17         I've got a manufacturing client.  I'm concerned, they're

18     concerned, about your ability to set aside what you described

19     as very strong feelings specifically about manufacturing.  And

20     are you able to say -- are you able to say there's just no way

21     that's going to seep back into your head during the course of

22     the trial?

23                   THE PANEL MEMBER:  I can't say there's no way it

24     won't seep back into my head.  I would like to say that it

25     wouldn't.

```
 1              MR. CULBERTSON:  Right.

 2              THE PANEL MEMBER:  But I can't.  I mean, I have -- I

 3    have strong feelings about the government's role in

 4    manufacturing, but in my opinion what I think we're about to

 5    hear has nothing to do with that.

 6              THE COURT:  I don't expect there to be any evidence

 7    in this case -- and counsel can correct me if I'm wrong, but I

 8    don't expect there to be any evidence in this case whether the

 9    government of China --

10              THE PANEL MEMBER:  Right.

11              THE COURT:  -- owns any part of Autel or whether the

12    government of Taiwan owns any part of Orange?

13              THE PANEL MEMBER:  Right.  Yes.  So I would like to

14    clarify my answers there were more about the government of

15    each than the manufacturers of each.  I think the people of

16    China are just like the people in America.

17              THE COURT:  Am I correct, counsel, that there's not

18    going to be an effort to put on evidence about government

19    ownership of either of the parties?

20              MR. HEARTFIELD:  You are correct.

21              THE COURT:  Mr. Culbertson, are you going to attempt

22    to do that?

23              MR. CULBERTSON:  I am not going to attempt do that,

24    but I do have the same concern.  And so I would just again ask

25    you, you know, since you've made that connection on your own
```

1    before we got here between the government and manufacturing

2    companies, you know, are you sure you're going to be able to

3    set that aside during the course of the trial?

4              THE PANEL MEMBER:  Again, I cannot be sure.  I think

5    that I -- I feel confident I wouldn't.  I bet that I could set

6    it aside, but I can't say that for sure.

7              MR. CULBERTSON:  We appreciate your honesty.

8              THE COURT:  Nobody's asking you to give us a

9    guarantee.

10             THE PANEL MEMBER:  Then the answer is, yes, I can

11   set it aside.

12             THE COURT:  All right.  Do you have any questions,

13   Mr. Heartfield --

14             MR. HEARTFIELD:  No, Your Honor.

15             THE COURT:  -- of Mr. Bradshaw?

16       Mr. Bradshaw, I appreciate your candor.  I'm going to let

17   you join the rest of the panel outside the courtroom.  Just

18   don't discuss anything we talked about in here?

19             THE PANEL MEMBER:  Okay.

20             THE COURT:  Thank you, sir.

21             (The Panel Member left the courtroom.)

22             THE COURT:  I'm going to deny the challenge for

23   cause on Mr. Bradshaw.  You're welcome to use a peremptory

24   challenge, Mr. Culbertson.

25             MR. CULBERTSON:  I understand.  Thank you, sir.

```
 1              THE COURT:  But I'm satisfied he can serve and be

 2    fair and impartial.

 3         Miss Singleton, can you come up, please, ma'am?

 4         Good morning, Miss Singleton.  How are you?

 5              THE PANEL MEMBER:  I'm good.  How are you?

 6              THE COURT:  Good.  This is our microphone.  We are

 7    just going to talk up quietly up here.

 8              THE PANEL MEMBER:  Okay.

 9              THE COURT:  When we started this morning, I told you

10    I thought the trial would start today and be done on Friday.

11              THE PANEL MEMBER:  Yes.

12              THE COURT:  And I asked if anybody had a serious

13    problem about being here the whole week, and you raised your

14    hand.  Tell me about that.

15              THE PANEL MEMBER:  Well, I'm the court manager and

16    administrator for the municipal court, and we do have court

17    this coming Wednesday.  And I do all the settings and the

18    proceedings with Judge Roth.  So I'm needing to be there next

19    to him to process all the sentencing and paperwork.

20              THE COURT:  You don't know this, but a million years

21    ago when I was a young attorney in Marshall, I used to

22    prosecute citations in the municipal court.

23              THE PANEL MEMBER:  Did you?

24              THE COURT:  I sure did.  So I know exactly what you

25    do and I know exactly where you do it.
```

1          THE PANEL MEMBER:  Yeah.

2          THE COURT:  Is there anybody that could cover for

3    you one week?

4          THE PANEL MEMBER:  The only person that could, she's

5    still fairly new and she's mortified that I'll be picked.

6          THE COURT:  Okay.  Is there anything else about your

7    situation other than work-related situation that you've

8    explained that would make it difficult for you to be here if

9    you were selected?

10          THE PANEL MEMBER:  No, sir.  That's it.  Judge Roth

11    and another clerk are going to be out next week for vacation.

12    So if I were to miss this whole week, it would kind of put me

13    behind with only having one other person for next week.

14          THE COURT:  Yes, ma'am.  Okay.  I understand that.

15    And I know you understand, Miss Singleton, because you work in

16    the court system that jury service is always a sacrifice?

17          THE PANEL MEMBER:  Yes, sir.

18          THE COURT:  It's never just easy.

19          THE PANEL MEMBER:  Yes, sir.

20          THE COURT:  Okay.  Either counsel have any questions

21    for Miss Singleton?

22          MR. HEARTFIELD:  Not the Plaintiff.

23          MR. CULBERTSON:  No, Your Honor.

24          THE COURT:  I'm going to let you join the rest of

25    the group outside, Miss Singleton.  Just don't discuss what we

1    talked about in here.

2              THE PANEL MEMBER:  Okay.  Thank you.

3              THE COURT:  Thank you, ma'am.

4         (The Panel Member left the courtroom.)

5              THE COURT:  I'm going to keep Miss Singleton on the

6    panel.  I'm not excusing her.

7         Mr. Jones, would you come up, please, sir?

8         Good morning, sir.

9              THE PANEL MEMBER:  Good morning.  How are you doing?

10             THE COURT:  Good morning.  This is our microphone,

11   and we're going to talk quietly here.

12        Mr. Jones, when we started, I told everybody that we'd

13   begin the trial today and I expected it to be done on Friday,

14   and I asked if there was anybody that had a serious problem

15   that would interfere with them being available all week, to

16   let me know.  And you raised your hand?

17             THE PANEL MEMBER:  Yes, sir.

18             THE COURT:  Tell me about that, Mr. Jones.

19             THE PANEL MEMBER:  Okay.  My dad, he started a trash

20   company in 2009.  He services a little over 300 customers.  He

21   got diagnosed with kidney cancer.  He had one kidney removed,

22   and it came back in his second kidney.  Since April, I have

23   taken over, and we service those 300 customers Monday,

24   Tuesday, Thursday, and Friday, with Wednesday being a make-up

25   day if somebody missed or something like that.  Right now I'm

1    the sole person responsible for picking up those customers.

2           THE COURT:  Okay.  Is this a one-man operation?

3           THE PANEL MEMBER:  Yes, sir.

4           THE COURT:  You don't have helpers?

5           THE PANEL MEMBER:  I have a brother, but he's

6    currently incarcerated.  So he was the back-up.

7           THE COURT:  Okay.  Other than your brother, you

8    don't have any other back-up or any other way to keep the

9    business --

10          THE PANEL MEMBER:  No, sir.  One-man operation that

11   I -- I don't have the financial means to pay for that.

12          THE COURT:  Mr. Jones, they're writing down

13   everything we're saying, so it's important that you and I talk

14   one at a time.

15          THE PANEL MEMBER:  Okay.

16          THE COURT:  But you don't have anybody else that can

17   run this business if you're on this jury, and what you're

18   telling me is it will be shut down for a week and 300 people

19   won't have their trash picked up.

20          THE PANEL MEMBER:  That's correct.

21          THE COURT:  Okay.  All right.  Mr. Heartfield, any

22   questions of Mr. Jones?

23          MR. HEARTFIELD:  No, Your Honor.

24          THE COURT:  Mr. Culbertson?

25          MR. CULBERTSON:  No, Your Honor.

```
1          THE COURT:  And there's not any way you can keep

2    this business running for a week so you can do your

3    constitutional duty and serve on this jury?

4          THE PANEL MEMBER:  The only way would be just be

5    picked up.

6          MR. HEARTFIELD:  Your Honor, can I ask a question?

7          THE COURT:  I've already given you a chance and you

8    passed on it.

9          MR. HEARTFIELD:  I know.  I just may not have heard

10   what the trash pick-up schedule is.

11         THE PANEL MEMBER:  It's Monday, Tuesday, Thursday,

12   and Friday, with Wednesday being like if somebody missed or a

13   new customer service, things like that on Wednesday.

14         MR. HEARTFIELD:  Understood.

15      Thank you, Your Honor.  I appreciate the extra.

16         THE COURT:  Mr. Jones, I appreciate your candor.

17   I'm going to let you join the rest of the group outside for

18   recess.

19         THE PANEL MEMBER:  Okay.

20         THE COURT:  Just don't discuss anything that's been

21   talked about in here.

22         THE PANEL MEMBER:  Yes, sir.

23         THE COURT:  Thank you.

24            (The Panel Member left the courtroom.)

25         THE COURT:  I don't usually let business
```

1    interruption with a sole proprietor rise to the level of

2    excusing somebody from their constitutional obligations to

3    serve as jurors.  I am concerned about 300 people not having

4    their trash picked up for a week, and we have enough people to

5    select a jury from without Mr. Jones.

6        And I'm going to excuse Mr. Jones because of his

7    schedule.  If it weren't those 300 people, if it wasn't Mr.

8    Jones working in his business by himself, I would not reach

9    the same conclusion.

10        Ms. Mayeaux, would you come up, please, ma'am?

11        Good morning.

12            THE PANEL MEMBER:  Good morning.

13            THE COURT:  This is our microphone, Ms. Mayeaux.  We

14    are just going to talk quietly here.

15        During the back and forth this morning, my notes indicate

16    that you said that the Plaintiff might be a little bit ahead

17    because they hold the patent here.  There's no question that

18    Plaintiff owns this patent.

19            THE PANEL MEMBER:  Okay.

20            THE COURT:  And the Defendant's going to tell this

21    jury that they don't infringe it and they're going to tell

22    this jury that in their opinion it's not valid.

23        And I'm going to tell the jury that every issued patent

24    from the U.S. Patent and Trademark Office is entitled to be

25    presumed to be valid, but the jury can find that it is

1    invalid --

2              THE PANEL MEMBER:  Okay.

3              THE COURT:  -- if the Defendant shows by clear and

4    convincing evidence that it is, in fact, an invalid patent.

5        Now, with that set of ground rules and with those

6    understandings, is there anything about that that you don't

7    believe you could comply with or that would keep you from

8    being fair and impartial?

9              THE PANEL MEMBER:  Not at all.  I can be fair, yes,

10   sir.

11             THE COURT:  Can you treat both sides as if they are

12   starting out equally?

13             THE PANEL MEMBER:  Yes.

14             THE COURT:  Okay.

15             THE PANEL MEMBER:  Yes.

16             THE COURT:  Can you wait until you've heard the

17   Defendant's side of the case before you make any decisions?

18             THE PANEL MEMBER:  Yes, sir.

19             THE COURT:  You know, one has to go first and one

20   has to go second.

21             THE PANEL MEMBER:  I know.

22             THE COURT:  All right.

23             THE PANEL MEMBER:  Yes.

24             THE COURT:  Mr. Culbertson, do you have questions of

25   Ms. Mayeaux?

```
 1              MR. CULBERTSON:  Two questions I believe of Ms.

 2    Mayeaux, and one was I think I heard you say --

 3              THE COURT:  Let me ask you both to talk into this so

 4    the court reporter can hear you.

 5              MR. CULBERTSON:  Thank you.

 6         I think I recall when we were having a conversation, you

 7    said that you hated the idea of someone's idea being stolen

 8    and that's part of why you thought the Plaintiff was ahead.

 9    Right?

10              THE PANEL MEMBER:  Yes, probably.

11              MR. CULBERTSON:  Okay.  What Judge --

12              THE PANEL MEMBER:  I have a co-worker who used to do

13    that all the time, but they -- but it's not here or there.

14              MR. CULBERTSON:  Okay.  That experience obviously

15    seems to have had an impact on you with your co-worker.

16              THE PANEL MEMBER:  Yeah, I guess.  I don't work with

17    her anymore.

18              MR. CULBERTSON:  Okay.  Judge Gilstrap was talking

19    with you about the question of validity and there's no -- and

20    we agree there is a presumption of validity.  There's not a

21    presumption about infringement.  There's another question you

22    will be answering.  Right?  Does my client infringe the

23    patent?  And what I need to understand from you is, is the

24    Plaintiff starting out ahead on that question, too?

25              THE PANEL MEMBER:  No.
```

1          MR. CULBERTSON:  Okay.

2          THE PANEL MEMBER:  I can be fair.

3          MR. CULBERTSON:  Okay.

4          THE PANEL MEMBER:  I promise.

5          MR. CULBERTSON:  I appreciate your time.  Thanks.

6          THE COURT:  All right.  Do you have anything of this

7     member of the panel, Mr. Heartfield?

8          MR. HEARTFIELD:  No, Your Honor.

9          THE COURT:  All right.  Ms. Mayeaux, I'm going to

10    let you join the rest of the panel outside for recess.  Just

11    don't discuss anything we talked about in here.  Thank you,

12    ma'am.

13          THE PANEL MEMBER:  Thank you.

14              (The Panel Member left the courtroom.)

15          THE COURT:  All right.  I'm going to deny the

16    challenge for cause for Ms. Mayeaux.  She stays on the panel.

17       Mrs. Sheffield, would you join us, please, ma'am?

18       Good morning.

19          THE PANEL MEMBER:  Good morning.

20          THE COURT:  This is the microphone, Mrs. Sheffield.

21    We're going to try to talk quietly here.

22          THE PANEL MEMBER:  Okay.

23          THE COURT:  I have two things to talk with you

24    about.  First of all, my notes indicate that you said during

25    the questioning that suing people was contrary to the

1    teachings of the Bible and it just wasn't right.

2        And, you know, we have a Plaintiff in this case that's

3    brought this lawsuit.  There's a plaintiff in every case.

4            THE PANEL MEMBER:  Yes.

5            THE COURT:  Is that belief so strong that you would

6    be unable to treat the Plaintiff fairly and impartially, or

7    can you put that out of your mind and not treat these two

8    companies any differently except based on the evidence that

9    you hear?  If you're going to have a problem being fair to the

10   Plaintiff, I need to know it now.  You think you would?

11           THE PANEL MEMBER:  Yes.

12           THE COURT:  Okay.  I was also going to talk with you

13   about your scheduling problem.  Can you tell me what that is?

14           THE PANEL MEMBER:  I've got a doctor's appointment

15   Friday, a very important doctor's appointment for my

16   bradycardia.  It goes out of rhythm and it's been doing it,

17   so --

18           THE COURT:  Okay.  And that's something you need to

19   see about Friday?  You don't need to reschedule?

20           THE PANEL MEMBER:  No.

21           THE COURT:  Okay.

22           THE PANEL MEMBER:  Because it's making me faint and

23   almost passing out because it drops down to like 40-something.

24   They've told me if it gets any worse, I'm supposed to go to

25   the hospital.

1           THE COURT:  All right.  Mr. Heartfield, do you have

2   any questions of Mrs. Sheffield?

3           MR. HEARTFIELD:  No, Your Honor.

4           THE COURT:  Mr. Culbertson, any questions?

5           MR. CULBERTSON:  No, Your Honor.

6           THE COURT:  Okay.  Mrs. Sheffield, I'm going to let

7   you join the rest of the panel outside the courtroom.  Just

8   don't talk what we talked about in here.

9           THE PANEL MEMBER:  Okay.

10          THE COURT:  Thank you, ma'am.

11          THE PANEL MEMBER:  Thank you.

12             (The Panel Member left the courtroom.)

13          THE COURT:  All right.  I'm going to excuse Mrs.

14  Sheffield both for her scheduling problem and based on the

15  challenge for cause.

16      That brings us to Mr. Anderson.

17      Mr. Anderson, would you join us, please, sir?

18      Good morning, sir.

19          THE PANEL MEMBER:  Good morning.

20          THE COURT:  This is our microphone, if we can talk

21  quietly.

22      Mr. Anderson, you indicated during the questioning this

23  morning that you try not to buy anything made in China, you're

24  concerned about their human rights record, and you're

25  concerned about the quality of the products that they put out.

1          THE PANEL MEMBER:  Correct.

2          THE COURT:  You understand this is not a lawsuit

3    between the country of China and Taiwan.

4          THE PANEL MEMBER:  I understand that, too.

5          THE COURT:  Two different companies; one happens to

6    be based one place, one happens to be based the other.  That

7    being said, what I really need to know, and now is the time to

8    find out, is, can you be fair and impartial to both of these

9    parties, or are your feelings about China such that the

10   Defendant that's based out of the People's Republic of China

11   is going to be treated unfairly and impartially by you if

12   you're on this jury.  And I just -- there's not a right or

13   wrong; I just need the honest truth.

14         THE PANEL MEMBER:  I understand.  I would be fair.

15   I mean, I don't buy stuff from China if I can keep from it,

16   but that would not preclude me from looking at the evidence

17   and coming to a fair decision.

18         THE COURT:  Are you confident that you can treat

19   both sides fairly?

20         THE PANEL MEMBER:  Yes, sir.

21         THE COURT:  Okay.  All right.  Mr. Culbertson, do

22   you have any questions of Mr. Anderson?

23         MR. CULBERTSON:  No, Your Honor.

24         THE COURT:  Mr. Heartfield?

25         MR. HEARTFIELD:  No, Your Honor.

1      THE COURT:  Mr. Anderson, I'm going to let you join

2  the rest of the panel outside for recess.  Just don't discuss

3  what we talked about in here.

4      THE PANEL MEMBER:  Yes, sir.

5      THE COURT:  Thank you, sir.

6  (The Panel Member left the courtroom.)

7      THE COURT:  All right.  I'm going to deny the

8  challenge for cause with Mr. Anderson.  He remains on the

9  panel.

10  Mrs. Martin, would you come up, please, ma'am?

11  Good morning.

12      THE PANEL MEMBER:  Good morning.

13      THE COURT:  This is the microphone.  We're going to

14  try to talk quietly up here.

15      THE PANEL MEMBER:  Okay.

16      THE COURT:  The Clerk told me that you'd indicated

17  to her that you were going through some cancer-related

18  treatments?

19      THE PANEL MEMBER:  Yes.  I have a blood disorder

20  that I've been going through for the last eight months in

21  treatments.

22      THE COURT:  Is that the basis of your scheduling

23  problem that you raised your hand about?

24      THE PANEL MEMBER:  Yes.  And I've got the schedule

25  here showing that I go every Tuesday and Wednesday, and then

1    it takes me a couple of days to recover.

2           THE COURT:  All right.  And is this some kind of a

3    chemo treatment?

4           THE PANEL MEMBER:  No.  It's called hemochromatosis,

5    and they take a pint of blood off of me every week because my

6    iron is crazy.

7           THE COURT:  Okay.

8           THE PANEL MEMBER:  So it's the opposite--I have high

9    iron.  And so they take one pint of blood off of me every

10   week, so it makes me very anemic.

11          THE COURT:  All right.  And you go every week two

12   times?

13          THE PANEL MEMBER:  Twice a week--labs on Tuesday

14   and phlebotomy is on Wednesdays.

15          THE COURT:  Okay.  And I don't know an easier way to

16   say this.  This just basically wipes you out --

17          THE PANEL MEMBER:  Uh-huh.

18          THE COURT:  -- or it makes you where it's hard to

19   function?

20          THE PANEL MEMBER:  I'm very fatigued.  I'm very

21   tired, like I said.  It keeps me -- I'm probably in bed the

22   next day most of the day, and I'm anemic so that makes you

23   really tired.

24          THE COURT:  Okay.  And this has been going on how

25   long?

1          THE PANEL MEMBER:  For eight months.

2          THE COURT:  Okay.  And it's going to continue this

3   week and into the future?

4          THE PANEL MEMBER:  Through July, yeah.  My numbers

5   should be hopefully better by July.

6          THE COURT:  All right.  Mrs. Martin, I appreciate

7   that.  I'm going to ask you to join the rest of the panel

8   outside the courtroom.  Just don't discuss what we talked

9   about in here.

10          THE PANEL MEMBER:  Okay.

11          THE COURT:  Thank you.

12              (The panel member left the courtroom.)

13          THE COURT:  I'm going to excuse Mrs. Martin.

14      That brings us to No. 33, Mr. Montgomery.

15      Mr. Montgomery, would you join us, please?

16      Good morning, Mr. Montgomery.

17          THE PANEL MEMBER:  Good morning.

18          THE COURT:  This is the microphone.  We're just

19   going to talk quietly here.

20      During the questioning this morning, you indicated that

21   you did have issues with the quality of Chinese products?

22          THE PANEL MEMBER:  Yes, sir.

23          THE COURT:  But I thought I heard you say you

24   wouldn't be partial or biased toward Orange in this case.

25   What I really need to know is, can you tell me that if you're

1  on this jury, both the Plaintiff and the Defendant will start

2  out in the same equal position and that you will listen to the

3  evidence, that you'll treat both sides fairly and impartially,

4  and you'll let the evidence and only the evidence guide you as

5  to any decisions you would make as a part of the jury?  Can

6  you tell me that?

7            THE PANEL MEMBER:  Yes, sir.  I feel like I can be

8  impartial.

9            THE COURT:  Okay.  You don't have any real concerns

10  about your ability to be fair and impartial?

11            THE PANEL MEMBER:  No, I don't.

12            THE COURT:  All right, sir.

13       Mr. Culbertson, do you have questions for Mr. Montgomery?

14            MR. CULBERTSON:  No questions, Your Honor.  Thank

15  you.

16            THE COURT:  Mr. Heartfield?

17            MR. HEARTFIELD:  No, Your Honor.

18            THE COURT:  Okay.  Mr. Montgomery, I'm going to let

19  you join the rest of the group outside.  Just don't discuss

20  what we talked about in here, sir.

21            THE PANEL MEMBER:  Thank you.

22            THE COURT:  Thank you.

23                 (The Panel Member left the courtroom.)

24            THE COURT:  I'm going to deny the challenge for

25  cause on Mr. Montgomery.  He stays on the panel.

1       Let's review where we are, counsel.  I've excused No. 9,

2  Mr. Maxwell.  I've excused No. 16, Mr. Jones.  I've excused

3  No. 23, Mrs. Sheffield.  And I've excused No. 28, Mrs. Martin.

4       We're going select eight jurors.  Each side gets four

5  peremptory challenges.  That's 16.  And within that, I've

6  excused two members of the panel, so that tells me we should

7  strike through 18.  Do you agree with that?

8            MR. HEARTFIELD:  That's what I have.

9            MR. CULBERTSON:  That's right.

10           THE COURT:  Without any disagreement then, we'll

11  strike through Panel member No. 18.

12       It's 20 minutes until noon.  I'll give you until noon

13  today, and at noon if you'll have your strike list in to

14  Ms. Brunson, we'll proceed to seat the panel -- or seat the

15  jury from that.

16       You're welcome to use any place in the courthouse to meet

17  and talk about it, but have your strike list in to Ms. Brunson

18  by 12:00 noon.

19           MR. HEARTFIELD:  Thank you, Your Honor.

20           MR. CULBERTSON:  Thank you, Your Honor.

21           (The following was had in open court.)

22           THE COURT:  All right.  While counsel exercise their

23  peremptory challenges, the Court will stand in recess.

24                      (Brief recess.)

25           THE COURT:  Be seated, please.

1          Ladies and gentlemen, if you will listen carefully, as

2     your name is called by our Courtroom Deputy, Ms. Brunson, if

3     you'll come forward and take your place in the jury box.

4          Let me make it clear that we're going to seat eight of

5     you as the jury in this case.  I'm going to ask that the first

6     four people whose names are called, if you will come forward

7     and position yourselves on the front row of the jury box, the

8     second four members, 5, 6, 7, and 8, on the back row of the

9     jury box.

10          Whosoever name is called first, if you would come forward,

11    enter the jury box on the front row, go all the way to the end

12    and remain standing in front of the last chair.  Then the

13    second person whose name is called, if you'll enter the front

14    row of the jury box, go toward the end, and stand in front of

15    the third chair from the end, leave a vacant chair between you

16    and person No. 1.  No. 3 will do the same thing.  No. 4 will

17    do the same thing.

18          And then the first four of you will be seated on the

19    jury -- or in the jury box on the front row with an empty seat

20    between each member.  And then the second four of you will go

21    to the back row and do the same thing so that, when we're done

22    and I seat all eight of you, when you're all in the box, you

23    will all be half on the front row, half on the back row, and a

24    vacant chair between each member.  And those will be your

25    positions throughout the trial.

1        So with that, I'm going to ask our Courtroom Deputy to

2    call the names of the eight members of the panel that have

3    been selected as jurors in this case.

4            THE CLERK:  William Lee Huggins, Jaycie Pemberton,

5    Laura Siler, Freddie Luther, Vesta Soper, Kevin Vrooman,

6    Cheryl York, Tina Singleton.

7            THE COURT:  All right.  I'll also ask Ms. Brunson at

8    this time to administer the oath to the eight of you as jurors

9    in this case.

10           (Whereupon, the oath was administered by the Clerk.)

11           THE COURT:  Please have a seat, ladies and

12   gentlemen.

13       For those of you on the panel that were not selected, I'm

14   about to excuse you in just a minute.  But, first of all, I

15   want to tell you how much the Court and the Court staff

16   appreciates your service by being here this morning.   I am

17   well-aware, ladies and gentlemen, that every one of you had

18   other places to be today, you had other things to do, you had

19   responsibilities on each of you that you had to set aside to

20   answer the summons that you've received, to present yourself,

21   be here this morning, and to engage in the process of

22   selecting this jury.  Even though you weren't selected, you've

23   done very real and important public service by being here.

24       Quite honestly, the court system could not function and

25   we could not conduct jury trials as provided for in civil

1   cases under the guarantees of the Seventh Amendment of our

2   Constitution without ordinary citizens like each of you

3   answering the call to jury duty, coming when summonsed, and

4   presenting yourself as you have this morning.  Each of you

5   have done very real and important public service, and the

6   Court recognizes that, the Court appreciates it, and the Court

7   thanks you.

8        And I'm sure and quite confident I'm speaking not only

9   for the Court but the parties in this case, the lawyers in

10  this case, everyone associated with what's going on recognizes

11  the important absolute critical role that you've supplied in

12  the process, and we appreciate what you've done by being here.

13       As you leave the courtroom in just a minute through the

14  double doors in the back, if you will exit to the right,

15  you'll go right by Ms. Clendening's office.  She will be there

16  to collect these very valuable numbers that you're wearing on

17  all your clothing.  Those are not souvenirs you get to take

18  with you.  We'll use them again with the next jury, so please

19  turn those in.

20       If you need any kind of written verification for your

21  employer as to where you've been this morning, she will supply

22  that for you.  If you have any questions about your service by

23  being here this morning, Ms. Clendening and her staff will be

24  glad to help you with it.

25       Again, ladies and gentlemen, thank you for being here.

1    Thank you for being willing to serve, and I hope the next time

2    you're summonsed, you'll appear with the same good attitude

3    that I've seen from each of you this morning.

4         With that, those on the panel who were not selected to

5    serve on the jury are excused.

6              (Whereupon, the jury left the courtroom.)

7              THE COURT:  Be seated, please.

8         Ladies and gentlemen of the jury, I'm about to excuse you

9    in just a minute for lunch.  I need to go over a couple of

10   things with you before we do that.

11        First of all, you need to know that during the course of

12   this trial I've ordered the Clerk's Office to provide lunch to

13   you each day.  So lunch is going to be brought to you in the

14   jury room.  You are not going to have to leave the building to

15   go out in the community, try and find a place to have lunch,

16   and get back.  That will be easier on you.

17        It will also save time and let us cover more ground each

18   day as we try to get through this case during the week that

19   I've told you about.  So plan each day that lunch will be

20   provided to you by the Court.

21        Also, ladies and gentlemen, you need to be aware that

22   it's my practice to work long days each day so that we can

23   finish this trial in a shorter number of days.  I know lots of

24   judges who start at 10:00 in the morning and quit at 4:00

25   p.m., and they will take two weeks to try a case that I can

1    try in one week because we will start at 8:30 in the morning

2    each day, and we will have lunch brought in so that you only

3    need about 45 minutes for lunch, and then we will go until

4    5:30 or 6:00 at night.  And if we will work longer days, we

5    can finish in half as many days as it takes somebody else to

6    try a case who doesn't have that kind of a schedule.

7        And for the last almost 12 years now, jurors have told me

8    trial after trial after trial they would rather be away from

9    their homes and their work and their family a shorter number

10   of days, even if it meant longer days to do that.  So that's

11   the approach we're going to take.  And you can let those that

12   you live with and work with know that you'll be getting here

13   to start each morning at 8:30 and you'll be finishing and

14   heading back to your homes probably somewhere in the

15   5:30-to-6:00 range.

16       And you need to know that there's not an absolute science

17   to how this is done.  If -- for example, if we have a witness

18   on the witness stand at 5:00 in the afternoon and it takes

19   them 45 minutes to finish, then we'll go to 5:45.  If it takes

20   them an hour to finish, we'll probably go to 6:00.  It's

21   always preferable if we can finish a witness and not have to

22   break that witness and bring them back and start over again

23   with the same witness the next day.

24       So it's not an exact science, but we'll do the best we

25   can.  But we're not going to be stopping at 4:00 or 4:30 or

1    even 5:00 each day.  So plan on that kind of a schedule over

2    this coming week.

3           Also, while you're at lunch today, I want you to take an

4    opportunity to make sure Ms. Clendening has a good working

5    cell phone number for you.  It's possible, it's not likely but

6    it's possible, we might -- the Court might need to communicate

7    with you while you're not in session here over the evening or

8    at some other time and we would need a cell phone number for

9    that.  So if for some reason that were to come up, Ms.

10   Clendening would be the one to contact you.  And if you'll

11   make sure over the lunch break that she has a good working

12   cell phone number for you, that would be appreciated.

13          Also, speaking of cell phones, ladies and gentlemen, I'm

14   going to ask you if you have a cell phone or a tablet or any

15   kind of electronic device like that, that you not bring it

16   back into the courtroom today.  If you have it with you today,

17   leave it in the jury room.  When you come back tomorrow, don't

18   bring it into the courthouse.

19          One of the things I'm going to tell you is not to do any

20   outside research about this case, about these products, about

21   this patent, about these parties, or anything related to this

22   lawsuit.  Smartphones are just a small computer you hold in

23   your hand, and it's sometimes tempting if you have it here to

24   do a quick Google search or some other kind of internet search

25   about any of the items I've told you not to do research about.

1          So I'm going ask you, starting tomorrow, don't bring any

2     of those kind of electronic devices into the courthouse.  If

3     you have them with you today, leave them in the jury room when

4     you come back from lunch.

5          Now, you're going to see the lawyers in this case using

6     iPads and laptops and smartphones.  Those are tools of the

7     trade and they're entitled to use them.  They are not entitled

8     to let them ring, sound, or disrupt this proceeding, and

9     they're under strict orders from me to keep them on silent.

10    But don't feel like, Well, why do they get to use their

11    devices if I don't get to use mine.  There's a difference here

12    and you need to understand that.  So please be aware of that

13    going forward.

14         Also, ladies and gentlemen, don't discuss this case with

15    anyone.  And when I say don't discuss the case, I mean don't

16    communicate about it in the broadest sense of the term with

17    anyone.  It is absolutely essential that at the end of this

18    trial when you've heard all the evidence from both sides and

19    you are in the jury room deliberating on your verdict, which

20    you will find to be a set of questions that you're then to

21    answer based on the evidence that you've heard, it is

22    essential that the only information you have to draw upon in

23    answering those questions in the verdict form is the evidence

24    that you've heard presented from the witness stand under oath

25    and subject to cross examination and the documents and

1    exhibits that the Court has admitted into evidence under the

2    Federal Rules of Evidence.

3         The exhibits in the case and the sworn testimony of the

4    witnesses should comprise all of the evidence and information

5    that you have to call upon to answer those questions in the

6    verdict form that you're going to be asked to answer at the

7    end of the trial, and it is absolutely essential that there be

8    no other sources of information that would come into play in

9    that process.

10        Therefore, it's essential that you not communicate with

11   anybody about this case, and that means, again, in the

12   broadest sense of the term.  Not only don't have a

13   conversation with anybody about it, don't email about it,

14   don't text message about it, don't communicate electronically

15   in any way.  If you are a user of social media, don't post

16   anything on Facebook or tweet anything on Twitter or use

17   Instagram or any of the other number of social media platforms

18   that may be out there.  All that's communication and it's

19   essential that you not communicate with anyone.  Otherwise,

20   you risk having us to potentially start all over again with

21   another jury and waste thousands of dollars and hundreds of

22   hours in resources that are dedicated to this trial.

23        And when I say, ladies and gentlemen, don't communicate

24   with anyone about this case, that also means between the eight

25   of you.  It is important that the eight of you not communicate

1    with each other about the evidence in this case until you've

2    heard all the evidence.

3        And when you've heard all the evidence, I will then have

4    the lawyers present their closing arguments to you, I will

5    give you my final instructions on the law that you are to

6    apply, and then I will say, "Ladies and gentlemen of the jury,

7    you may now retire to the jury room to deliberate upon your

8    verdict."

9        When I say those words, then everything changes and you

10   go from being prohibited to discuss the evidence and the

11   testimony of the witnesses between yourselves to being

12   required to discuss the evidence that's presented during the

13   trial among yourselves in an effort to reach a unanimous

14   agreement about how to answer those questions that will be

15   submitted to you in the verdict form.

16       Until you have been instructed by me to retire and

17   deliberate on your verdict, you must not discuss or

18   communicate in any way with each other about the evidence.

19   And at all times you must not discuss or communicate with

20   anybody else about the case at all.

21       And I can tell you, ladies and gentlemen, that unless you

22   live alone, when you get home tonight, wherever that is,

23   whoever is there, the first thing they're going to say when

24   you walk through the door is, Well, tell me what happened in

25   federal court in Marshall today.

1    Don't even try to answer that question, because if you

2    do, you're almost assuredly going to violate this instruction

3    I've given you.  So just smile at whoever that is and look at

4    them and say, That very stern federal judge told me not to

5    discuss the case with anybody and I'm not going to discuss the

6    case with you right now.  When the case is over and I've been

7    released as a juror, then I'll be free to discuss it with you.

8    But don't even try to answer the question that you're, I

9    guarantee, going to get when you get home this evening,

10    because if you do, you'll almost assuredly violate this

11    instruction.  And this is a critically important instruction,

12    because if it is violated, ladies and gentlemen, as I say, it

13    risks wasting a lot of time and effort and resources that have

14    gone into this trial.

15    Again, when I say don't communicate, I mean it in the

16    broadest sense of the term.  Don't use any social media, don't

17    use any electronic forms of communication, don't communicate

18    orally, don't write it on a piece of paper, don't communicate

19    in any possible way with anyone about the case, including the

20    eight of yourselves.

21    Also, ladies and gentlemen, don't do any research about

22    this case.  Don't go home at night and open up your laptop and

23    type in the name of these parties or these lawyers or the

24    accused products in the case or anything.  Don't do any online

25    research or any kind of research.  If you're like me and you

1    have an old set of encyclopedias on the shelf, don't pull one

2    of those off and do any research.  Don't do any research in

3    any way.

4         Again, this all goes back to the same fundamental

5    principle that when you retire to deliberate on your verdict

6    and consider how to answer the questions that will be in that

7    verdict form, the only information, the sole universe of the

8    information, you have to draw upon to answer those questions

9    must be limited to the sworn testimony of the witnesses and

10   the exhibits that the Court has admitted into evidence.

11   That's all, and that's a fundamental principle.

12        Also, ladies and gentlemen, I don't think this is likely,

13   but I need to instruct you on it anyway because it's not

14   outside the realm of possibility.  If during this trial, if at

15   any time any third party approaches you, contacts you, tries

16   to talk about this case, tries to influence you about your

17   decisions, tries to have any interaction with you that you

18   feel is in any way inappropriate, then you should immediately

19   let Ms. Clendening know, she will advise the Court, and the

20   Court will deal with it.

21        I don't think it's likely, but, ladies and gentlemen,

22   there are no unimportant cases that get to a jury trial in a

23   federal court, and it is within the realm of possibility,

24   although I don't think it's likely.  But if you feel that

25   anybody has approached you and tried to discuss anything about

1    this case or influence you in any way or have any

2    inappropriate contact with you about your role as a juror,

3    then let Ms. Clendening know.  Again, she'll advise the Court,

4    and the Court will deal with it.

5        Also, ladies and gentlemen, over the course of the trial

6    this week there are going to be times when you're coming in at

7    the beginning of the day and going out at the end of the

8    day--and, again, we have one front entrance to this

9    courthouse--you're going to invariably be in close contact

10   with some of these lawyers, some of these witnesses, some of

11   the representatives of the companies, some of the paralegals

12   and support staff for each of the trial teams.  You're going

13   to be in close contact unavoidably with the people involved in

14   this trial.

15       When you do, you need to understand they're not going to

16   speak to you, they're not going to say, Good morning, they're

17   not going to say, Good evening, I hope you have a good night,

18   travel safely on your way home.  They're not going to be

19   friendly and engaging and gregarious, as we usually are in

20   East Texas, because they're under instructions from me not to

21   have any interaction with any members of the jury.

22       Again, the only information from any source that you must

23   have before you when you answer the questions in the verdict

24   form must come from open court where the witnesses have

25   testified under oath and subject to cross examination and the

1    exhibits before you have been admitted by the Court under the

2    Rules of Evidence.  That's all.

3        So when these lawyers and paralegals and witnesses and

4    other people associated with either or both sides of these two

5    trial teams walk right by you, don't speak to you, pretend

6    like you're not there, don't hold it against them, don't think

7    they're being rude or unfriendly.  Understand, ladies and

8    gentlemen, they are following my instructions, and that's why

9    they're being that way.

10       All right.  With those instructions, ladies and

11   gentlemen, I'm going to excuse you for lunch.  It should be

12   waiting for you in the jury room.

13       When you come back, we will begin with my preliminary

14   instructions followed by opening statements from the attorneys

15   for both sides.  The opening statements that each side will

16   give you is not an argument; it's intended to provide a

17   roadmap for each of you about what each party thinks they'll

18   be able to prove through the trial.

19       Once they've finished the opening statements, first by

20   the Plaintiff and then by the Defendant, then we'll begin the

21   Plaintiff's case in chief.  The Plaintiff will call their

22   witnesses and the witnesses will testify.  And when the

23   Plaintiff has passed the witness, then the Defendant's counsel

24   will cross examine the witnesses.  And then they'll call their

25   next witness and so forth and so on until the Plaintiff has

1    presented all its witnesses.  When it does, the Plaintiff will

2    rest what's called the Plaintiff's case in chief.

3         When the Plaintiff rests its case in chief, then we will

4    transition to the Defendant's case in chief and the Defendants

5    will call their witnesses who will testify.  And when the

6    Defendants have passed the witness, then Plaintiff's counsel

7    will cross examine the Defendant's witnesses.  And we'll go

8    through each of the Defendant's witnesses until the Defendant

9    has put on all of its witnesses, and then the Defendant will

10   rest its case in chief.

11        When the Defendant rests its case in chief, the Plaintiff

12   has the opportunity, but is not required, to call to testify

13   what are known as rebuttal witnesses to rebut what the

14   Defendant has put on.  If the Plaintiff calls rebuttal

15   witnesses, then they will testify.  And when they've

16   testified, Defense counsel will cross examine them.  And

17   when we've gone through all of the rebuttal witnesses that

18   the Plaintiff might call in their rebuttal case, then you

19   will have heard all of the evidence in this case.  If the

20   Plaintiff doesn't call rebuttal witnesses, then at the end

21   of the Defendant's case in chief, you will have heard all of

22   the evidence in this case.

23        Whenever that is, when you've heard all the evidence,

24   then the Court will proceed to give you its final instructions

25   on the law that you are to apply, counsel for the Plaintiff

1   and the Defendant will present their closing arguments, and

2   when you've heard the parties' closing arguments and received

3   my final instructions, then I will say, "Ladies and gentlemen

4   of the jury, you may now retire to the jury room and

5   deliberate on your verdict."

6         That, ladies and gentlemen, is when you, the eight of

7   you, go from being prohibited to talking about the evidence

8   with each other to being required to talk about and discuss

9   the evidence among the eight of you in an effort to reach a

10  unanimous decision about how to answer the questions that will

11  be furnished to you in the verdict form.

12        So I hope that overview structurally of how we are going

13  to proceed is helpful with you.

14        With that and with those instructions, you are excused

15  for lunch, which should be waiting for you in the jury room.

16        The jury is excused.

17              (Whereupon, the jury left the courtroom.)

18              THE COURT:  All right.  Be seated, please.

19        Who will be presenting opening statements for the

20  Plaintiff?

21              MR. RABENA:  I will, Your Honor--John Rabena.

22              THE COURT:  All right.  And who will be presenting

23  opening statement for the Defendant?

24              MR. CULBERTSON:  I will, Your Honor.

25              THE COURT:  All right.  And am I correct, Plaintiff,

1    that your first witness will testify with aid of an

2    interpreter?

3              MR. RABENA:  That's correct, Your Honor.

4              THE COURT:  All right.  We will make those

5    arrangements, and we'll move seating over here by the witness

6    stand over the lunch break so the interpreter will be close to

7    the witness.

8         We're going to break for lunch.  It's roughly 12:30.  We

9    are going to take roughly 45 minutes, so I'll try to be back

10   in the courtroom at 1:15, and then we'll proceed with my

11   preliminary instructions to the jury, your opening statements,

12   and then we'll get on to the Plaintiff's case in chief.

13        Any questions from either side before we recess for

14   lunch?  Anything from the Plaintiff?

15             MR. HEARTFIELD:  No, Your Honor.

16             THE COURT:  Anything from the Defendant?

17             MR. CULBERTSON:  Your Honor, may I raise one issue?

18             THE COURT:  You may.

19             MR. CULBERTSON:  Thank you.

20        And I didn't want to object during the questioning of the

21   panel, but I note that counsel blew right through MIL No. 9

22   using the word 'trespass' time and time again, and MIL No. 14

23   talking about the size of the legal team and the number of

24   lawyers involved, and I just want to raise that now.  I don't

25   know if they intend to do it in their opening.  I'd rather not

1    object during opening, either.

2              THE COURT:  Well, as both sides are aware, the Court

3    has a standing order on motions in limine that apply in this

4    case, and I intend to enforce them.  One of those limine

5    orders prohibits certain language or verbiage being used

6    that's inflammatory or pejorative.  'Trespassing' is listed in

7    MIL No. 9 as one of those.

8        The other side of the coin is you can't very well

9    complain about a limine order if you wait until time's passed,

10   then you bring it up after everything's already happened.

11             MR. CULBERTSON:  Understood.  And to be

12   prophylactive moving forward.

13             THE COURT:  Well, I'll expect both sides to comply

14   with the limine provisions in the Court's standing order.  If

15   there are perceived violations of it, you need to raise it

16   with me at the time and I'll deal with it --

17             MR. CULBERTSON:  Understood.

18             THE COURT:  -- either in front of the jury or at the

19   bench.

20             MR. CULBERTSON:  Thank you.

21             THE COURT:  Anything further before we recess for

22   lunch?  All right.  I will see you at approximately 1:15.

23   Until then, we stand in recess for lunch.

24                      (Lunch recess.)

25             THE COURT:  Be seated, please.

1    All right, counsel.  Anything that needs to be raised

2    with the Court before I bring in the jury and proceed to give

3    them my preliminary instructions?

4         MR. RABENA:  Not from Plaintiff, Your Honor.

5         MR. CULBERTSON:  Not from Defendant, Your Honor.

6         THE COURT:  Let's bring in the jury, please.

7         (Whereupon, the jury entered the courtroom.)

8         THE COURT:  Welcome back from lunch, ladies and

9    gentlemen.  Please have a seat.

10   Members of the jury, you've now been sworn as the jurors

11   in this case, and as the jury, you are the sole judges of the

12   facts.  As such, you will decide and determine all of the

13   facts in this case.

14   As the Judge, I will give you instructions on the law,

15   decide any questions of law that arise over the course of the

16   trial, and handle all matters regarding evidence and

17   procedure.  I'm also responsible for maintaining an efficient

18   flow of the evidence and the trial and maintaining the decorum

19   of the courtroom.

20   At the end of the evidence, I'll give you detailed

21   instructions about the law to apply in deciding this case, and

22   I'll give you a list of questions that you are then to answer.

23   This list of questions is called the verdict form.  Your

24   answers to the questions will need to be unanimous, and those

25   answers will constitute the jury's verdict in this case.

1          Now, let me briefly tell you what this case is about.  As

2     you are aware, this case involves a dispute regarding one

3     United States patent.  I know that you've all seen the video

4     this morning prepared by the Federal Judicial Center, but I

5     need to give you some instructions now and on the record about

6     a patent and how one is obtained.

7          Patents are granted or denied by the United States Patent

8     and Trademark Office, sometimes called for short simply the

9     PTO, sometimes called the Patent Office.  A valid United

10    States patent gives the patent holder the right for up to 20

11    years from the date the patent application is filed to prevent

12    others from making, using, offering to sell, or selling the

13    patented invention within the United States or from importing

14    it into the United States without the patent holder's

15    permission.

16        A patent is a form of property called intellectual

17    property, and like other forms of property, a patent can be

18    bought or sold.

19        A violation of the patent holder's rights is called

20    infringement.  A patent holder may try to enforce a patent

21    against persons it believes to be infringers by filing a

22    lawsuit in federal court, and that's what we have in this

23    case.

24        The process of obtaining a patent is called patent

25    prosecution.  To obtain a patent, one must first file an

1    application with the United States Patent and Trademark

2    Office.  The PTO employs trained examiners who review patent

3    applications.

4         The application filed with the Patent Office includes

5    within it something called a specification.  The specification

6    contains a written description of the claimed invention

7    telling what the invention is, how it works, how to make it,

8    and how to use it.  The specification concludes or ends with

9    one or more numbered sentences.  These numbered sentences,

10   ladies and gentlemen, are called the patent claims.

11        When a patent is granted by the PTO, it is the claims

12   that define the boundaries of its protection and give notice

13   to the public of those boundaries.

14        Now, patent claims may exist in two forms referred to as

15   independent claims and dependent claims.  An independent claim

16   does not refer to any other claim in the patent.  It is

17   independent.  It is not necessary to look at any other claim

18   to determine what an independent patent claim covers.  On the

19   other hand, a dependent claim refers to at least one other

20   claim in the patent and it includes the limitations of that

21   dependent claim itself as well as those of the patent to which

22   it refers, or as we sometimes say, from which it depends.

23        In this case there are two patent claims at issue from

24   the patent-in-suit.  Both of the claims at issue in this case

25   are independent claims.  Neither of the claims in this case

1    are dependent claims.

2        Now, a claim often uses the word 'comprising.'

3    Comprising means including or containing.  A claim that

4    includes the word 'comprising' is not limited to the methods

5    or devices having only the elements that are recited in the

6    claim, but also covers methods or devices that add additional

7    elements.

8        Take for example a table -- excuse me, a claim that

9    covers a table.  If the claim recites a table comprising a

10   table top, legs, and glue, then the claim will cover any table

11   that contains these structures even if it contains other

12   structures, such as leaves to go in the top of the table to

13   expand it or wheels to go on the ends of the legs.

14       That's a very simple example using the word 'comprising'

15   and what it means.  In other words, it can have other features

16   in addition to those that are covered by the patent.

17       Now, after the applicant files their application with the

18   PTO, an examiner is assigned by the PTO to review the

19   application and to determine whether or not the claims are

20   patentable--that is to say, appropriate for patent protection,

21   and whether or not the specification adequately describes the

22   invention that's claimed.

23       In examining the patent application, the examiner reviews

24   certain information about the state of the technology at the

25   time the application was filed.  The PTO, the Patent Office,

1   searches for and reviews this type of information that is

2   publicly available or that was submitted by the applicant.

3   This type of information is called prior art.  The examiner

4   reviews this prior art to determine whether or not the

5   invention is truly an advance over the state of the art at the

6   time.

7        Now, prior art is defined by law, and I'll give you

8   specific instructions at a later time as to what constitutes

9   prior art.  However, in general, prior art includes

10  information that demonstrates the state of the technology that

11  existed before the claimed invention was made or before the

12  application for a patent was filed.

13       Now, a patent contains within it a list of certain prior

14  art that the examiner has considered, and the items on this

15  list are called the cited references.

16       Now, after the prior art search and examination of the

17  application, the examiner informs the applicant in writing of

18  what the examiner has found and whether the examiner considers

19  any claim to be patentable, in which case it would be allowed.

20  And this writing from the examiner to the applicant is called

21  an office action.

22       Now, if the examiner rejects the claims, the applicant

23  has an opportunity to respond to the examiner to try to

24  persuade the examiner to allow the claims.  The applicant also

25  has a chance to change or amend the claims or to submit new

1    claims, and the papers generated in this back and forth

2    between the examiner and the applicant are called the

3    prosecution history.

4        And this process, this prosecution history, may go back

5    and forth between the examiner and the applicant for some time

6    until the examiner is ultimately satisfied that the

7    application meets the requirements for a patent.  In that

8    case, the application issues as a United States patent or, in

9    the alternative, if the examiner ultimately concludes that the

10   application should be rejected, then no patent is issued.

11   Sometimes patents are issued after an appeal within the PTO or

12   to a court.

13       Now, to help you follow the evidence, ladies and

14   gentlemen, I'm going to give you a brief summary of the

15   positions of the two competing parties.

16       As you know, the party that brings a lawsuit is called

17   the plaintiff.  The Plaintiff in this case is Orange

18   Electronic Company, Ltd., which you'll hear referred to as the

19   Plaintiff.  You'll probably also hear it simply referred to as

20   Orange.  And as you know, the party against whom a lawsuit is

21   brought is called the defendant.  The Defendant in this case

22   is Autel Intelligent Technology Corp., Ltd., which you will

23   hear simply during the course of the trial referred to as

24   either the Defendant or as Autel.

25       Now, sometimes we'll -- people will mispronounce the name

 1    and you'll hear it as Autel, but it's properly pronounced

 2    Autel even though it starts with an A-U.

 3         Now, as I told you during jury selection, this is a case

 4    of alleged patent infringement, and as I've already mentioned,

 5    there is one United States patent at issue in this case and it

 6    is United States Patent No. 8,031,064.  And as you've already

 7    been told, patents are commonly referred to by the last three

 8    digits in the patent number.  So in this case Patent No.

 9    8,031,064 will be referred to and you'll hear it simply called

10    during the course of the trial as the '064 Patent.

11         This patent may be referred to at various times as the

12    patent-in-suit, it may be called the asserted patent, and it

13    may simply called, as I mentioned, the '064 Patent.  This

14    asserted patent generally relates to tire pressure monitoring

15    systems.

16         Now, the Plaintiff Orange contends that the Defendant

17    Autel infringes certain claims of the patent-in-suit by

18    importing, making, leasing, or selling products that include

19    its patented technology.  Orange further contends that the

20    Defendant Autel's infringement has been and is willful.

21    Finally, Orange contends that it's entitled to money damages

22    as a result of that infringement.

23         The Defendant Autel denies that it infringes the

24    Plaintiff's patent-in-suit and contends that the asserted

25    claims of the patent-in-suit are invalid as being obvious in

1    the light of prior art.  The Defendant Autel further contends

2    that the asserted claims are invalid because the claims are

3    directed to an ineligible subject matter.

4         Now, I know, ladies and gentlemen, there have been many

5    new words and many new concepts that have been thrown at you

6    since you arrived at the courthouse this morning.  I am going

7    to define a lot of these terms and explain a lot of these

8    concepts to you as we go through these instructions.  The

9    attorneys are going to discuss them with you in their opening

10   statements, and the witnesses are going to help you as they go

11   through their testimony to understand these words and

12   concepts.

13        So please do not feel overwhelmed at this stage.  I

14   promise you, it will all come together as we go through the

15   trial.

16        Now, one of your jobs in this case is to decide whether

17   or not the asserted claims of the patent-in-suit have been

18   infringed.  You will also be asked to decide whether or not

19   the asserted claims are invalid.  If you decide that any claim

20   of the patent-in-suit has been infringed by the Defendant and

21   it is not invalid, then you will need to decide and you will

22   be asked to decide whether or not the infringement by the

23   Defendant has been willful.  You will also at that time need

24   to decide what amount of money damages, if any, should be

25   awarded to the Plaintiff to compensate it for that

1    infringement.

2        Now, my job in this case is to tell you what the law is,

3    to handle rulings on evidence and procedure, to oversee the

4    conduct of the trial, and to maintain the decorum of the

5    courtroom.  In determining the law, ladies and gentlemen, it

6    is specifically my job to determine the meaning of any claim

7    language from within the patent-in-suit that needs

8    interpretation.

9        And I've already determined the meanings of certain claim

10   language from the patent-in-suit, and I will give you these

11   meanings, they're sometimes called constructions or

12   definitions, later, and you must accept the meanings that I

13   give you and use those meanings as to that language when you

14   decide whether any particular claim has or has not been

15   infringed, and whether or not any claim is invalid.

16       You'll also be given a document in a few moments that

17   reflects these meanings or constructions.

18       Now, for any claim language that I have not provided you

19   with a definition or construction, then you should apply the

20   plain and ordinary meaning of that language.  But if I have

21   supplied you with a definition or a construction, you're to

22   apply my definition or meaning to that language throughout the

23   case.

24       However, my interpretation of any of the language from

25   the claims should not be taken as an indication to you that

1    the Court has a personal opinion or any opinion at all

2    regarding the issues of infringement, invalidity, damages, or

3    any other issue in this case.  Those issues are yours alone to

4    decide, ladies and gentlemen.

5        And I'll provide you with more detailed instructions on

6    the meanings of the claims before you retire to deliberate and

7    reach your verdict.

8        In deciding the issues that are before you, you'll be

9    asked to consider specific legal rules, and I'll give you an

10   overview of those rules now, and then at the conclusion of the

11   case I'll give you much more detailed instructions.

12       The first issue that you're asked to decide is whether

13   the Defendant Autel has infringed any of the asserted claims

14   of the patent-in-suit.  Infringement, ladies and gentlemen, is

15   assessed on a claim-by-claim basis.  And the Plaintiff Orange

16   must show you by a preponderance of the evidence that a claim

17   has been infringed.  Therefore, there may be infringement as

18   to one claim but no infringement as to another claim.

19       There are also a couple of different ways that a patent

20   can be infringed, and I'll explain the requirements of each of

21   these types of infringement to you in detail at the conclusion

22   of the case.  But, in general, a defendant may infringe the

23   asserted patent by making, using, selling, or offering for

24   sale in the United States, or importing into the United

25   States, a product meeting all the requirements of a claim of

1    the asserted patent, or one that practices all the required

2    steps of a claim.

3        And I'll provide you with more detailed instructions on

4    the requirements for infringement at the conclusion of the

5    case.

6        Now, the second issue that you will be asked to decide is

7    whether or not the asserted patent is invalid.  Invalidity,

8    ladies and gentlemen, is a defense to infringement.

9    Therefore, even though the United States Patent and Trademark

10   Office has allowed the asserted claims and even though a

11   patent is presumed to be valid once it has been issued by the

12   Patent Office, you, the jury, must decide whether those claims

13   are invalid after hearing the evidence presented during this

14   trial.

15       You may find that a patent claim is invalid for a number

16   of reasons, including because the claims -- because the patent

17   claims subject matter is obvious.  Now, for a patent claim to

18   be invalid because it is obvious, the Defendant must show by

19   clear and convincing evidence that the claim would have been

20   obvious to a person of ordinary skill in the field of the

21   technology of the patent at the relevant time.

22       You will need to consider a number of questions in

23   deciding whether the invention claimed in the asserted patent

24   is obvious, and I'll provide you with more detailed

25   instructions on these questions at the conclusion of the

1    trial.

2        Now, patents must claim a patent eligible subject matter.

3    In general, a patent is directed toward an eligible subject

4    matter if it claims a process, machine, manufacture or

5    composition of matter or any new or useful improvement thereon

6    or thereof.  However, if the Court determines that a patent is

7    also directed towards an abstract idea, then the jury must

8    determine whether the patent only covers activities that were

9    well-understood, routine, and conventional at the time of the

10   alleged invention.  I'll provide you with more detailed

11   instructions on this question at the conclusion of the trial.

12       Now, if you decide that any claim from the patent-in-suit

13   has been infringed and is not invalid, then you will need to

14   decide whether or not the Defendant's infringement has been

15   willful.  If you decide that any claim of the patent-in-suit

16   has been infringed and is not invalid, you will also need to

17   decide what amount of money damages should be awarded to the

18   Plaintiff as compensation for that infringement.

19       A damage award must be adequate, ladies and gentlemen, to

20   compensate the patent holder for the infringement and in no

21   event may a damage award be less than what the patent holder

22   would have received if it had been paid a reasonable royalty

23   for the use of its patent.

24       However, the damages that you might award, if any, are

25   meant to compensate the patent holder and they are not meant

1    to punish the Defendant.  And you may not include in any

2    damages award an additional amount as a fine or a penalty

3    above what is necessary to fully compensate the patent holder

4    for the infringement.

5         Additionally, damages cannot be speculative, and the

6    Plaintiff in this case, Orange, must prove the amount of its

7    damages for the alleged infringement by a preponderance of the

8    evidence.

9         I'll give you more detailed instruction on the

10   calculation of damages for the Defendant's alleged

11   infringement of the patent-in-suit at the conclusion of the

12   trial, including by giving you specific instructions with

13   regard to the calculation of a reasonable royalty.  However,

14   ladies and gentlemen, the fact that I'm instructing you on

15   damages does not mean that the Plaintiff is or is not entitled

16   to recover damages.

17        Now, over the course of the trial, ladies and gentlemen,

18   you're going to be hearing from a number of witnesses in this

19   case, and I want you to keep an open mind while you're

20   listening to the evidence and not decide any facts until

21   you've heard all the evidence in the case from both sides.

22   This is important.  While the witnesses are testifying,

23   remember, you will have to decide the degree of credibility

24   and believability to allocate to the witnesses and the

25   evidence.

1          So while the witnesses are testifying, you should be

2     thinking about and asking yourselves things like the

3     following:  Does the witness impress you as being truthful?

4     Does he or she have a reason not to tell the truth?  Did he or

5     she have any personal interest in the outcome of the case?

6     Does the witness seem to have a good memory?  Did he or she

7     have an opportunity and ability to observe accurately the

8     things that they've testified about?  Did the witness appear

9     to understand the questions clearly and answer them directly?

10    And, of course, does the witness' testimony differ from the

11    testimony of any other witness, and if it does, how does it

12    differ?  These are some of the kinds of things that you should

13    be thinking about while you're listening to each witness over

14    the course of this trial.

15         I also want to talk to you briefly, ladies and gentlemen,

16    about expert witnesses.  When knowledge of a technical subject

17    may be helpful to you, the jury, a person who has special

18    training and experience in that particular field, we call them

19    an expert witness, is permitted to testify to you about his or

20    her opinions on those technical matters.  However, you're not

21    required to accept an expert witness' opinions or any other

22    witness' opinions for that matter.  It's up to you to decide

23    whether to believe an expert witness or any witness, and

24    whether what they tell you is correct or incorrect or whether

25    or not you want to believe what they have to say.

1          Now, I anticipate, ladies and gentlemen, over the course

2     of this trial both sides are going to present expert witnesses

3     testifying on their behalf.  But when they do, it will be up

4     to you to listen to that expert's qualifications.  And when

5     they give an opinion and explain the basis for that opinion,

6     you will have to evaluate what they say, whether you believe

7     it, and to what extent, if any, that you want to give that

8     opinion weight.

9          Remember, ladies and gentlemen, judging and evaluating

10    the credibility and the believability of each and every

11    witness is an important part of your job as the jury.

12         Now, during the trial, it's possible that there will be

13    testimony from one or more witnesses that are going to be

14    presented to you through what is called a deposition.  In

15    trials like this, it's difficult to get all of the witnesses

16    together in person at the same place at the same time so that

17    they can testify live to the jury.  So before the trial

18    begins, the lawyers from both sides take the witnesses and

19    depose them or a deposition is conducted with regard to those

20    witnesses.

21         In a deposition the witness is present, he's sworn and

22    placed under oath, a court reporter is present, and the

23    parties are represented by their counsel just as if the

24    witness was in court giving their testimony.  They are asked

25    questions by counsel, they give answers under oath, and the

1    questions and the answers are taken down and recorded.

2        Also, ladies and gentlemen, many times these depositions

3    are recorded not only in the traditional transcription method

4    where what is said and answered is written down but they are

5    often recorded with video recordings, and portions of those

6    depositions may be played back to you as evidence in this case

7    where those witnesses are not available to testify to you in

8    person.

9        You need to be aware that if that happens, when a portion

10    of a deposition is played back to you, especially if it's a

11    video portion of a deposition, that you're likely to see

12    breaks or skips or glitches in that testimony.  Let me explain

13    to you why.  In most depositions, a witness is asked questions

14    and gives answers for up to seven hours, but in a trial the

15    lawyers for that side may determine that this witness only

16    needs to present 15 minutes of testimony from that

17    seven-hour-long deposition.

18        To save you and me from having to listen to seven hours

19    of testimony to get 15 minutes' worth of material, they are

20    able to edit those video recordings of that deposition and cut

21    out the pertinent parts that make up that 15 minutes and

22    splice that together and present it to you as a part of this

23    trial.  That means we save all that time.

24        But as a part of that process, there may very well be

25    little skips or glitches.  You may hear differences in the

1    voices of the lawyers asking questions.  All those things may

2    occur as a part of putting that pertinent material together to

3    avoid having to listen to seven hours of testimony just to get

4    15 minutes of important relevant information.

5        If that happens, if deposition witnesses are presented

6    and if you see or notice skips or glitches, changes in voice,

7    other irregularities, don't focus on those, don't get

8    distracted by those.  Focus on the questions asked and the

9    answers given and know that, by doing that, you are being

10    saved a lot of time and headache of listening to the rest of

11    that deposition that really might not apply.

12        So I want you to be aware that if we get deposition

13    testimony in this case and it's presented by video, you're

14    likely to see that.  Again, don't be confused or focused on

15    any breaks or glitches.  Pay attention to the questions asked

16    and the answers given under oath by the witness.

17        Remember, ladies and gentlemen, deposition testimony is

18    entitled to the same consideration and, insofar as possible,

19    is to be judged by you, the jury, as to its credibility,

20    weight, and otherwise considered in the same way as if the

21    witness had been present in person and testified live before

22    you in open court from the witness stand.

23        Also, ladies and gentlemen, over the course of the trial

24    you will be shown various documents that have been admitted

25    into evidence by the Court.  If you're shown an admitted

1    exhibit, the Court has already reviewed the document and heard

2    any objections to it and has considered the applicable rules

3    of evidence and has admitted the exhibit into evidence.  If I

4    did not admit it into evidence, you will not be shown it

5    during this trial.

6        But it is possible that some of the documents you will be

7    shown may have portions of them that have been redacted or

8    blacked out because the Court determined that those sections

9    were not relevant or confusing or did not need for some other

10   reason to be shown to the jury.  If you're shown an exhibit in

11   this trial that has portions of it redacted or blacked out,

12   don't focus on what's been redacted, don't try to guess what's

13   been blacked out.  Focus on the part you can read and that is

14   legible and what it says.  Don't focus on the portion you

15   can't read.

16       Also, despite all these pretrial procedures to try and

17   make this case more streamlined for you, it is still possible

18   over the course of the trial that the lawyers are going to

19   raise objections with the Court.  And when the lawyers raise

20   objections, I will issue rulings on those objections.

21   Remember, it's the duty of an attorney on each side to object

22   when the other side offers testimony or evidence the attorney

23   believes is not proper under the rules of the Court, the rules

24   of procedure, or the rules of evidence.

25       Now, upon the Court allowing the testimony or other

1    evidence to be introduced over the objection of an attorney,

2    the Court does not, unless expressly stated, indicate any

3    opinion to you as to the weight or effect of that evidence.

4        Also, ladies and gentlemen, you should know that the

5    Court has already entered certain rulings and orders

6    prohibiting the reference to certain matters in this case.

7    There are topics or subjects or language that the Court has

8    already determined are not relevant or that should be limited

9    and that they may create more confusion than probative value.

10   These are called limine rulings or motions in limine.  Some

11   lawyers refer to them as MILs, M-I-Ls--motion in limine for

12   short.

13       If you hear the lawyers mention the word 'limine' or

14   orders in limine, please understand that's a reference to this

15   mechanism that the Court's already considered as a part of the

16   pretrial proceedings here.  And if a question or response

17   violates a prior limine ruling, I may ask you to disregard

18   that, either that question or that response.  And by giving

19   you such an instruction, I'm simply trying to avoid confusion

20   over language or terminology that you may not already be

21   familiar with.  I just want you to know what the word 'limine'

22   means if it comes up over the course of the trial.

23       Now, as I've stated to you before, you, the jury, are the

24   sole judges of the credibility and the believability of all

25   the witnesses, and you, the jury, are the sole judges as to

1    what effect and weight, if any, to be given to all the

2    evidence.

3         Now, I'd like to compliment most of the parties in this

4    case and their counsel because up until today they've worked

5    with the Court diligently to cover a lot of exhibits and other

6    issues as a part of our pretrial proceedings.  And through

7    these pretrial proceedings that you were not required to be

8    here for, the Court has already made rulings about the

9    admissibility of the exhibits.  And a lot of time has been

10   saved through these pretrial proceedings that you're not

11   required to listen to today.

12        So, as I told you, if the parties show you an exhibit

13   over the course of the trial, it means that I have already

14   ruled on its admissibility and found that that exhibit is

15   properly admissible.  And then after they have presented it,

16   they can ask such additional questions as they wish to put it

17   in a proper context.

18        But I want you to know both sides have worked with the

19   Court to streamline these issues so you don't have to listen

20   to all the objections and arguments for and against that I

21   heard during these pretrial proceedings regarding all these

22   exhibits.  That's already been done.  And if it's shown to you

23   as an exhibit in this case, it means that I have already

24   determined that it's properly admissible under the rules of

25   evidence and the rules of the Court.  And I promise you,

1    ladies and gentlemen, whether you appreciate it or not, that

2    has saved you a lot of time as we go through this trial.

3         However, it is still possible that objections may arise

4    over the course of the trial.  If I should sustain an

5    objection to a question addressed to a witness, then you, the

6    jury, must disregard the question entirely and you may draw no

7    inference from its wording or guess or speculate about what

8    the witness would have said if I had permitted them to answer

9    the question.  On the other hand, if I overrule an objection

10   addressed to a witness, then -- or addressed to a question,

11   then you should consider the question and the answer just as

12   if no objection had been made in the first place.

13        Now, you should be aware, ladies and gentlemen, that the

14   laws of the United States permit a United States district

15   judge to comment to the jury on the evidence in the case.  But

16   those comments from the judge to the jury are not evidence and

17   they're an expression only of the judge's opinion, and the

18   jury is free to disregard those comments in their entirety

19   because, as I've said, you, the jury, are the sole judges of

20   the facts.  You, the jury, are the sole judges of the

21   credibility and believability of the witnesses, and you the

22   jury, are the sole judges as to what amount of weight, if any,

23   to give to the testimony of the witnesses.

24        And even though the law permits me to comment to you on

25   the evidence in this case, as I indicated to you during jury

1  selection, I'm going to work very hard not to comment on the

2  evidence in this case and not to give you any idea about what

3  I think about the testimony of the witnesses or any of the

4  other evidence that's presented because determining the facts

5  from that evidence is your job, it is not my job.

6      Now, in front of me is our court reporter, Mr. McRoberts,

7  and he will take down everything that's said over the course

8  of the trial, and that will be placed in what's called a

9  transcript, the written record of every question, every

10  answer, every comment.  But that transcript, ladies and

11  gentlemen, you should be aware, is not going to be available

12  for you to review during your deliberations.  You're going to

13  have to rely on your memory of the evidence.  You're not going

14  to have a written copy of everything that was said during the

15  trial.  So remember, you're going to have to

16  remember -- you're going to have to rely, rather, on your

17  memory of the evidence once you begin your deliberations.

18      In a moment I'm going to see that each of you receives a

19  juror notebook, and these notebooks are going to contain

20  spaces within them where you can prepare and keep notes over

21  the course of the trial if you decide to keep notes.  It's up

22  to each juror whether to take notes over the course of the

23  trial or whether or not to take notes; and if you decide to

24  take notes, how detailed they should be or how otherwise they

25  should be.  It's strictly up to you.

1      But remember, any notes that you take over the course of

2  the trial are for your own personal use only, and you still

3  have to rely on your memory of the evidence.  The notes are

4  simply a way to refresh your memory or recollection of the

5  evidence, and that's why you should be paying close attention

6  to the testimony of each and every one of the witnesses.

7      Remember, you should not abandon your own recollection or

8  memory because some other juror's notes indicate something

9  different.  If you take notes, they're there simply to refresh

10 your recollection.

11     I'm going to ask our Court Security Officer to pass out

12 these juror notebooks to the members of the jury at this time.

13                 (Pause in proceedings.)

14         THE COURT:  In these notebooks, ladies and

15 gentlemen, you're going see that you each have a copy of the

16 patent-in-suit, the asserted patent, as we've heard it called

17 already, the '064 Patent.

18     Also, you're going to find that you have a chart or a

19 ledger in there with certain language from the two asserted

20 claims that the Court has already construed or interpreted.

21 You'll find on one side of that chart the language from the

22 claims, and opposing it on the other ledger or other side of

23 that chart you'll find the meaning or the construction or the

24 definition, it's called, of that language that the Court has

25 already reached.

1        Again, you must apply my definitions and meanings of that

2   claim language to the claims when you decide the issues that

3   you are asked to determine, including the issues of

4   infringement, invalidity, and damages.

5        Now, behind that claim construction ledger or chart,

6   claim language, you're going to find a section of witness

7   pages for each witness that may testify in the case, and there

8   should be a photograph of the witness at the top of each page

9   together with their name and spaces for taking notes there.

10  The Court's found that it's helpful, once you retire to

11  deliberate, to be able to look back and see a picture of each

12  person that testified as you recall and rely on your memories

13  of the evidence and testimony that they gave.

14       Behind those witness pages, you should also find a new

15  legal pad that you can use for additional note-taking, and

16  there should be a pen in the front pocket of each notebook for

17  note-taking if you choose to take notes.  Again, whether you

18  take notes over the course of the trial or not is up to you.

19  And if you take them, they're there simply to refresh your

20  recollection.  You still have to rely on your memory of the

21  evidence when you consider the issues that are going to be

22  presented to you in the verdict form.

23       I'm going to ask, ladies and gentlemen, that you keep

24  these notebooks with you throughout the trial.  If you're

25  leaving at the end of each day or when you're leaving at the

1    end of each day, I should say, be sure to take those notebooks

2    with you to the jury room and leave them closed on the table

3    there so they'll be there the next morning.  Don't leave them

4    out here in the courtroom.  When you're in the jury box, as

5    you are now, you should have them in your possession.

6        Now, there may be times over the course of the trial

7    where we take a short break or a recess, and if you're not

8    going to be outside of the jury box very long, I may simply

9    say, Ladies and gentlemen, you can simply close and leave your

10   notebooks in your chairs so that you don't have to carry them

11   with you back and forth.  If you're going to be in that

12   position and it's going to be a short period of time, I'll

13   tell you and you can simply close your notebook in that case

14   and leave them in your chase.

15       But, otherwise, if you're going to be out of the

16   courtroom for any length of time, over lunch breaks and at the

17   end of the day, I'm going to ask you to take them with you,

18   and when you leave for the day, leave them in the jury room,

19   don't take them outside the courtroom.  But they should either

20   be in the jury room or they ought to be in your possession at

21   all times.

22       Now, in a moment we're going to hear the opening

23   statements from the attorneys for the competing parties.

24   These opening statements, ladies and gentlemen, are designed

25   to give you a roadmap of what each side expects to show you by

1   way of its evidence.

2       And you should remember throughout this trial that what

3   the lawyers tell you is not evidence.  The evidence in this

4   case is the sworn testimony of the witnesses presented from

5   the witness stand under oath and subject to cross examination,

6   as well as the exhibits that the Court has already reviewed

7   and found to be admissible under the rules of evidence.  That

8   is the sole source of the evidence in this case.

9       And what the lawyers tell you, again, is not evidence;

10  it's simply their impression of what the evidence is.  And

11  they have a duty to try and point out to you what they believe

12  the evidence shows.  But, remember, what they tell you is not

13  evidence.

14      Now, after the opening statements from both sides, as I

15  mentioned to you before we broke for lunch, we'll proceed with

16  what's called the Plaintiff's case in chief.  The Plaintiff

17  will present its witnesses subject to cross examination by the

18  Defendant.  Then when the Plaintiff concludes its case in

19  chief, the Defendant will present its case in chief and call

20  its witnesses, and they'll testify subject to cross

21  examination from the Plaintiff's counsel.

22      Then if they choose to, when the Defendant rests its case

23  in chief, the Plaintiff may call rebuttal witnesses.  If they

24  do, we'll hear them in the same way.  If they don't, then we

25  won't.  And at that point you will have heard all of the

1    evidence in this case.

2        Now, after you've heard all the evidence in this case,

3    I'm going to give you written instructions on the law, and you

4    will also have a copy of the instructions that I will give you

5    on the law, and you can take these copies, you'll each have

6    your own, of my final instructions on the law with you back to

7    the jury room when you retire to deliberate on your verdict.

8    These final instructions that I'll give you orally at the end

9    of the trial which you will have in written form as well are

10   often called the Court's final instructions to the jury.

11   They're sometimes called the Court's charge to the jury.

12       After I have given you my final instructions or the

13   Court's charge to the jury, then you'll hear closing arguments

14   from the attorneys for the two competing parties.  After

15   you've heard the closing arguments, then I will instruct you

16   to retire to the jury room, to consider the evidence, and to

17   answer the questions that are set forth in the verdict form.

18   That is called your jury deliberations.

19       During your deliberations, ladies and gentlemen, you must

20   discuss the evidence over the course of the trial that's been

21   presented in an effort to reach a unanimous decision about how

22   to answer those questions in the verdict form.  But as I've

23   told you already, up until that point and before you retire to

24   deliberate on the verdict, you must not discuss or communicate

25   with each other about the evidence in this case or anything

1    related to the trial, nor may you communicate with any other

2    person about the evidence or anything that occurs during the

3    course of the trial.

4         Let me also remind you that during the course of the

5    trial when we take breaks, as we come and go each day in the

6    morning, as you come and go in the evenings, the lawyers and

7    the parties and the witnesses and all the people associated

8    with each side of this case are not going to talk to you,

9    they're not going to converse, they're not going to say good

10   morning or good evening, they're not going to say have a safe

11   drive home, they're not going to have any communications with

12   you, and that's because I've instructed them not to.  And when

13   that happens, don't hold it against them, don't think they're

14   being rude or unfriendly; simply understand that they're

15   following the instructions of the Court.

16        Now, with that, we're going to proceed to hear opening

17   statements from the parties.  We'll begin with the Plaintiff,

18   and then after the Plaintiff's opening statement, we'll hear

19   the Defendant's opening statement.

20        Mr. Rabena, you may present the Plaintiff's opening

21   statement at this time.

22              MR. RABENA:  Thank you, Your Honor.

23              THE COURT:  Would you like a warning on your time?

24              MR. RABENA:  Yes, sir.  Five minutes, please.

25              THE COURT:  I will give you a warning with five

1    minutes remaining.  You may proceed with Plaintiff's opening

2    statement.

3            MR. RABENA:  Good afternoon.

4        This case is about fairness, doing the right thing.  The

5    evidence that you will see in the next few days will enable

6    you to do the right thing at the end when it's your turn to

7    decide this case.  It's about my client, Orange Electronic,

8    and Mr. Yu.

9        Mr. Yu is sitting in the blue chair over there, and he's

10   the vice president of R&D at Orange.  He'll testify first this

11   afternoon.  And he'll explain to you how he developed a new

12   technology, an improvement, that allowed car mechanics and

13   tire technicians to make their lives a little bit easier, to

14   make what they do a little bit easier when they change tires

15   and when they deal with tire pressure monitoring systems.

16       And as a result, it made the lives easier of you and me

17   who -- people who drive cars and trucks because when we get

18   our tires serviced, that process is now a little bit better

19   because of this invention.

20       Orange and Mr. Yu were proud and happy about their

21   development.  They did the right thing, and they went to the

22   U.S. Patent Office and disclosed it, and they were granted a

23   United States patent.  I think you have a copy in your books.

24       Unfortunately, not everybody does the right thing, and

25   that's why we're here.  The Defendant Autel has added Orange's

1    invention to their products.  And when they learned about

2    Orange's patent, they ignored it.

3        Orange is not asking Autel to stop or to take the feature

4    out of their product, which they're entitled to by virtue of

5    their patent.  They simply want Autel to pay a reasonable fee

6    for using their technology.

7        Let me tell you a little bit more about Orange.  Orange

8    makes products only in the area of TPMS, tire pressure

9    monitoring systems.  That's the only technology that they deal

10   with.  These are some of the products on the screen.  On the

11   left is a TPMS sensor, and I'm holding one up right now.  It's

12   a little bit small, but you'll get to a chance to see these up

13   close later.  It goes in the wheel of the car.

14       And the next item is a tool that allows you to install

15   them into the wheel.

16       And then the last two items are diagnostic tools that can

17   diagnose things that are going on and also program and

18   diagnose the sensors.  I'm holding one in my hand as well.

19       Orange is headquartered in Taiwan, but it has people all

20   over the world because it sells its products all over the

21   world.  This is from their website.  It shows they have sales

22   rep in the U.S.  They have them all over.  Their largest U.S.

23   company is, in fact, Standard Motor Products, which is also

24   called SMP.  It's a large aftermarket parts distributor.

25       But Orange started by making OEM products, original

1    equipment products, for companies like the ones you see here

2    on this slide.  So instead of aftermarket products, Orange

3    makes -- also makes original equipment, sensors, tire pressure

4    sensors, for companies like Ford, Honda, Toyota, Nissan,

5    Hyundai, and others.  So if you buy a new Ford, the chances

6    are that the tire pressure sensors in that Ford are actually

7    made by Orange.  These companies trusted Orange to make

8    quality and reliable products at a fair price.

9        Orange also makes aftermarket products, as I mentioned,

10   and the technology in this case deals with aftermarket

11   products that Orange makes.  And this slide is also from

12   Orange's website, and it shows tire technicians, these are

13   customers of Orange, these are tire technicians who use

14   Orange's sensors and Orange's tools.  They're all holding --

15   it's a little bit difficult to see, but they're all holding an

16   Orange programming tool that programs the sensors.  And some

17   of them are holding Orange's sensors as well.

18       All right.  You've heard a lot about TPMS and tire

19   pressure monitoring systems.  I'm going to give you an

20   overview of what that technology is about.  This will be

21   explained in more detail by, the Judge referred to, as an

22   expert witness, Mr. Joseph McAlexander, who's an electrical

23   engineering expert who will testify later today or tomorrow.

24       Maybe you've seen, hopefully not, but probably a lot of

25   you have seen on your dashboard an alarm light like the

1     tire-looking light on the left bottom of your screen

2     now--that's a picture of a dashboard--meaning there's

3     something wrong with one of your tires.  Usually it means the

4     pressure's too low.  Sometimes it could mean the pressure is

5     too high.  But that's an alert coming from your tire pressure

6     monitoring system.

7          And on the right of the screen, it's a more -- there's

8     more detailed information about the tire pressure in this

9     vehicle.  And some of the newer cars have this level of detail

10    where the screen can tell you, the dashboard can tell you,

11    which tire is low and also the exact pressure in each tire.

12         And so how does that work?  This is a top-level diagram

13    from an -- we're looking at a vehicle, a car from the top.

14    And as you -- and in each wheel there is, as you can see, a

15    little, almost triangular-looking structure which is a sensor.

16    Okay?  And the sensor -- each sensor has a unique

17    identification number.  And this is how the car knows which

18    tire is flat and which is not, how the car knows what data

19    it's receiving is coming from which tire.

20         So all of the sensors send radio waves to the computer in

21    the car.  And in this diagram, it's shown as labeled as an

22    ECU.  It's received through that receiving unit, the blue

23    shape.  That's sort of an antenna.  The information goes to

24    the ECU.  You can think of it as a computer.  ECU stands for

25    electronic control unit.  And that's -- the ECU is what puts

1    that information on your dashboard once it receives it from

2    the sensors.

3        So those red, sort of diagonal waves are meant to reflect

4    that there's radio wave transmission from the sensors to the

5    ECU.  But the ECU is receiving this data, the tire pressure

6    data, from four different sensors at the same time.  So how

7    does it know which one is sending which batch of information?

8    Well, the key is in the identification numbers.  The sensor ID

9    that each sensor has is unique to it, and the car's computer

10   has a table that it can check.

11       For example, if you remember in the dashboard that I

12   showed you, the right front tire was at zero in that dashboard

13   figure.  All right?  So how does this car know it's the right

14   front tire.  What I'm showing is an illustration where -- of

15   the data packet that the sensor would send, you know, from the

16   right front tire.  And the data, the information, that that

17   sensor transmits is its sensor ID.

18       This is a key element.  The sensor ID is what the car

19   identifies it because the car knows where each sensor is.  And

20   its pressure data, which in this case is zero, a lot of times

21   they also send the temperature because that sometimes can be

22   useful, the frequency, and that the battery is okay.

23       These batteries last three to five years, and that you'll

24   hear more about later.  That causes an issue that -- that's

25   relevant.  So the sensor sends -- each of these are sending a

1    different packet with its own sensor ID attached to it.

2         The car computer has a table sort of like what's

3    represented in blue on your screen, and that enables the car's

4    computer to know which sensor is sending which batch of data.

5    So when it gets this red packet at the ECU, it says, okay, I'm

6    getting data from sensor ID number 8TUL 977, which one is

7    that?  And it will look in its table, and it will say, oh,

8    that's the front right tire according to the data table.

9    That's what the car -- so now the car's computer can put the

10   information up on the screen so you know which tire you have

11   to fix.

12        But what happens when you change that tire?  You go get

13   it fixed, and they put a new sensor in.  Well, sensors have a

14   unique ID number.  So the new sensor, and in this slide I'm

15   showing, that tire's been replaced and the sensor's been

16   replaced.  It has a new sensor ID, NN 5559.  Notice the

17   pressure is now up to 30 because they fixed the tire, too.

18        Well, the car doesn't know what to do with that data when

19   it gets it because it only has the IDs of the original

20   sensors.  Therein lies the issue that Mr. Yu was trying to fix

21   in 2008.  How do we deal with this?  Because all the other

22   technologies, what was happening was you had to get somebody

23   to reprogram your car computer in order to reset it with the

24   new ID of the new sensor.

25        And a lot of car manufacturers, different brands, would

1    not let aftermarket tire shops access those computers because

2    of proprietary reasons or for other reasons.  So one of the

3    problems that consumers like we had was if you had that light

4    go off in your dashboard and then you decided, I'm going to go

5    to Discount Tire.

6        Now, this is in a time frame early 2000 when TPMS first

7    came out before Mr. Yu's invention.  You didn't want to go to

8    your dealership because they're expensive.  So I'm going to go

9    to Discount Tire, they have good prices.  All right.  You

10   drive to Discount Tire, they can change your tires, no

11   problem, and because the batteries in the sensors only last

12   three to five years, they're going to recommend you should

13   change your sensors, too.  All right?

14       So if you change your sensors, they all have new ID

15   numbers.  So as a result, when you leave Discount Tires with

16   your nice new tires, your light is still on the dashboard.

17   And you tell Discount Tire, hey, my light is still on.  And

18   they say, sorry, I can't -- we can't access your car's

19   computer to reset that light.

20       So you have to go back to the dealer.  So you take

21   another half a day off work to go get that done, and the

22   dealer resets your car's computer with the new ID numbers of

23   the new sensors.  And then everything works like it used to.

24       Well, that was annoying to customers.  It also was

25   annoying to Discount Tire and to aftermarket tire shops.  And

1    there were a number of different approaches that folks were

2    trying to come up with to -- to fix this problem, but they all

3    dealt with, how do you reprogram the car's computer.

4        There are techniques called -- where you actually plug

5    into the on-board diagnostic port of the computer, that's one

6    way, if you get the car maker's permission.  Another

7    technology that you'll hear from the witnesses Mr. Yu and Mr.

8    McAlexander is called a relearn procedure, which again takes

9    some time to do, but there are ways you can put your car into

10   a relearn mode where -- and sometimes you have to drive it a

11   certain way, but that relearn mode will allow your car to

12   relearn the IDs, which wheel is in which position.  Those are

13   all complicated.

14       But Mr. Yu came up with a different approach that he

15   called ID Copy.  And this was roughly in 2008.  And he -- ID

16   Copy is something that they added to their tools.  Tools

17   generally existed before because you could do other things

18   with them.  They added the ID Copy feature to their tools, and

19   their sensors have to be programmable sensors that can be

20   programmed.  And generally what Mr. Yu's invention is at a

21   very high level, ID Copy, is illustrated by this figure here.

22       Number 1, you take the new tool, which can receive

23   information off of an old sensor, you bring it up to the old

24   sensor and read the data, including the sensor ID out of the

25   old sensor.  And he figured a way to program that into a

1    programmable new sensor.  So you essentially trick the car's

2    computer into thinking it still has the old sensor ID.

3         You never have to worry about getting permission from the

4    car dealer to access their on-board diagnostic port.  It's a

5    fairly straightforward and simple procedure once you -- once

6    you know how to do it.

7         And, in fact, it saves -- it save customers from having

8    to take that extra trip to the car dealer to get them to reset

9    their dashboard TPMS system.  But it also saves car mechanics

10   and tire technicians time.

11        What I'm showing you now is a marketing blurb from

12   Orange's website that talks about the ID Copy technology and

13   talks about what -- some things that it -- some benefits it

14   provides.  It says in the top left, it's a little bit small,

15   it says it's relearn mode free.  You don't have to do the

16   relearn procedures.  It's OBD free.  You don't need an

17   on-board diagnostic plug to plug into the car's computer to do

18   this procedure.  And it says that the Orange sensors -- all

19   Orange sensors can be ID copied, and that function is

20   protected by the U.S. patent.

21        The clock image is meant to show how the ID Copy approach

22   saves the technicians time.  It can take about five minutes to

23   reset to put -- to reset four sensors, four new sensors to

24   perform the ID Copy function, as opposed to relearn procedure

25   which in the old days was 45 minutes.  Now it can be faster,

1    like 20 minutes as a maximum, but still ID Copy is faster than

2    most other approaches.  So it saves the technicians a lot of

3    time.

4         I'm going to play a little video from Orange's website

5    about how the tool works and how the tool does this procedure,

6    and I'll stop it at times to explain what they're doing.

7              (Whereupon, PTX 26 was played in open court.)

8         Okay.  Pause it.

9         You can see here first the technician entered the make

10   and model of the car, and now the technician is putting the

11   tool -- he selected read and -- read ID.  Now he or she is

12   taking the tool up to the wheel's old sensor, it's the valve

13   stem, and reading the information out of the old sensor.

14        Go ahead.

15        (The video continued.)

16        Now you can see on the screen--pause it there--that it

17   has read the ID number as C3A732 from the old sensor and

18   captured that into the tool.

19        Go ahead.

20        (The video continued.)

21        Selects the copy ID function.

22        (The video continued.)

23        Now he takes the new sensor and puts it towards the top

24   and presses a button and it clones the old sensor's ID into

25   the new programmable sensor and it will give him a green

1    circle.  You can see it pop -- there you go.

2        So now you can see -- pause it there.  Now you can see

3    that that old sensor's ID has been cloned into the new sensor,

4    C3A732.  The car won't know anything changed, and now you can

5    put the new sensor in the wheel and the customer can move on.

6        Next slide, please.

7        All right.  Mr. Yu was excited and Orange was excited

8    about this development because it lets their customers, the

9    tire technicians, perform their services more efficiently.  As

10   a result, they went to the Patent Office and were awarded this

11   patent, the '064 Patent.  You can see it has Mr. Yu's name on

12   it, and the assignee, which is the owner, is Orange Electronic

13   Company.

14       It also lists what the Judge referred to earlier as prior

15   art.  This is old patents, old technologies that the Patent

16   Office looked at and considered when it granted this patent

17   and deciding that it was patentable.

18       So what is a patent?  You saw the video this morning.  In

19   general, obtaining this patent is sort of like a property

20   right, like a deed of trust, and you can think of the patent

21   and the patent claims as a boundary of the boundary that

22   Orange's patent protects and owns.

23       When Orange got the patent, it put it on its website.  It

24   was proud of this fact.  And when it advertised ID Copy, you

25   can see an image here on the left of the patent when it talked

1    about the advantages and how it works.  They put their patent

2    on the website to let the world know.

3        It is another example of a website blurb.  We've seen

4    this young lady before, but this image has the description of

5    ID Copy, and where it says program a sensor, not the vehicle,

6    and you can see an image of the patent, the '064 Patent, and

7    its number below that as well.

8        I want to sort of back up and take a look at the timing

9    of how all these events took place, and so this is a timeline

10   that sort of sets it out for you.  The TPMS in general came

11   about in 2000, roughly 2000, and the U.S. government issued

12   regulations that said by 2007 every new car has to have some

13   type of TPMS system in it.  But in the beginning in the 2000

14   time frame, that's the time frame when a lot of aftermarket

15   shops could not access the car's computer so you had to get

16   the dealer to reset your dashboard.

17       And then in 2008, Mr. Yu came up with the ID Copy

18   concept.  He filed his patent application towards the end of

19   2008.  And Orange, as they're entitled to do, started selling

20   their products with copy -- with the ID Copy technology in it.

21       The patent was issued by the federal government in 2011,

22   and Orange also started receiving awards.  You'll see these

23   awards, I have them on my desk, but you have an image of them

24   in the timeline.  These two examples, one is from the

25   government of Taiwan, and one is from SMP.  That's Orange's

1    largest U.S. customer.  SMP gave Orange that award and also

2    bought 20 percent or 20 or 25 percent of the company as a

3    result, they were so happy with the ID Copy technology.

4        And you may ask why a Taiwanese company wants -- would

5    want a U.S. patent or would be able to get a U.S. patent.

6    Well, this SMP is one main reason, is that Orange sells

7    products in the U.S. and most of the products they sell are to

8    SMP or through SMP.  And in order to protect their biggest

9    customer from competition that's not fair and competition by

10   infringing products, Orange needed to get a patent to protect

11   SMP.

12       At the same time roughly in 2012 after the patent had

13   issued, there were three what's called re-examination requests

14   filed at the Patent Office.  These are an anonymous requests

15   by someone who tried to knock out the '064 Patent.  They sent

16   more prior art to the Patent Office to try to knock it out.

17   Now, some of the claims were adjusted during those procedures,

18   but they're passed now and the claims that we have today are

19   the ones at issue in this case.

20       Also shown on this timeline in 2012 is when Autel started

21   putting their -- what they call Copy by Activation in their

22   products.  They don't call it ID Copy.  They call it Copy by

23   Activation.  But the evidence will show you it's the same

24   thing.

25       I have a video as well of the Autel products.  But,

1    first--this is from their website--these are some of Autel's

2    TPMS products.  And on the bottom it's mostly sensors that go

3    into the wheels, and on the top you'll see mostly programming

4    tools.

5         And Autel also liked the Copy by Activation feature a

6    lot.  In fact, they liked it so much they put it into every

7    one of their programming tools.  And you'll see that every one

8    of the programming tools doesn't have every feature that they

9    offer, but every one of their programming tools has Copy by

10   Activation because it's an important feature for them to be

11   able to sell to their customers.

12        Here's the video from Autel's website explaining how to

13   do Copy by Activation.

14        And for the sake of the court reporter, I'm okay if it's

15   not transcribed.  It has speaking in it.

16             (Whereupon, PTX 27 was played in open court.)

17             MR. RABENA:  Pause it.

18             THE COURT:  You have five minutes remaining,

19   counsel.

20             MR. RABENA:  Thank you, Your Honor.

21        As you can see, just like with the Orange product, the

22   gentleman in the video took the Autel tool, he selected Copy

23   by Activation and put it near the old sensor at the wheel, and

24   copied the sensor ID.  And now he's taking a new sensor, a

25   programmable sensor, put it at the top, and he pressed the

1    button and it's now programming that sensor, the old sensor

2    ID, into the new sensor just like in Orange's ID Copy

3    technology.

4        Go ahead.

5        (Video continued.)

6        Okay.  Members of the jury, Orange and I want to thank

7    you for your time and your attention to this case.  It's very

8    important to Orange.

9        At the end of the trial, we're going to ask you to award

10   Orange a reasonable fee for Autel's use of this technology,

11   and on your verdict form, it will look something like this.

12   And while that's a big number, 6.6 million, it's a small

13   percentage of the sales that Autel has had.  And we think the

14   evidence will show to you that it's a reasonable amount given

15   their use, and that's all Orange is asking for is for fair and

16   reasonable payment for the use of their technology.

17       Thank you.

18           THE COURT:  Defendant may now present its opening

19   statement.  Would you like a warning on your time, Mr.

20   Culbertson?

21           MR. CULBERTSON:  Yes, please, Your Honor.  Could I

22   have one at five minutes, please?

23           THE COURT:  I'll warn you when you have five minutes

24   remaining.

25           You may proceed with opening statement.

1          MR. CULBERTSON:  Thank you, Your Honor.

2      Welcome back again.  I'm Geoff Culbertson.  I'm one of

3  the lawyers that's representing Autel, and on behalf of Ms.

4  Huang and all of the Autel team who's traveled across the

5  globe to be here for this case, we want to thank you for your

6  service.

7      I hope this demonstrates how important this case is to

8  Autel.  We need your help to resolve it, and we're going to

9  put on an efficient case to give you the tools to allow at the

10 end of the case to make the right decision on the verdict form

11 that you heard about from Judge Gilstrap today.

12     When all is said and done, we expect the evidence will

13 lead you to find that Autel doesn't infringe Orange's patent.

14 Okay?  We think that patent -- the evidence will show that

15 that patent's invalid and that Orange isn't entitled to any

16 damages at all.

17     So how did we get here?  You're going to hear a very

18 different story from what you just heard from Orange's

19 counsel.  The evidence will provide a simple answer:  Orange

20 is struggling in the market.  You'll hear from Autel that they

21 don't even encounter Orange.  They don't consider them a

22 competitor.

23     And so what Orange is trying to do, instead, to make up

24 for those failures is to compete here with its patent.  And

25 that's okay.  It has that right, to assert its patent.  But

1    now that we're here, now that we're all gathered here in this

2    courthouse, it's got to prove those allegations.  It's got to

3    prove that Autel's product read on every single word of the

4    two claims that Orange is asserting here.

5        The evidence will show that Autel's products are

6    different, though.  Okay?  Autel doesn't use this patent.

7    Autel doesn't need this patent.  And Autel doesn't want the

8    technology that's described by this patent.  It's a patent

9    that never should have issued in the first place.

10       Just a quick -- quick moment to -- to talk about Autel.

11   Autel is a leading manufacturer of automotive diagnostic tools

12   like the TPMS products that you've heard about already.  This

13   is their maxiTPMS tool.  I'll show you two.  We have an MX

14   sensor that you'll see this tool used with, and you're going

15   to see how the sensor and the tool interact with and

16   communicate with one another.  You're going to see product

17   demonstrations from the -- the experts that will testify in

18   this case and perhaps from Autel representatives as well.

19       Autel's products are available around the world in 50

20   countries through its distributors.  Autel is an innovator.

21   Each year it invests roughly 20 percent of its revenues into

22   research and development--new technologies, new products, new

23   developments that drive the growth of their business.

24       And Autel has its own patents.  It's got 1300 of them

25   worldwide.  More than a hundred of them are directed to the

1   TPMS technologies that we're talking about in this case.  So

2   they understand the importance of intellectual property

3   rights, and they also understand that it's important to defend

4   yourself when you're accused of using a patent that you don't

5   infringe.  Autel's not going to be bullied into paying a

6   license for a patent that it doesn't use, that it doesn't

7   want, and it doesn't need.

8       And so what do I mean when I say that Autel doesn't need

9   Orange's patent?  Well, Autel's succeeding, it's competing,

10  out there with its own products, with its products because of

11  its own innovations and its own development.  The evidence

12  will show that Autel doesn't practice the claims that you're

13  going to learn about in this case, and its products are

14  different than what Orange's patent describes.  So Orange's

15  patent has no value to Autel.  It doesn't need it.

16      This case is important to Autel, ladies and gentlemen.

17  That's why they brought this team.  They're away from their

18  work, they're away from their families to be here for this

19  trial because they take these allegations so seriously.  It's

20  that important.

21      And I think you're going to hear from up to three members

22  of Autel's team.  You're going to hear from -- I expect you'll

23  hear from Mr. Luo, who is the TPMS product director.  He's

24  going to talk about Autel's research and development and their

25  products and about the TPMS market.

1        I expect you'll hear from Mr. Feng -- Mr. Zeng, rather,

2    Feng Zeng.  He supervises the TPMS software development, the

3    software that's running on Autel's TPMS tools.

4        And then I expect you'll hear from Ms. Chen.  She's

5    the sale -- she manages the sales operations at Autel, and

6    she'll talk with you about Autel's sales activities and how

7    they distribute their products, including the products that

8    are sold here in the United States.

9        You heard a bit just now about ID Copy.  You're going to

10   hear that called ID Copy, you're going to hear it called Copy

11   by Activation, and you're going to hear a lot about it during

12   the course of the trial, I anticipate.  And it's a whole lot

13   like, I think you might appreciate by now, the copy and paste

14   functions that we all use on our word processors now or even

15   on our phones and text messages, copy and paste.

16       And I'm going to try to show you what I mean by that.

17   This is figure 4 from Orange's patent.  Okay?  This is not the

18   invention.  It's important to understand these are not the

19   claims.  It's not the invention that -- that orange is

20   asserting here.

21       What this is is a description of what was known in the

22   prior art.  This figure is Orange admitting in its patent that

23   this was already out in the world in prior art.  And so if we

24   look here, as you can see, we have a sensor that's storing an

25   ID.  It's that yellow bar code.  I've added this animation.

1    Okay?  This won't be in the patent in your books.

2        And we have an apparatus down there at the bottom.  And

3    the apparatus is going to read the ID off of the sensor, it's

4    going to copy the ID, and there's some processing that goes on

5    in there, and then it's going to send the ID from the

6    apparatus back to the new sensor where it's pasted.  Copy from

7    one sensor, pasting to another.

8        You just heard Orange say that they invented ID Copy.

9    They didn't.  Orange -- what the evidence will show is that

10   that existed before the time that Orange applied for its

11   patent.  Orange didn't invent these rewritable sensors that

12   we're seeing here and that we're talking about in this case.

13   Those were known, too.  Orange didn't invent this tool that's

14   accomplishing the copying and the pasting, either.

15       So what you should be looking for in the evidence and

16   asking for in the evidence is, what is it that Orange really

17   invented in this patent?  And the answer to that is going to

18   be there's nothing really novel in this patent.  The evidence

19   will be that Orange didn't really invent anything new, and the

20   evidence will clearly and convincingly show that this patent

21   is invalid.

22       So if all of these concepts and these components that are

23   claimed in the patent were so well-known at the time, how is

24   it, how is it, that Orange wound up with the '064 Patent?

25       Well, the evidence will show that the inventor took a

1    well-known and simple concept and tried to make it

2    look -- tried to make it appear more than it really is.  And

3    so how did he do that?  He did that by piling words on top of

4    words on top of words on top of words.

5         There's two claims at issue in this case, ladies and

6    gentlemen.  This is one of them.  This is claim 26.  Claim 27

7    is almost identical, but it's actually a little bit longer,

8    even more words.

9         Now, it's Orange's burden, I think you learned this

10   morning, to prove that Autel practices every single word on

11   your screen.  That's how they prove infringement--every single

12   word.  But you won't see that in Orange's evidence, ladies and

13   gentlemen.  So the answer to the Court's infringement question

14   at the end of the trial will be no.  And we can show you that

15   by focusing on just two short phrases from all of these words.

16   One is about how power is distributed within the setting tool,

17   and one about how the -- one about the information that's

18   stored on the sensors.

19        With regard to the power routing, Orange claimed a very

20   specific way to route power in the setting tool.  The evidence

21   will show that Autel's tools do it differently.  Autel tools

22   don't practice this patent or route power the way that the

23   Orange patent describes.

24        What I'm showing you here on the left are the way that

25   claims 26 and 27 describe the routing of power within the

1    setting tool.  It's from a power source, you can think of that

2    as a battery, to a control module, you can think of that as a

3    brain, and then it's distributed out to the setting tool.

4    That's what claims 26 and 27 say.

5         On the right, you can see that Autel's engineers chose a

6    very different way to design the routing of power through its

7    setting tool.  Power is not routed through a control module;

8    instead, it's routed from this battery, this power source, to

9    another component called a voltage regulator.  And you can

10   think of the voltage regulator more like a traffic cop.  It's

11   determining when and where and how much power needs to be

12   distributed where.  And then the power is distributed within

13   the setting tool.  Right here, Autel's products don't do what

14   claims 26 and 27 say.

15        You're going to hear Mr. Zeng testify about why Autel

16   made that choice in designing its tool, but what's most

17   important to you is just this difference.  You're going to see

18   evidence that Autel's tools don't practice the power routing

19   claim language in Orange's patent.  For this reason alone,

20   Orange can't prove infringement.

21        The second phrase that -- I told you there were two short

22   phrases we could focus on to show that these products don't

23   infringe.  The second phrase we're going to focus on deals

24   with the type of information that's stored on the sensors.

25        Here again, to get its patent, Orange claimed a very

1    specific type of -- claimed something very, very specific.

2    They claimed that only the old identification is stored on the

3    sensors.  That's important--only the old identification.  In

4    other words, if a sensor stores two identifications, it

5    doesn't what the claims say.  It doesn't infringe.

6         The evidence that you'll see about Autel's products is

7    their sensors store three identifications.  Multiple IDs are

8    on these -- these accused sensors, just like you and I might

9    identify ourselves uniquely in different ways with maybe a

10   driver's license, a driver's license number, a passport, a

11   passport number, and a social security number, Autel's sensors

12   also identify themselves in different ways, versus the

13   application ID.  That's the one you heard about.  That's the

14   one I expect Autel -- excuse me, Orange is going to try to use

15   to prove infringement.  Think of that like your driver's

16   license.

17        But Autel sensors store two more IDs.  There's a product

18   serial number.  You can think of that like your social

19   security number.  That's unique to you.  The product serial

20   number is unique to each sensor in the same way.  And you're

21   going to see these two IDs yourself through the operation of

22   the tool.

23        Here what you're seeing is when the tool reads the

24   sensor, it finds and displays both the sensor ID and the PSN.

25   It's right there on the screen--two IDs.  That alone shows

1   that Autel's products don't infringe, they don't do what the

2   claims say, which is to store only the old identification that

3   they're wanting to copy.

4        But there's a third ID that's stored on Autel sensors,

5   and that's the chip ID.  And it's the ID that's in the chipset

6   that's stored inside the sensor.  And it's another ID that's

7   stored on the sensor and it uniquely identifies and

8   distinguishes the sensors from one another.

9        With those short phrases, we can show you that Orange

10  can't meet these limitations with the Autel products.  You're

11  going to see evidence that the products don't practice these

12  very specific features I just talked with you about.  And you

13  learned this morning, again, that infringement requires that

14  every word be present in the infringed products.  B-I-N-G

15  doesn't get them there.  Close isn't good enough.

16       Now, to help us make sense of all this, we're going to

17  present a world class electrical engineer, Dr. Shukri Souri.

18  He's got degrees from Oxford and from Stanford.  He's got 25

19  years of experience.  He's got patents in this area of

20  technology.  He knows this stuff, and he's going to help us

21  all understand it.

22       And he's read the patent.  He's analyzed the products.

23  He's looked at the code that's running on the products.  He's

24  looked at witness testimony.  He's looked at thousands of

25  pages of documents.  He's considered what Orange's expert has

1   to say.  And he'll distill all that down to what's important.

2   Once he walks us through that evidence, you're going to have

3   exactly what you need to reach the right decision on the

4   infringement question which is no.

5       And he's going to help you with another issue, too, and

6   that's invalidity.  You're going to be asked at the end of the

7   trial whether Autel, whether we've proven that the asserted

8   claims that Orange is saying we infringe are invalid.  Judge

9   Gilstrap gave you some instructions this morning about

10  obviousness, and you're going to get more at the end of the

11  trial, I expect.

12      Doctor Souri, I expect, will explain to you that the

13  asserted claims are invalid because they were obvious to a

14  person of ordinary skill in the art at the time that Orange

15  applied for its patent.  In other words, others thought of

16  this first and they disclosed it first.

17      I want you to pay close attention to the evidence about

18  two prior patent applications, both that predate the '064

19  Patent.  One's called Nantz, and one's called Nihei.  Those

20  are just the names of the inventors.

21      Doctor Souri will explain that Nihei and Nantz together

22  teach everything that's described in Orange's patent and they

23  predated Orange's patent.  So the claims are invalid.

24      Ultimately, I think Doctor Souri will explain to you that

25  Orange's claims describe ordinary components connected in

1    ordinary ways performing ordinary functions.  He'll show you

2    that all of this was well-known, routine, and conventional by

3    the time Orange filed for its patent.

4         There are a lot of great patents out there, ladies and

5    gentlemen, but the evidence will show Orange just isn't one of

6    them.  But despite that, they're going to ask you to make

7    Autel, my client, pay a lot of money.  The last question on

8    the Court's verdict form will be about money.

9         Now, if you find the patents invalid, you won't reach

10   that question.  If you find there's no infringement, you won't

11   reach that question.  No infringement, no damages.  Invalid,

12   no damages.  We expect the evidence will lead you to that

13   result, but you're going to hear testimony from both party's

14   experts about what a reasonable royalty would have been in the

15   event that the patent is valid and infringed.

16        Orange's expert's going to tell you that's worth more

17   than $6.5 million.  I think $6.6 million is what you just saw

18   on the screen, and I'd like you to pay really close attention

19   to how he gets there.  The evidence will be that no one has

20   ever paid for a license to this patent.  So he had to look to

21   licenses to other patents in order to come up with a way to

22   value this.  And the only license that he's going to show you

23   is one that Orange has to an entire portfolio of patents from

24   Bosch.

25        Remember Bosch was mentioned this morning.  The Bosch

1   portfolio has many, many patents.  It has families of patents

2       And I expect Orange's expert is going to try to tell you

3   that somehow that entire portfolio of patents from Bosch is

4   worth as much to Autel as a single patent from a company that

5   none of you had heard about before you walked into court

6   today.  You'll hear from our economist, Phillip Kline, that

7   that's just not a fair comparison.

8       We asked Mr. Kline to do two things.  He's a certified

9   licensing professional, he's got a degree in economics, and

10  he's a certified public accountant.  We asked him to do two

11  things for this case to help us, to help you reach the right

12  result.  We asked him to look at Orange's damage analysis and

13  comment on it and then to perform his own independent damages

14  analysis.

15      So he's going to walk you through the errors that Mr.

16  Blacker, Orange's expert, made.  And then he's going to

17  explain that even if the patent is valid and even if Autel

18  infringes, the most Autel would ever pay to use this patent is

19  about $340,000.

20      In the end, the evidence will be that Autel doesn't

21  infringe, the patent is invalid, so we think no damages are

22  appropriate.

23      You heard Mr. Rabena tell you that this case is about

24  fairness, and I think he's right.  But what you need to ask

25  yourself, is it fair for Autel to pay for a patent that it's

1    not using, is it fair for Autel to pay for a patent that's

2    invalid, is it fair for Autel to pay six-and-a-half million

3    dollars for a patent that's not worth anywhere near that much?

4         I'm going to get a chance to talk with you again at the

5    end of the case, ladies and gentlemen.  Until then, on behalf

6    of Autel and our trial team, we very much appreciate your

7    attention and your hard work in this case.

8         Thank you.

9              THE COURT:  Counsel, does either party wish to

10   invoke the Rule?

11             MR. RABENA:  We do not, Your Honor.

12             THE COURT:  Autel?

13             MR. CULBERTSON:  No, Your Honor.

14             THE COURT:  All right.  Ladies and gentlemen of the

15   jury, there's a matter I need to take up with counsel outside

16   of your presence.  It's not going to take very long.  I'm

17   going to ask you to retire to the jury room.  You may simply

18   leave your notebooks closed in your chairs.  I'll have you

19   back in here very shortly.

20        While you're there, take an opportunity to stretch your

21   legs and get a drink of water.  We'll be back to continue with

22   the Plaintiff's first witness in just a minute.

23        The jury's excused to the jury room.

24             (Whereupon, the jury left the courtroom.)

25             THE COURT:  All right.  Be seated, please.

1          Counsel, I'm very concerned about something, and I want

2     to put you on notice of it right now.  The Court has spent

3     considerable time and energy preparing and entering its

4     standing order on motions in limine involving allegations of

5     patent infringement.  It's on the Court's website.  It's

6     recently been updated.  And it is obligatory and binding on

7     both of these parties and their counsel.  And so far both

8     sides are ignoring it and acting like they've never taken the

9     time to read the Court's standing limine order.

10         For example, Mr. Rabena just showed a timeline to the

11    jury that talked about third parties coming in and trying to

12    invalidate or knock out our patent and we had to adjust the

13    claims but we still survived.

14         Limine No. 6 precludes any evidence, testimony, or

15    argument about the PTAB, *inter partes* review, or any other

16    alternative structure that does not relate directly to an

17    Article III trial in a district court.  That's a clear

18    violation of Limine No. 6.

19         Mr. Culbertson's already raised the issue about the

20    word 'trespassing' used in opening statements.  And MIL No. 26

21    in this order of list of standing MIL orders precludes either

22    party from referring to the presiding judicial officer in any

23    proceeding by name.  You are to refer to the Court

24    institutionally.

25         I can't count how many times both of you have talked

1    about Judge Gilstrap said this, Judge Gilstrap said that.

2    You're here to talk about what the Court says, and you can say

3    the Court may instruct you or you will hear the Court tell you

4    this, but you are prohibited under this order from calling out

5    my last name before this jury.  And you've done it more times

6    than I've counted.

7        I am going to start enforcing this, and I am going to

8    start imposing penalties on both sides if you violate this

9    limine order.  You're conducting yourselves as if it doesn't

10   exist and you don't care that it's out there.  I care that

11   it's out there.  And if there are continuing violations of

12   this limine order, there are going to be sanctions imposed.

13       Do both sides understand what I'm saying?

14           MR. RABENA:  Yes.

15           MR. CULBERTSON:  Yes, Your Honor.

16           THE COURT:  All right.  Consider yourselves on

17   notice both ways.

18       Are you prepared to call your first witness, Mr. Rabena?

19           MR. RABENA:  I am, Your Honor.

20           THE COURT:  I'll bring the jury back in, please.

21       Mr. Johnson, bring the jury back in.

22       While the jury's out, I want lawyers on both sides to

23   read the standing orders on limines before you appear tomorrow

24   morning.  I want everybody to be able to tell me under oath

25   you've read it and looked at it.  Okay?

1          MR. RABENA:  Yes, Your Honor.

2          MR. CULBERTSON:  Yes, Your Honor.

3          (Whereupon, the jury entered the courtroom.)

4          THE COURT:  Please be seated, ladies and gentlemen.

5     I told you it wouldn't be very long.  Thank you for your

6     cooperation.  We're now going to proceed to begin the

7     Plaintiff's case in chief.

8          Plaintiff, call your first witness.

9          MR. RABENA:  Your Honor, Plaintiff calls Mr. Hung

10    Chih Yu.

11         THE COURT:  All right.  Mr. Yu, if you'll come

12    forward.

13         This witness is going to testify with the aid of an

14    interpreter.  Is that correct?

15         MR. RABENA:  Yes, Your Honor.

16         THE COURT:  And the interpreter's been previously

17    credentialed and sworn.  Correct?

18         MR. RABENA:  Yes, Your Honor.

19         THE COURT:  All right.  Let's ask the interpreter to

20    position herself, and then I'll have the Courtroom Deputy

21    administer the oath so that the interpreter can assist the

22    witness.

23         (Whereupon, the oath was administered by the Clerk.)

24         THE COURT:  All right.  Have a seat, please.

25         MR. RABENA:  Your Honor, could I have the Court's

```
 1    permission to pass out binders?
 2            THE COURT:  Yes, you may distribute binders.
 3        All right, Mr. Rabena.  You may proceed with direct
 4    examination.
 5            MR. RABENA:  Thank you, Your Honor.
 6                    HUNG CHIH YU, SWORN,
 7    testified under oath as follows:
 8                   DIRECT EXAMINATION
 9    BY MR. RABENA:
10    Q.   Mr. Yu, could you please introduce yourself to the jury?
11    A.   My name is Hung Chih Yu, and I work with Orange.
12    Q.   And what is your --
13    A.   And I'm right now the deputy general manager for the R&D
14    department.
15    Q.   How long, sir, have you worked for Orange?
16    A.   I've been working for Orange since 2005.
17    Q.   Could you give us a summary of your educational
18    background?
19    A.   My last degree is a Master's degree from Feng Chia
20    University.
21            THE INTERPRETER:  I just asked the witness how to
22    pronounce -- how to spell the university, and he says it's
23    F-E-N-G C-H-I-A University, and the degree is in automated
24    control.
25    Q.   (BY MR. RABENA)  Tell us about Orange Electronics.  When
```

1    did Orange Electronics come about?

2    A.    It is a company that was founded in 2005, and the main

3    products are TPMS.

4    Q.    Does Orange make any products that are not TPMS related?

5    A.    No.  So far all the products that Orange makes are

6    related to TPMS.

7              THE COURT:  Let me ask the interpreter to pull the

8    microphone a little closer to you so that we can hear your

9    answers.

10             THE INTERPRETER:  Closer?  Yes, Your Honor.  Is this

11   better?

12             THE COURT:  That's better.

13   Q.    (BY MR. RABENA)  Could you give us a very high-level

14   explanation of what TPMS is?

15   A.    The TPMS system is essentially installing sensors in each

16   of the four tires of a car, and then on the -- in the car

17   there is also a receiver that receives signals coming from the

18   sensors.

19   Q.    Okay.  We're going to come back to TPMS in more detail

20   later, but for now I want to stay with Orange, the company.

21             MR. RABENA:  Could we have JX 24, please?

22   Q.    (BY MR. RABENA)  Could you tell us what this document is?

23   A.    This is the marketing material that Orange places on our

24   company website.

25   Q.    Okay.  Do you send it to customers or potential

```
 1    customers?

 2    A.    Yes, we do.

 3    Q.    All right.

 4              MR. RABENA:  Let's look at page 3.

 5    Q.    (BY MR. RABENA)  What is this map showing us, or this

 6    page showing us?

 7    A.    These are the main sales spots that we have in different

 8    parts of the world.

 9    Q.    You have customers in the United States?

10    A.    Yes, we do.

11    Q.    Can you identify any of them, who the customers are in

12    the United States, the bigger ones?

13    A.    The main customer is SMP.

14    Q.    Okay.  In the -- you have the U.S. indicated on the map

15    there.  You have an office in the U.S.?

16    A.    Yes, in California.

17    Q.    Is it a physical building or is it a remote worker or

18    what?  How many people?

19    A.    There is only one person working for the U.S. operation,

20    and they work from home.

21    Q.    And what's that person's function?

22    A.    In operations business.  It should be sales and

23    marketing.

24    Q.    Okay.

25              MR. RABENA:  Can we look at page 4, please?
```

1    Q.   (BY MR. RABENA)  What does this page show?

2    A.   These are our large -- large OEM customers, and they are

3    automobile makers.

4    Q.   What does OEM stand for?

5    A.   Original equipment manufacturer.

6    Q.   And so am I right that -- or is it right that you

7    sell -- you provide products to these OEM companies?

8    A.   Yes.

9    Q.   What do you -- what does Orange provide to Ford, for

10   example?

11   A.   TPMS sensors.

12   Q.   And what about to Honda and Nissan?  What does Orange

13   provide to those companies?

14   A.   Same.  TPMS.

15   Q.   The sensors?  Is it just sensors?

16   A.   Yes.

17   Q.   Okay.  Aside from original equipment companies like the

18   ones on this slide, does Orange make aftermarket products?

19   A.   Yes.

20        MR. RABENA:  Let's look at page 5, please.

21   Q.   (BY MR. RABENA)  And can you tell us what we're seeing on

22   page 5?

23   A.   These are some of our major aftermarket customers.

24   Q.   Are any of these aftermarket customers in the United

25   States?

1   A.   Yes.   SMP and Dorman.

2   Q.   What types of products does Orange make for the

3   aftermarket customers?

4   A.   So mainly when the sensors installed -- original sensors

5   installed on the vehicles are broken, we will provide to them

6   the sensor used for repair purposes.

7   Q.   Does Orange provide any of these companies the

8   programming tools?

9   A.   Yes.

10  Q.   Roughly how many employees does Orange have?

11          MR. HNATH:  Objection, Your Honor, violates the MIL.

12          THE COURT:  State your objection again, counsel.

13          MR. HNATH:  Yes.  Violates the MIL against

14  describing the number of employees for the parties.

15          MR. RABENA:  Your Honor, I'll withdraw the question.

16          THE COURT:  Just a minute, counsel.

17      MIL No. 3 prohibits introduction of evidence regarding

18  party's overall financial size, wealth, or executive

19  compensation, but I don't find it has anything to do about the

20  number of employees of the company.

21      I'm going to overrule the objection.  You can either

22  stand on the answer or you can withdraw it, Mr. Rabena.

23          MR. RABENA:  I'll ask for an answer.  Thank you,

24  Your Honor.

25          THE WITNESS:  120.

1    Q.    (BY MR. RABENA)  Thank you.

2         Now let's go back to the TPMS again and get into a little

3    more detail how that works.

4              MR. RABENA:  Could we see JX 25 and, in particular,

5    page 13?  And I'm going to zoom in on that image on the top

6    left because it was similar to the one I used in opening.

7    Q.    (BY MR. RABENA)  Mr. Yu, are you able to use this image

8    and explain to the jury generally how TPMS works in a vehicle?

9    A.    So from the diagram, you can see that each tire has a

10   TPMS sensor installed, and the TPMS sensor on each tire

11   transmits wirelessly information regarding the pressure and

12   temperature of that tire.  And the information is sent to the

13   TPMS receiver in the middle.

14   Q.    Okay.  Why is it important -- what's your understanding

15   of why the U.S. government requires TPMS systems in cars?

16   A.    There are three main reasons.  The first reason is that

17   when the pressure is low, the system will be able to remind

18   the user that they need to add pressure.

19        And second reason is that, prior to the existence of the

20   system, in the U.S. every year 10,000 traffic accidents happen

21   because of the pressure problem.

22        And the third reason is low tire pressure undermines fuel

23   efficiency of vehicles, so problem with tire pressure is also

24   not environmentally friendly.

25   Q.    When did -- when did TPMS systems generally start showing

1    up in vehicles?

2    A.    The earliest TPMS systems were installed in cars between

3    1999 and 2000 time frame, but it wasn't mandatory in the U.S.

4    until 2007.

5    Q.    Okay.  Using this example on the screen, suppose the left

6    front tire was low.  How -- can you explain how the TPMS

7    receiver would know that it was the left front tire that's low

8    compared to the other wheels which have sensors sending in

9    data?

10   A.    Because each sensor has its own unique ID, and the TPMS

11   receiver in the middle remembers or has these unique IDs

12   stored in the receiver.  So when data is received from one of

13   the sensors, it will be able to identify through looking at

14   the ID.

15   Q.    Okay.  Were you in the courtroom when Autel's counsel was

16   talking about part numbers and chip numbers that their sensors

17   have?  Did you hear that explanation?

18   A.    Yes.

19   Q.    Does the TPMS receiver use part numbers to identify which

20   sensor is sending it data?

21              MR. HNATH:  Your Honor, objection, calls for expert

22   testimony, lacks foundation.

23              THE COURT:  Approach the bench, counsel.

24              (The following was had outside the hearing of the

25              jury.)

1          THE COURT:  You're talking about the Orange product

2    when you say TPMS?

3          MR. RABENA:  TPMS in general.

4          THE COURT:  That's part of the problem, counsel.  I

5    mean, you don't have a patent on TPMS.  You have a patent as

6    spelled out in the document issued by the PTO, and you've

7    asserted two claims, 26 and 27.  And at some point you are

8    going to have to put that claim language before this jury and

9    show how the Defendant's products read on each element of that

10   claim language.

11         You are not going to say, here's our TPMS, here's their

12   TPMS, *ipso facto* they are the same thing so they infringe.

13   That's an improper comparison.  Your whole opening was here's

14   our product, here's their product, end of story.

15         We're going to have to get into a proper comparison.  And

16   I understand what you're doing now is background, but you're

17   going to have to delineate between what is your product for

18   Orange and what is Autel's product that you allege infringes.

19   You can't blur the lines between the products and make it like

20   it's just one thing, and that's the way this is coming across.

21         So I have some real concerns about inviting this jury to

22   make an improper comparison without a clear review of the

23   claim-by-claim, element-by-element requirements that we have

24   to get to.  So you're telling me we're going to do that.

25   Correct?

1          MR. RABENA:  We absolutely are going to do that,

2     Your Honor.  This question is background about how generally

3     TPMS systems work in cars and that cars do not use part

4     numbers in monitoring their sensors.

5          THE COURT:  Well --

6          MR. RABENA:  And this witness has testified that

7     he's designed and sold OEM sensors that work with OEM cars.

8     So he has a background to understand that.

9          THE COURT:  I'm not opposed to some background

10    information, but we can't have one universe of TPMS and both

11    of these products are within that circle and there's no

12    distinction between them.  It can't be our product, their

13    product, they're the same, they're copied, they're similar,

14    therefore they infringe.

15         You're going to have to distinguish, are you asking about

16    the Orange product?  He has personal knowledge of the Orange

17    products.

18         MR. RABENA:  Yes, sir.

19         THE COURT:  You need to limit it to his products

20    since he's the corporate representative for the Plaintiff

21    instead of some generic TPMS that nobody knows if it's theirs,

22    yours, or somebody else's.  That's where the confusion's

23    coming in.

24         If you'll limit it to his company's products, I'll

25    overrule the objection and allow you to go forward.  Okay?

```
1              MR. RABENA:  Yes, I understand, Your Honor.

2              THE COURT:  Now, that being said, I don't expect

3    this witness to offer opinion testimony.

4              MR. RABENA:  He's not.

5         Your Honor, the next line of questioning is about his OEM

6    products that they make at Orange.

7              THE COURT:  Well, what he knows of his own personal

8    knowledge is perfectly fine.

9              MR. RABENA:  Okay.

10             MR. HNATH:  Your Honor, our concern --

11             THE COURT:  But not what he might speculate or opine

12   about.

13             MR. RABENA:  Okay.

14             THE COURT:  Yes, sir?

15             MR. HNATH:  Our concern is I think it's into other

16   sensors, other company's sensors.  That really is getting into

17   expert testimony, it's lacking foundation.  And also their

18   infringement contentions have nothing to do with non-Autel

19   sensors anyways or what's contained in non-Autel sensors.

20             THE COURT:  Well, I don't want to get too far

21   afield.  I'm intending to give the Plaintiff some latitude.

22   This is the first witness.  This is background.

23        But I'm very concerned about no delineation between the

24   Plaintiff's products, the Defendant's products, some

25   third-party's products.  We're going to have to be precise and
```

1    not just talk about what's some TPMS system in the generic

2    sense.  That invites too much confusion and a lack of clarity

3    as to where this jury ought to be directing its focus.

4              MR. RABENA:  Yes, sir.

5              THE COURT:  So if you'll make it clear about what

6    you're talking about, and if he can testify from his own

7    personal knowledge, I have no problem with it.  Okay?

8              MR. RABENA:  Yes, sir.

9              THE COURT:  All right.  Let's proceed.

10             (The following was had in the presence and hearing

11             of the jury.)

12             THE COURT:  At this point the objection's overruled.

13        Let's proceed, counsel.

14             MR. RABENA:  You can take this exhibit down.

15   Q.   (BY MR. RABENA)  Mr. Yu, before you joined Orange, were

16   you involved in a design or development of any TPMS products

17   in general?

18   A.   So between 2003 and 2004 when I was in graduate school in

19   Feng Chia University, I was mainly involved in development of

20   TPMS.

21   Q.   Okay.  And then when did you first join Orange, the

22   company?

23   A.   2005.

24   Q.   Okay.  When you first joined Orange, were you involved in

25   the design or development of TPMS products?

1  A.    Yes, I was involved in Orange's main TPMS products

2  development project.

3  Q.    Could you give the jury some examples of TPMS products

4  that you have been involved with at Orange?

5  A.    So Orange has four types of products.  The first type is

6  for cars that do not have TPMS systems previously installed,

7  so we provide a kit which contains four sensors for four

8  tires, plus the receiver.

9        The second type of product is called OE sensors, and they

10  are for the customers who are automobile makers.

11       And the third type of products are for the repair market.

12  So the customers' cars have originally -- have sensors that

13  came with the car, and then they are defective or they're

14  broken at some point, and we provide replacement sensors for

15  those cars.

16       And the fourth type are TPMS-related tools.

17  Q.    Okay.  How long --

18            MR. RABENA:  I'm going to put on the document

19  camera, if I can do this right.  The box has a label, JX 33,

20  and I'm going to take the sensor out of the box.

21  Q.    (BY MR. RABENA)  Are you familiar with JX 33?

22  A.    Yes, I am.  This is one of our products.

23  Q.    So how long -- this is a sensor.  Correct?

24  A.    Yes.

25  Q.    How long do the batteries typically last in these TPMS

1  sensors?

2  A.    Between three to five years.

3  Q.    And is that -- what happens if the battery fails?

4  A.    The entire sensor has to be replaced.

5  Q.    Is that the only time they get replaced--when the battery

6  dies?

7  A.    No.  There is another scenario in which tires have to be

8  replaced, but the sensors are still okay, the battery is not

9  completely dead yet.  But in the situation the mechanic is

10  likely to recommend that the sensor being replaced as well.

11  Q.    Okay.  If you go back to like 2004 time frame, when a new

12  sensor was being installed, did it automatically communicate

13  with the car?

14     And let's talk about an Orange sensor or an OEM sensor

15  that Orange makes.  Did it automatically communicate with the

16  car or did the mechanic have to do something?

17  A.    When a new sensor is installed, the receiver in the car

18  only had old ID of the old sensor.  So the car's receiver

19  wouldn't be able to automatically identify information coming

20  from the new sensor.  So the mechanic will have to do

21  something to reset the system in order for the receiver to be

22  able to identify information or data coming from the new

23  sensor.

24  Q.    What were the ways that mechanics or tire technicians

25  would reset the car's computer after putting in a new sensor

1  back in the 2004 time frame?

2  A.   There were two modes to do that.  The first one was

3  called a learning mode.  That means the tire engineer will

4  have to dig out the manual of the car and to look for the

5  detailed information in there to find out how to enter into

6  this learning mode in order for the car to reset and

7  allow -- to allow the receiver to receive information or

8  identify information coming from the new sensor.

9       The other is called OBD tools mode.  So different cars

10  had their specific OBD tools, and the mechanics or the car

11  engineers will have to have the specific OBD tool for the car

12  model in order to reset the receiver for it to identify

13  information coming from the new sensor.

14  Q.   Okay.  Now I want to start to ask you about ID Copy

15  technology and your invention.

16            MR. RABENA:  If I can switch this over.

17            THE COURT:  Let me interrupt for a minute.

18       We've been back from lunch just over two hours.  We're

19  going to take a short recess at this juncture.  I understand

20  this witness has lengthy testimony to give, and so there may

21  not be a perfect place to break.  But we're going to break

22  here for a short recess.

23       Ladies and gentlemen of the jury, you can simply close

24  your notebooks and leave them in your chairs.  Remember all my

25  instructions not to discuss the case among yourselves, and

1   we'll be back here shortly to continue with this witness.

2          The jury's excused for recess at this time.

3                (Whereupon, the jury left the courtroom.)

4            THE COURT:  All right.  Be seated, please.

5          Counsel, I recognize that several of you have not tried

6   cases in this court before me in the past, so I want to give

7   you a heads-up that when a lawyer says something on the

8   record, like, I now want to talk about ABC, I consider that an

9   improper sidebar comment because it's not a question.  It's a

10  statement by counsel directly to the jury about what the

11  lawyer wants to talk about.

12         If you want to do sign posting, you need to put it in the

13  form of a question.  Mr. Yu, is it all right if we transition

14  and talk about ABC at this point?  That's not improper sidebar

15  commenting because it's directed to the witness and it's in

16  the form of a question.

17         But just standing up there looking at the jury and

18  saying, I now want to change the subject and I now want to

19  talk about this, that, and the other, you're not at the podium

20  in this courtroom to talk about what you want to talk about.

21  You're here to ask the witness questions.

22         So if you want to do sign posting, that's fine, do it in

23  the form of a question and direct it at the witness, not a

24  blanket statement directed to the jury.  That way both sides

25  are on notice of what the Court's preference is in that

 1    regard.

 2        Any questions?

 3            MR. RABENA:  No, Your Honor.

 4            MR. HNATH:  No.  Thank you.

 5            THE COURT:  Let's take a short recess, approximately

 6    10 minutes, and we'll be back and continue.

 7        The Court stands in recess.

 8                        (Brief recess.)

 9            THE COURT:  Be seated, please.

10        Are you prepared to continue with your direct examination

11    of the witness, Mr. Rabena?

12            MR. RABENA:  I am, Your Honor.

13            THE COURT:  All right.  Let's bring in the jury,

14    please.

15            (Whereupon, the jury entered the courtroom.)

16            THE COURT:  Please be seated, members of the jury.

17    We'll continue with the Plaintiff's direct examination of Mr.

18    Yu.

19        Counsel, you may continue.

20            MR. RABENA:  Thank you, Your Honor.

21        JX 24, please.

22    Q.  (BY MR. RABENA)  Mr. Yu, we spoke about this page earlier

23    in this exhibit, and it mentions ID Copy.  Could you explain

24    to the jury generally what ID Copy is?

25    A.  So our thoughts back then was to find a way to skip the

1    need to reset the car computer or the OBD tools because the

2    car computer is still thinking that it's using the old sensor

3    ID.  So we are trying to copy the old sensor ID to trick the

4    car computer into thinking that it is still receiving data

5    from the old sensor and so that we can allow the TPMS system

6    to continue to function.

7    Q.    When did you come up with this idea?

8    A.    Roughly around the end of 2007 to the beginning of 2008.

9    Q.    And how do you know that?

10   A.    When I was going through the patent description document,

11   I noticed that the Word document for the patent description

12   document was dated January of 2008.

13          MR. RABENA:  Can we have Exhibit JX 67, please?

14   Could you split screen with the translation?  Keep going up.

15   There you go.

16   Q.    (BY MR. RABENA)  Could you tell the jury what this

17   exhibit is, JX 67?

18   A.    This was the patent description that I wrote in 2008.

19   Q.    Okay.

20          MR. RABENA:  And zoom in on the right side of the

21   screen, please, where it has -- says 'metadata' at the top.

22   Q.    (BY MR. RABENA)  What do you understand that to indicate?

23   A.    This indicates that this document was created on January

24   16th, 2008.

25   Q.    Okay.

```
1            MR. RABENA:  You can remove that part.  And could
2    you go to -- on the English side where it talked about
3    figures?  We saw that a second ago.  There we are.
4    Q.  (BY MR. RABENA)  This -- see this page references some
5    figures.  Did you have figures that corresponded to this
6    write-up?
7    A.  Yes, I do.
8            MR. RABENA:  Can we have PTX 16, please?  And flip
9    through the pages a little bit.
10   Q.  (BY MR. RABENA)  Mr. Yu, what is PTX 16?
11   A.  These are the sort of charts that we used in our patent.
12   Q.  Do you have an understanding of when these drawings were
13   created?
14   A.  They should have been drawn or created around the same
15   time frame that the patent explanation document was created
16   because in the patent description document these drawings were
17   cited.
18   Q.  Okay.  When you -- after you came up with your invention,
19   did you do anything to protect it?
20   A.  In June 2008 I sent the patent description document along
21   with the drawings to a patent firm, and I applied for a Taiwan
22   patent in August 2008 and then a U.S. patent in September
23   2008.
24   Q.  Can I ask you about your U.S. patent?
25   A.  Yes.
```

```
 1              MR. RABENA:  JX 29, please.  And maybe go to the

 2    next page.

 3    Q.   (BY MR. RABENA)  What is JX 29?

 4    A.   This is the description of our U.S. patent.

 5    Q.   Did you have a demonstrative prepared to help you explain

 6    your patent to the jury?

 7    A.   Yes.

 8    Q.   Does it accurately depict what you'll be describing?

 9    A.   Yes.

10    Q.   And will it be helpful to the jury to understand your

11    testimony?

12    A.   I believe so.

13              MR. RABENA:  Could we have the demonstrative,

14    please?

15    Q.   (BY MR. RABENA)  I take it this is an image of your '064

16    Patent.  Is that correct?

17    A.   Yes.

18    Q.   And the next page, could you describe what you're

19    depicting here?

20    A.   So this is trying to describe the old technology, mainly

21    using the OBD tool to write the old information into the

22    monitoring apparatus.

23    Q.   Where is the monitoring apparatus located?

24    A.   The top right-hand side, the box -- the orange, this box

25    is trying to depict the car.  So you can see that the four
```

1    corners of this box has four tires, and in the middle is the

2    monitoring apparatus.

3    Q.    Does the monitoring apparatus, does that relate in any

4    way to what we've been calling the ECU, or the car's computer?

5    A.    Yes.

6    Q.    Okay.  And what is this line, the squiggly line on

7    the -- I just tried to circle it and now I'll hit the clear

8    button.

9         Did you see what I was pointing to?  That squiggly line

10   on the right that's going between the blue box labeled setting

11   apparatus and the orange box labeled car, what is that line?

12   A.    That is what we have been referring to as OBD.  So before

13   being able to write the ID to the monitoring apparatus in the

14   car, one has to plug in an OBD cable to the -- there's a slot

15   on the car.

16   Q.    Okay.  I'm going to click, and what -- the ziggy arrow

17   line from the car to the setting apparatus just turned yellow.

18   What are you depicting there?

19   A.    That is trying to show that the signal coming from the

20   tire will be transmitted in a wireless way to the apparatus

21   down below.

22   Q.    So in the old OBD approach, the setting apparatus could

23   capture the ID by wireless?  Do I have that right?

24   A.    Yes.

25   Q.    Okay.  And now I click again, and that line that you said

1    was an OBD connection up to the monitoring apparatus, that

2    just turned yellow.  So what are you depicting there?

3    A.   That's trying to depict that by using the OBD cable, we

4    are able to transmit the signal which we just captured

5    wirelessly from the sensor now to the monitoring apparatus.

6    Q.   Okay.  And that was in the old OBD approach.  I have that

7    right?

8    A.   Yes.

9    Q.   Do people still use the old OBD approach?

10   A.   Some people still do, yes.

11   Q.   All right.  The next slide is entitled Orange Invention,

12   U.S. Patent No. 8,031,064, and on the right has a blue box of

13   setting apparatus.  Can you describe what you're showing here?

14   A.   So the blue box is depicting our setting apparatus, our

15   tool.  This setting apparatus is different from other or

16   traditional tools in that the bottom, it has an input module,

17   and this module would allow us to enter information in two

18   ways, either manually using input interface or through sending

19   a code by using code scanner.

20   Q.   Okay.  I'm going to click, and in comes a gray box.

21   Could you tell us what just happened?

22   A.   The gray box is a old tire pressure detector, and

23   the -- by sending a low frequency signal by the setting

24   apparatus, it can activate the old tire pressure detector in

25   the gray box so it will send a wireless signal.  And by

1    sending the wireless signal, we can then write down the ID.

2    Q.    Okay.  I just clicked again, and the box 122, which has

3    888 in it, that turned yellow and has -- the numbers appeared,

4    and then those curvy lines at the bottom turned yellow.  Can

5    you explain what you're depicting there?

6    A.    It's trying to depict that once the low frequency signal

7    is sent in order to activate the old tire pressure sensor, and

8    by receiving the low frequency signal, the old tire pressure

9    sensor detector will then send the ID, which is 888, in a

10    wireless way to the setting apparatus.

11    Q.    I see.  The -- well, let's continue.  I'll click again,

12    and in comes a green box that says 'new tire pressure

13    detector'.  What are you depicting here?

14    A.    So that's trying to depict that we want to write the new

15    ID, which we just received, into this new tire pressure

16    sensor.

17    Q.    So I click again, and some yellow highlighting appears.

18    Can you explain to the jury what you're showing with that

19    yellow highlighting in the 888 in box 122?

20    A.    Again, we are using low frequency signals to send the old

21    sensor ID, 888, which we just captured earlier and we want to

22    send that into the new tire pressure sensor.  So you can see

23    that the 888, this ID is now in the new tire pressure sensor.

24    Q.    Thank you.

25         So you mentioned low frequency signals.  Is that the

1  transmission at the top which is going from the right to the

2  left?  Is that what you were describing as a low frequency

3  signal?

4  A.   Yes.

5  Q.   And what frequency range are you talking about when you

6  say 'low frequency'?  Does it have a number associated with

7  it?

8  A.   The medium frequency is about 125K or 135K.

9  Q.   I'm sorry.  Did you say medium frequency or low

10  frequency?

11  A.   The medium value of the low frequency.

12  Q.   Okay.  And it's what value?

13  A.   125K to 135K.

14  Q.   Okay.  And how about the bottom transmission which goes

15  from left to right?  What would you call that frequency?

16  A.   That's high frequency.

17  Q.   And does it have a name?

18  A.   High frequency or radio frequency.

19  Q.   Okay.  And what would be the number, the frequency range

20  in numbers, that you would be talking about for radio

21  frequency?

22  A.   So for automobile industry, the standard radio frequency

23  is 315 megahertz or 433 megahertz.

24  Q.   Is there a reason why you use low frequency signals to go

25  from the setting apparatus to the detector and radio frequency

1    signals when you go from the detector to the setting

2    apparatus?

3    A.   So this method saves energy for the user.  So it reduces

4    cost.

5    Q.   Did you ever consider just having low frequency signals

6    in both directions and not having any radio frequency signals?

7    Did you ever consider that, for example?

8    A.   No, I haven't, because if we were to do that, the entire

9    sensor would be much bigger, bulkier, so the manufacturing

10   cost would be even higher and the process would be more

11   complex.

12   Q.   Okay.  Does Orange -- I think that's the last of your

13   slides.  Thank you.

14        Does Orange have any products that use your ID Copy

15   invention?

16   A.   Yes, many of our products use that technology.

17   Q.   I'm going to put on the document camera what's been

18   marked as JX 34.  Can you tell the jury what JX 34 is?

19   A.   This is a TPMS tool that we make, and the abbreviation is

20   OG.

21   Q.   Does JX 34 use your ID Copy technology?

22   A.   Yes.

23   Q.   Okay.

24        MR. RABENA:  Can we have JX 70, please?  And zoom in

25   on the first page.

1    Q.    (BY MR. RABENA)  Do you know generally what this exhibit

2    is?

3    A.    This is marketing material, part of the marketing

4    material of our company.

5    Q.    Is it available on Orange's website?

6    A.    Yes.

7    Q.    Okay.  It refers to a diagnostic tool - OPSS II.  Could

8    you explain what OPSS II is?

9    A.    It's an abbreviation for Orange programmable system.

10   Q.    Okay.  And it says, program the sensor, not the vehicle.

11   Does it use your ID Copy technology?

12   A.    Yes.

13   Q.    Do the Orange programming tools that have ID Copy, do

14   they also have other methods for programming sensors other

15   than ID Copy?

16   A.    So in addition to ID Copy, we also support the original

17   manufacturer's learning mode as well as the mode using OBD

18   tools.

19   Q.    Are there advantages to ID Copy as compared to these

20   other programming methods, in your view?

21   A.    Yes.  So using our method, it's much faster to operate,

22   and it is easier to learn as well.

23   Q.    Okay.

24          MR. RABENA:  JX 22, please.  Page -- oh, yeah.

25   Q.    (BY MR. RABENA)  Is this -- can you tell us what this

1    document is, in general?

2    A.   This is trying to show that using our technology, it

3    takes only five minutes to write four IDs, whereas if we were

4    to use the original -- the old technology, that is, it would

5    take 45 minutes.

6         MR. RABENA:  Could I have PTX 26, please?

7    Q.   (BY MR. RABENA)  Were you in the courtroom, sir, when I

8    played the video of the Orange products?

9    A.   Yes.

10   Q.   I'm going to play a little bit of it and pause it and ask

11   you a question.  Can I do that?

12   A.   Yes.

13        MR. RABENA:  Could you play a little bit, please?

14        (Whereupon, PX 26 was played in open court.)

15        MR. RABENA:  Okay.  Pause it.

16   Q.   (BY MR. RABENA)  What's happening here, sir?

17   A.   It's trying to read the old sensor ID.

18        MR. RABENA:  Okay.  Go ahead and play.

19        (Video continued.)

20        MR. RABENA:  Okay.  Pause.

21   Q.   (BY MR. RABENA)  What's it showing now?

22   A.   So the top left side shows that it has successfully read

23   the ID.

24   Q.   Is that the C3A732 number we see in the box?

25   A.   Yes.

1            MR. RABENA:  Okay.  Play.

2       (Video continued.)

3            MR. RABENA:  And pause it.

4   Q.   (BY MR. RABENA)  What's happening now?

5   A.   So here it's trying to write the ID that was read earlier

6   in the previous pause into the new sensor.

7            MR. RABENA:  Okay.  Play.

8       (Video continued.)

9            MR. RABENA:  Pause it.

10  Q.   (BY MR. RABENA)  And what are we seeing now?

11  A.   We can see that the old sensor ID, which is C3A732, is

12  now written onto the new sensor.

13  Q.   Okay.  Does Orange provide user manuals to customers that

14  describe how to perform an ID Copy operation?

15  A.   Yes.

16           MR. RABENA:  PTX 1, please.

17  Q.   (BY MR. RABENA)  What is PTX 1?

18  A.   That's the user manual for our products that are short

19  for OG.  When I said OG earlier, I was referring to this

20  product.

21  Q.   Is that the product I'm holding up now that was JX 34?

22  A.   Yes.

23           MR. RABENA:  Could you go to page 6?  And maybe zoom

24  in on the top a little bit.

25  Q.   (BY MR. RABENA)  Can you tell us what's being shown on

1    page 6?

2    A.    It's showing the process that's required to copy one ID.

3    Q.    Okay.  And this is part of your ID Copy process?

4    A.    Yes.

5                MR. RABENA:  JX 70, please.  And the second page of

6    the PDF.  Yeah.

7    Q.    (BY MR. RABENA)  What is shown here?

8    A.    So it's trying to show the top two sensors.  The left one

9    is the old sensor and the right sensor is the new sensor.  And

10   this diagram is trying to show that after copying the old

11   sensor ID onto the new sensor, the car computer has been

12   tricked to think that the old sensor is still working.

13   Q.    Why is it showing an OE sensor on the left?

14   A.    That represents the sensor that we're trying to replace,

15   and that sensor was from the original manufacturer and now it

16   has a dead battery or it's no longer working.

17   Q.    What does OE stand for?

18   A.    Original equipment.

19   Q.    Are you familiar with the designs and technologies of any

20   OE TPMS sensors?

21   A.    Yes.

22   Q.    How is it that you're familiar?

23   A.    Two reasons.  One is that we have previously worked

24   together with OE manufacturers, and so we did some design and

25   development on their behalf.

1          And the second reason is that we are also trying to

2     develop aftersales market products.  So we have purchased some

3     of the OE sensors in the market from the manufacturers of cars

4     in order to conduct a reverse engineering to understand their

5     products in order to develop aftermarket products.

6     Q.   For the OE sensors that you have designed or studied in

7     this connection, how many sensor IDs does an OE sensor have?

8               MR. HNATH:  Objection, Your Honor, calls for expert

9     testimony.  Outside the scope of infringement contentions.

10              THE COURT:  Overruled.  The question asked for

11    sensors that this witness has designed.  He should have

12    personal knowledge of that.  Overruled.

13              THE WITNESS:  So we've looked at several different

14    types of OE sensors.  Generally speaking, each sensor has only

15    one unique ID.

16    Q.   (BY MR. RABENA)  Okay.  How about Orange replacement

17    sensors, aftermarket sensors?  How many sensor IDs do they

18    store in them?

19    A.   One.

20    Q.   Okay.  What other information do the Orange programmable

21    sensors store in them besides the sensor ID?

22    A.   Maybe there will be manufacturing date, the manufacturing

23    ticket number, and there will be versions for software and

24    firmware.  Hardware, sorry.

25    Q.   Do the Orange sensors store pressure information?

1    A.   Yes.

2    Q.   Do they store temperature information?

3    A.   Yes.

4    Q.   Do they store any information about the battery status?

5    A.   Yes.

6    Q.   Do they store a chip ID number?

7    A.   Yes.

8    Q.   Does the car's TPMS system use the chip ID number in the

9    normal TPMS operation?

10   A.   Yes.

11   Q.   How is the chip ID number used by the car?

12   A.   It's also using wireless method to transmit, and each

13   sensor only transmits one type of signal, one type of ID.

14   Q.   Which type of ID does the detector send to the car's TPMS

15   computer?

16   A.   It varies among different car manufacturers.  They will

17   each -- each will determine the format or the type of ID that

18   it sends.

19   Q.   Okay.  You talked about a sensor ID that the Orange

20   sensors store and also a chip ID number that the Orange

21   sensors store.  Which one, or both, does -- is used in the

22   operation of the TPMS system in the car while you're driving?

23   A.   It will use the transmitted -- it will use the sensor ID

24   to the car computer to be taken as the main sensor ID.

25   Q.   Okay.  Can I ask you about awards?  Has Orange received

1    any awards for its ID Copy technology?

2    A.    Yes.

3                MR. RABENA:  Your Honor, may I have the awards

4    passed to the witness?

5                THE COURT:  Yes.  You can approach the witness.

6    Hand them to the Court Security Officer.  He'll hand them to

7    the witness.

8    Q.    (BY MR. RABENA)  Mr. Yu, I've handed you PTX 19A and B.

9    Can you tell the jury what these are?  And maybe hold them up

10   when you're describing them.

11   A.    This is an award of Taiwan's Small and Medium Enterprise

12   Innovation Award for the small and medium enterprise

13   administration of Taiwan's Ministry of Economic Affairs.

14   Q.    Does it relate in any way to the ID Copy technology?

15   A.    Yes.  It actually has our OPSS technology written on the

16   award.

17   Q.    And does OPSS include the ID Copy technology?

18   A.    Yes, it does.

19   Q.    Okay.  And how about the other one?  What is that award

20   for?

21   A.    This is a Top Supplier Award that we received from SMP.

22   Q.    And SMP is a customer in the United States?

23   A.    Yes.  It's our main customer in the United States.

24   Q.    Did SMP acquire part of Orange Electronic as part of this

25   award?

1    A.    Yes.   They are our largest shareholder.

2    Q.    Thank you, Mr. Yu.

3         MR. RABENA:   Your Honor, I pass the witness.

4         THE COURT:   All right.   Cross examination by the

5    Defendant?

6         MR. HNATH:   Yes, Your Honor.   And can we hand out

7    binders?

8         THE COURT:   You may proceed to distribute binders.

9         MR. HNATH:   Thank you.

10        THE COURT:   All right.   Mr. Hnath, you may proceed

11   with cross examination when you're ready.

12        MR. HNATH:   Thank you, Your Honor.

13                    CROSS EXAMINATION

14   BY MR. HNATH:

15   Q.    Good afternoon, Mr. Yu.

16   A.    Good afternoon.

17   Q.    You've worked at Orange since it was formed in 2005.   Is

18   that correct?

19   A.    Yes.

20   Q.    You were one of the co-founders.   Is that correct?

21   A.    Yes.

22   Q.    And you have an ownership interest in Orange.   Is that

23   correct?

24   A.    Yes.

25   Q.    And what is that ownership interest?

1    A.    About 10 percent.

2    Q.    You began your work on TPMS products when you joined the

3    company in 2005.  Is that right?

4    A.    Well, actually I started TPMS product design back in

5    2003.  So between 2003 and 2005 when I was in graduate studies

6    at Feng Chia University--that's F-E-N-G C-H-I-A University--I

7    have been involved in TPMS design.

8    Q.    And when you joined Orange in 2005, your general manager,

9    Mr. Hsu, asked you to develop products in response to market

10   demand at the time.  Is that correct?

11   A.    Yes.

12   Q.    And the market demand was that the United States was

13   planning a law to make TPMS sensors mandatory.  Is that

14   correct?

15   A.    Yes.

16   Q.    And TPMS sensors were not new at that time.  You had

17   studied those during your Master's degree studies between 2002

18   and 2005.  Correct?

19   A.    First of all, it's 2003 to 2005.

20   Q.    Okay.  Otherwise correct?

21   A.    Yes.

22   Q.    And when you joined Orange in 2005, other companies

23   already had TPMS products on the market using sensors and

24   handheld tools.  Correct?

25   A.    Yes.

1    Q.   One of those companies was a UK company by the name of

2    Schrader.  Correct?

3    A.   Yes.

4    Q.   And at that time they were selling to manufacturers such

5    as GM and Ford.  Is that correct?

6    A.   Yes.

7    Q.   And they had a very large market share in the U.S.

8    Correct?

9    A.   Yes.

10   Q.   And in 2005, you went out and you obtained a physical

11   sample of the Schrader product to examine.  Correct?

12   A.   I'm not sure whether that was in 2005.

13   Q.   Do you recall what year it was?

14   A.   I don't remember.

15   Q.   Was it before you began working on your ID Copy idea?

16   A.   Yes.

17   Q.   Okay.  And those products had a sensor in each tire to

18   sense and detect the pressure inside the tires.  Correct?

19   A.   Yes.

20   Q.   And those sensors had an integrated circuit inside the

21   sensor with a memory inside the integrated circuit.  Is that

22   correct?

23   A.   Yes.

24   Q.   And those sensors had transmission circuitry and an

25   antenna to send wireless RF signals to the receiver or the ECU

1    in the car.  Correct?

2    A.    Yes.

3    Q.    And that Schrader product that you looked at used a

4    handheld tool to send the location of each sensor to the

5    receiver or the ECU in the car.  Correct?

6    A.    Would you mind repeating the question?

7    Q.    Sure.  The Schrader product that you looked at before you

8    ever started working on your ID Copy invention used a handheld

9    tool to send the location of each sensor to the receiver or

10   the ECU in the car.

11   A.    It's not entirely true.

12   Q.    Okay.  Let me direct your attention -- do you recall

13   having your deposition taken in this place -- in this case?

14   A.    Yes.

15   Q.    And did you swear to tell the truth during that

16   deposition?

17   A.    Yes.

18   Q.    Did you tell the truth?

19   A.    Yes.

20   Q.    Okay.  Let me direct your attention to page 19 of your

21   deposition.  There's a paper copy in front of you.  You can

22   also see it up on the screen.

23           MR. HNATH:  And I will ask Mr. Malouf to pull up

24   page 19, line 25, through page 20, line 9.

25           Your Honor, may I publish the deposition or do I need

1    your permission --

2          THE COURT:  You need to refresh the witness'

3    recollection before you ask to publish.

4    Q.   (BY MR. HNATH)  Okay.  Do you recall testifying --

5          THE COURT:  You need to refer him to the section of

6    the deposition you want to focus on and have him review it.

7          MR. HNATH:  Okay.

8    Q.   (BY MR. HNATH)  Let me direct your attention to page 19,

9    line 25.  And could you read that through page 20, line 9?

10   Let me know when you're done.

11   A.   So line 4 of page 20, there is the word, "So then they

12   can sent the location."  He said it shouldn't be sent; it

13   should be set.  Maybe it's a typo.

14   Q.   Okay.  So let me ask you again.  Did the Schrader product

15   that you looked at have a handheld tool that would set the

16   location of each sensor to the receiver or ECU in the car?

17   A.   Yes.  Yes, then that's correct.

18   Q.   And the Schrader product that you looked at -- let me ask

19   you again.  Did you obtain a copy of that or did you obtain a

20   sample of the Schrader product and inspect it in 2005?

21   A.   Yes.

22   Q.   Okay.  And on that tool on the Schrader product, when you

23   press the button on the tool, the tool would send a 125K or

24   low frequency signal to the sensor.  Is that correct?

25   A.   Yes.

1    Q.   And after the sensor received the signal, it then sent a

2    radio frequency or RF signal to the car.  Correct?

3    A.   Yes.

4           THE COURT:  Let me ask the interpreter to speak up a

5    little bit louder with the English.

6           THE INTERPRETER:  Okay.  Okay.

7           THE COURT:  All right.  Let's continue.

8           MR. HNATH:  Thank you.

9    Q.   (BY MR. HNATH)  And that tool is used to write the sensor

10   ID into the car when the car was manufactured.  Correct?

11   A.   The technology that was used is the same, but it may not

12   be that specific tool.

13   Q.   Okay.  That technology existed at the time.  Correct?

14   A.   Yes.

15   Q.   Okay.  And the Schrader sensor that you looked at in 2005

16   had a power source.  Correct?

17   A.   Yes.

18   Q.   And the power source was in the form of a battery.  Is

19   that correct?

20   A.   Yes.

21   Q.   And is that true of sensors generally in your experience

22   that use batteries as power sources?

23   A.   There are two possibilities.  Batteries are one

24   possibility; the other is to have a power-generating device.

25   So you can't say that generally, that it's all batteries.

1    Q.   And when you started working at Orange in 2005, Schrader

2    was not the only TPMS company selling handheld tools and

3    sensors that you were aware of; you were aware of at least one

4    other company.  Correct?

5    A.   Correct.

6    Q.   And the sensor in that part was able to sense both

7    temperature and pressure.  Is that correct?

8    A.   Correct.

9    Q.   And that company's product had a similar structure to the

10   Schrader product with a battery and an IC in the sensor and it

11   -- and the tool communicated with the automobile in a manner

12   similar to the Schrader sensor.  Correct?

13   A.   Correct.

14   Q.   Do you recall the name of the other company?

15   A.   No, I don't.

16   Q.   Referring you to JX 3, which describes your 2005 product

17   -- well, first of all, what is JX 3?  Is this a user manual

18   for one of the early products that you developed?

19   A.   Correct.

20   Q.   And if we look at the bottom of the first page, the

21   copyright is 2005.  Do you see that?

22   A.   Yes.

23   Q.   So this was two or three years before you came up with

24   your ID Copy idea?

25   A.   Yes.

1    Q.    And if we look at JX 3.4, does that show a picture of the

2    product in the upper left?

3    A.    Yes.

4    Q.    And let me show you DPX 3.  It's a physical exhibit.

5              MR. HNATH:  May I have that handed to the witness,

6    Your Honor?

7              THE COURT:  You may.

8              MR. HNATH:  Thank you.

9    Q.    (BY MR. HNATH)  And does that physical exhibit, Mr. Yu,

10   correspond to what we see in Exhibit JX 3 in the picture we

11   just looked at?

12   A.    It's very, very close, but it's not the exact same

13   product.

14   Q.    Is it the same generation product?

15   A.    I'm not sure for the time being.

16   Q.    Let's stick with what's described in JX 3, the 2005 user

17   manual.

18        Did that product -- did the sensors in that product have

19   a power source in the form of a battery inside the sensor?

20   A.    Yes.

21   Q.    And did the sensor in that product have transmission

22   circuitry and an antenna to send RF signals containing

23   pressure information to the automobile's receiver or ECU?

24   A.    Yes.

25   Q.    And it had an integrated circuit with a microprocessor

1    having a rewritable memory.  Is that correct?

2    A.    Correct.

3    Q.    And when you developed the sensor that you used as part

4    of your ID Copy technology, you started with the sensor in the

5    2005 product, and then you added receiving circuitry and a

6    different manufacturer's integrated circuit.  Is that correct?

7    A.    The chip in the new generation sensor is completely

8    different from the chip in that sensor.

9    Q.    Okay.  Other than the chip and the addition of the

10   receiving circuitry, those are the main differences between

11   your 2005 sensor and the one you used for your ID Copy

12   technology.  Correct?

13   A.    There are two other differences--RF antenna and the

14   battery.

15   Q.    Okay.  And are those the main differences between those

16   sensors, the old sensor and the one you developed for the ID

17   Copy technology?

18   A.    No, there are many other differences.  Some of the

19   circuitry, the PCB components are all different.

20   Q.    Could you look at your deposition, Mr. Yu, page 54, lines

21   12 through 19?  Read those to yourself and let me know when

22   you're done.

23   A.    Okay.  I'm done.

24   Q.    Okay.  Would you agree with me that the IC or integrated

25   circuit and the receiving mechanism were the main differences

1  between the sensor that you were using in the 2005 product and

2  the sensor that you developed in connection with your ID Copy

3  technology?

4  A.   Yes.  These are the main differences, but there are other

5  differences as well.

6  Q.   Thank you.

7       You don't recall how you came up with the ID Copy idea.

8  The idea just came to you.  Is that correct?

9  A.   That's correct.

10 Q.   Do you remember who you discussed this idea with after

11 you came up with it?

12 A.   I don't remember exactly who, but if I discussed it with

13 anybody, it would be my colleagues in the company.

14 Q.   Do you recall which ones?

15 A.   It should be our general manager Hsu.

16 Q.   Could you look, Mr. Yu, at page 46 of your deposition,

17 line 22, through page 47, line 2?  I'll ask you to read those

18 to yourself, and let me know when you're done.

19 A.   I'm done.

20 Q.   Let me ask you again.  Do you recall which colleagues you

21 discussed the ID Copy idea with?

22 A.   It's been too long.  I genuinely don't remember.

23 Q.   And what was the first thing you did after you came up

24 with the idea?  Did you create drawings?

25 A.   I don't recall.

1    Q.    Did you create prototypes?

2    A.    It's too long.  I don't recall.

3    Q.    Do you recall how many prototypes of your invention you

4    created before you had a final product that was ready to be

5    commercialized?

6    A.    I don't recall.

7    Q.    Do you remember any difficulties that you had in creating

8    the physical embodiment of your invention?

9    A.    I don't recall.

10   Q.    Do you recall how long it took before you had a final

11   product that was ready to commercialize?

12   A.    I don't recall.

13   Q.    Do you recall which engineers at Orange worked with you

14   on this project?

15   A.    I don't recall.

16   Q.    Do you recall how many engineers worked with you on this

17   project?

18   A.    No, I don't recall.

19   Q.    Do you recall any reactions of anyone at Orange to your

20   idea of the ID Copy technology that you developed?

21   A.    I don't recall.

22   Q.    Do you recall how many hours you would have spent on the

23   ID Copy technology from the time you first had the idea until

24   you submitted a patent application?

25   A.    It's been too long.  I don't recall.

1    Q.    Okay.  Are you familiar with a company called CUB?

2    A.    Yes, I'm aware of that company.

3    Q.    And they are a Taiwanese company in the TPMS business.

4    Is that correct?

5    A.    Yes.

6    Q.    And were you aware of TPMS products from CUB before you

7    came up with the idea of the ID Copy technology?

8    A.    Do you mind repeating the question?

9    Q.    Yes.  Were you aware of TPMS products from CUB before you

10   came up with the idea of the ID Copy technology?

11   A.    It's been too long.  I don't recall.

12   Q.    Okay.  Let me ask you to look at your deposition, page

13   57, lines 20 to 23.  Could you read those to yourself, and let

14   me know when you're ready?

15   A.    Yeah, I'm ready.

16   Q.    Let me ask again.  Were you aware of TPMS products from

17   CUB before you came up with the idea of the ID Copy

18   technology?

19   A.    Now I can't recall.

20   Q.    So the answer is yes?

21   A.    No, I can't -- no, now I cannot recall.

22   Q.    Ahh.  Were you able to recall at the time of your

23   deposition?

24   A.    Yes.

25   Q.    And was your answer at that time "Yes?"

1    A.   Yes.

2    Q.   Okay.  And you became aware that CUB had filed a patent

3    application relating to TPMS products in a discussion that you

4    had with the boss of CUB, also named Mr. Yu.  Is that correct?

5    A.   Correct.

6    Q.   And that was a meeting that you had with Mr. Yu of CUB in

7    person.  Is that correct?

8    A.   Correct.

9    Q.   And that meeting could have taken place before you came

10   up with your ID Copy technology idea.  Correct?

11   A.   I don't recall.

12   Q.   So you don't recall one way or the other--it could have

13   been before you came up with your ID Copy technology idea.

14   Correct?

15   A.   Correct.  It's possible.

16   Q.   Okay.  Why were you having a discussion with Mr. Yu of

17   CUB about a patent application relating to TPMS?

18   A.   Do you mind repeating that question?

19   Q.   Sure.  Why were you having this discussion with Mr. Yu of

20   CUB about a patent application they had filed relating to

21   TPMS?

22   A.   Because at that time we were trying to develop universal

23   sensors, and we were aware that the United States has a

24   universal sensor patent, and Mr. Yu says that CUB has already

25   taken that U.S. patent and trying to apply that in Taiwan.

1   Q.   And after that conversation with Mr. Yu, then you went to

2   the Taiwanese Patent Office and you were able to find some

3   patent applications that CUB had filed relating to TPMS

4   products.  Correct?

5   A.   Yes.  I found out that they simply translated the U.S.

6   patent into Chinese and then used that to apply for a

7   Taiwanese patent.

8   Q.   Do you recall how many CUB patents or patent applications

9   you identified at the Taiwanese Patent Office?

10  A.   I don't recall.

11  Q.   The idea of manually keying in an identification into the

12  tool to program a new sensor, you got that idea because it's

13  similar to the idea of a computer keyboard.  Correct?

14  A.   Correct.

15  Q.   Okay.  May I ask you some questions about communication

16  codes?

17  A.   Yes.

18  Q.   First, a communication code is something that allows a

19  sensor to communicate with the receiver or the ECU in the car.

20  Is that correct?

21  A.   Correct.

22  Q.   And each car model has a unique communication code.  Is

23  that correct?

24  A.   Correct.

25  Q.   And the communication code is stored in the memory of the

1  sensor.  Is that correct?

2  A.   Correct.

3  Q.   And for your products that are sold in the repair market

4  or the aftermarket when you're replacing broken sensors, it's

5  important to be able to communicate with different car models.

6  Correct?

7  A.   Correct.

8  Q.   And, in fact, Orange promotes its TPMS products as able

9  to be used with 98 percent of the different car models.  Is

10  that correct?

11  A.   Correct.

12  Q.   And that's an important feature of your sensor products.

13  Correct?

14  A.   Yeah, you can say that.

15  Q.   And Orange in its user manual describes different ways of

16  programming the sensors.  Correct?

17  A.   Correct.

18  Q.   Okay.  So one way is to take the identification from the

19  old sensor and to copy it into the new sensor.  Correct?

20  A.   Correct.

21  Q.   And another way described in your user manual is to take

22  the identification from the OBD in the car and programming

23  that into the new sensor.  Correct?

24  A.   Do you mind repeating?

25  Q.   Sure.  Another method described in your user manual is

1    taking the identification from the car's OBD and copying that

2    into the new sensor.  Correct?

3    A.    Correct.

4    Q.    And your user manual also describes the OBD relearn

5    process--correct?--where you have to -- the OBD has to relearn

6    or learn the new sensor ID.  Correct?

7    A.    Correct.

8    Q.    Okay.  Are all those also described in the video that you

9    reviewed during your direct testimony?

10   A.    They should be in the video.

11   Q.    All right.  So what -- the part of the video that was

12   shown was just part of the video; it was not the entire video.

13   Correct?

14   A.    Correct.

15   Q.    And I noticed the video also stated that Orange has

16   worldwide rights to the Copy ID technology, but isn't it

17   correct that Orange only has patents in the U.S., Taiwan,

18   China, and Japan relating to ID Copy?

19   A.    That's correct.

20   Q.    Okay.  Would you agree with me that the Orange tool can

21   be used to take or read an ID from a non-Orange sensor?

22   A.    Yes, that should be able to be done, yeah.

23   Q.    And Orange sensors can also be used with non-Orange

24   tools, such as tools made by ATEQ, OTC, and Snap-On Tools,

25   as described on your website.  Correct?

1   A.   Correct.

2   Q.   May I ask you some questions about your -- about other

3   companies' sensors?

4   A.   Yes.

5   Q.   Okay.  Do you have access to other sensor manufacturers'

6   confidential information about the hardware or software design

7   of the memory in their sensor devices?

8   A.   I don't quite understand this question.

9   Q.   Sure.  When you said that you had examined other

10  companies' sensors, did you obtain from those companies their

11  confidential information about the sensors?

12  A.   So the documents mainly came from the car manufacturers,

13  and we were able to obtain those documents after entering into

14  confidentiality agreements with the car manufacturers.

15  Q.   Did these other sensors have chip IDs which identified

16  the sensor?

17  A.   In theory, yes.

18  Q.   Do you know what a product serial number is?

19  A.   Yeah.  So the definition of 'serial number' from

20  different companies are different.

21  Q.   Based on that definition, does Orange store product

22  serial numbers in its sensors?

23  A.   It depends on customers' requirements.  Some of the

24  customers would require for that.

25  Q.   And how about the other companies' IDs or sensors that

1  you worked with?  Did those also have product serial numbers?

2  A.   So we don't really pay that much attention to serial

3  numbers.  As a result, we haven't put much effort in studying

4  how other companies store their product serial numbers.

5  Q.   Okay.  So you don't know one way or the other.  Is that

6  correct?

7  A.   That's correct.

8  Q.   The Taiwanese Ministry of Economic Affairs Award, did

9  Orange submit an application for that award?

10 A.   Yes.

11 Q.   Was that the first time that Orange had ever applied to

12 the Taiwanese Ministry of Economic Affairs for an award for

13 its products?

14 A.   No.

15 Q.   Were you involved in preparing an application for that

16 award?

17 A.   I don't recall.  It's been too long.

18 Q.   And this award was in 2012.  Correct?

19 A.   Correct.

20 Q.   Do you know how many companies received an award from the

21 Ministry for their products in 2012?

22 A.   I don't recall.

23 Q.   Do you know whether any other small or medium enterprises

24 received innovation awards from the Ministry of Economic

25 Affairs in Taiwan in 2012?

1    A.    I don't know.

2    Q.    Referring to the other award that you discussed, the Top

3    Supplier Award from Standard Motor Products, that award was in

4    2022.  Correct?

5    A.    Correct.

6    Q.    And there's nothing on the face of that award referring

7    to the Orange product, is there?

8    A.    That's correct.

9    Q.    And Standard Motors had acquired an interest in Orange

10   back in 2013.  Correct?

11   A.    I don't recall the exact time.

12   Q.    It was well before 2022, wasn't it?

13   A.    Correct.

14   Q.    Do you know how many top suppliers Standard Motors

15   recognized in 2022?

16   A.    I don't know.

17   Q.    And I believe you said they're Orange's largest customer

18   for TPMS products in the U.S.  Is that right?

19   A.    Correct.

20   Q.    Thank you, Mr. Yu.

21           MR. HNATH:  I have nothing further.

22           THE COURT:  Is there redirect from the Plaintiff?

23           MR. RABENA:  No, Your Honor.

24           THE COURT:  All right.  You may step down, Mr. Yu.

25       Counsel, approach the bench, please.

1          (The following was had outside the hearing of the

2          jury.)

3          THE COURT:  Am I right Plaintiff's next witness is

4   Mr. McAlexander?

5          MR. RABENA:  It is, Your Honor.

6          THE COURT:  And he is a very lengthy witness.

7   Correct?

8          MR. RABENA:  He is, Your Honor.

9          THE COURT:  All right.  Unless you have something

10  else, we'll stop for the day and pick up with him in the

11  morning.

12         MR. HNATH:  Makes sense.  Thank you.

13         (The following was had in the presence and hearing

14         of the jury.)

15         THE COURT:  Ladies and gentlemen, the next witness

16  is going to be a lengthy witness, probably longer than this

17  last one we had.  We're not going to start another witness

18  this late in the day.  We're going to stop for the day and we

19  will pick back up with the Plaintiff's next witness tomorrow

20  morning.

21      I'm going to ask each one of you to be here about 8:15 or

22  8:20 so that we can start at 8:30.  I'm going to do my best to

23  be available so we can start promptly at 8:30.

24      I'm going to ask each of you to remember and recall the

25  instructions I've given you, particularly not to discuss the

1    case or anything about it with anyone else.  And again, I

2    promise you, when you get home you're going to be asked about

3    it.  Don't even try to answer that question, just blame it on

4    me, but don't even attempt to talk about the case in any way

5    with anybody.

6         Please take your notebooks with you when you leave the

7    jury room and leave them closed -- when you leave the

8    courtroom, I should say, and leave them closed on the table in

9    the jury room so they will be there with you in the morning.

10        Please travel safely to your homes.  And remember, ladies

11   and gentlemen, a jury is like a convoy--we travel as fast as

12   our slowest ship.  So if one of you is late tomorrow, we can't

13   start until everybody's here.  So please check the weather,

14   check the driving conditions, make sure you have gas in your

15   car, do whatever you need to do so that we can be here at 8:30

16   and start promptly.

17        With that, have a good evening, and we will see you

18   tomorrow morning.

19        The jury's excused until tomorrow morning.

20            (Whereupon, the jury left the courtroom.)

21            THE COURT:  Be seated, please.

22        Counsel, so that you'll know, we've used a total of 2

23   hours and 14 minutes and 18 seconds today.  Plaintiff has used

24   an hour and 18 minutes and 1 second, the Defendants used 56

25   minutes and 17 seconds of their designated trial time as of

1    right now.

2         Let me remind the parties of your obligation to

3    continuously meet and confer overnight with regard to

4    demonstratives and any other issues in hopes of resolving

5    those potential disputes so that we can start promptly in the

6    morning.  If there are disputes that are not resolved, you

7    need to report those and update the Court.  And if there are

8    disputes that survive the continuous process of meeting and

9    conferring overnight, then I'll be available to meet with you

10   in chambers by 7:30 in the morning in hopes that we can get

11   those resolved before we begin with the jury at 8:30.

12        The Court doesn't like to be here early just because the

13   Court likes to be here early.  I'm doing that so I can

14   maximize your trial time and take care of any overnight

15   disputes without doing it with the jury in the box and

16   consuming part of your trial time to do that.  If you need my

17   assistance I'll be here; if you don't, I am happy not to have

18   to be involved.  But continue to meet and confer and see what

19   you can do to work out any overnight disputes.  We had a

20   relatively small number this morning, and that was a welcome

21   situation.  Hopefully that will continue as we go forward.

22        Are there questions from either Plaintiff or Defendant

23   before we recess for tomorrow morning?

24             MR. RABENA:  Not from Plaintiff, Your Honor.

25             MR. HNATH:  Nothing from Defendant, Your Honor.

1    Thank you.

2            THE COURT:  All right.  Have a good evening.  I'll

3    see you tomorrow morning.

4        The Court stands in recess.

5            (The proceedings were concluded at 5:45 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      I HEREBY CERTIFY THAT THE FOREGOING IS A

2      CORRECT TRANSCRIPT FROM THE RECORD OF

3      PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4      I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5      FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6      COURT AND THE JUDICIAL CONFERENCE OF THE

7      UNITED STATES.

8

9      S/Shawn McRoberts              06/05/2023

10     _____DATE_____
       SHAWN McROBERTS, RMR, CRR
11     FEDERAL OFFICIAL COURT REPORTER

12     .

13

14

15

16

17

18

19

20

21

22

23

24

25