# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION



| | | |
|---|---|---|
| ORANGE ELECTRONIC CO. LTD., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:21-CV-00240-JRG |
| | § | |
| AUTEL INTELLIGENT TECHNOLOGY | § | |
| CORP., LTD., | § | |
| | § | |
| *Defendant*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Autel Intelligent Technology Corp., Ltd.'s ("Autel") Rule 50(b) Post-Trial Motions. (Dkt. No. 177.) Autel moves for judgment as a matter of law that: there was no direct infringement under 35 U.S.C. § 271(a) (the "Noninfringement Motion") (*id.* at 3–17); the Asserted Claims are directed only to ineligible subject matter under 35 U.S.C. § 101 (*id.* at 17); the Asserted Claims are invalid as obvious under 35 U.S.C. § 103 (*id.* at 23); there was no evidence of willfulness infringement by Autel (*id.* at 27); and the jury's damages award was unsupported and should be overturned (*id.* at 32).

Having considered the Noninfringement Motion, the Court finds that it should be **GRANTED**. In light of this finding, the Court finds that Autel's motions for judgment as a matter of law that that there was no evidence of willful infringement and that the jury's damages award was unsupported are necessarily **DENIED AS MOOT**. Autel's motions for judgment as a matter of law that the Asserted Claims are directed to ineligible subject matter and are invalid as obvious will be addressed by separate order.

## I.      BACKGROUND

Plaintiff Orange Electronic Co. Ltd. ("Orange") filed this lawsuit on June 30, 2021 alleging direct, indirect, and willful infringement of multiple claims of U.S. Patent No. 8,031,064 C3 ("the '064 Patent" or "the Asserted Patent"). (Dkt. No. 1, ¶¶ 49; *see also* Dkt. No. 1-1.) Generally, the '064 Patent relates to "an identification rewritable tire pressure detecting apparatus." (Dkt. No. 91.) The "tire pressure detecting apparatus has an identification rewriteable tire pressure detector and a setting apparatus." (Dkt. No. 1-1 at 15.) Orange accused various Autel tire pressure monitoring system ("TPMS") products of infringement of the '062 Patent.[1] (Dkt. No. 1, ¶ 18.) On March 23, 2023, Orange filed a notice limiting the asserted claims of the '064 Patent to Claims 26 and 27 (the "Asserted Claims"). (Dkt. No. 140.) Orange also withdrew its allegations of indirect infringement such that only its direct and willful infringement allegations remained at trial. (*Id.*; *see also* Dkt. No. 158.) Autel asserted defenses of noninfringement, invalidity, and intervening rights. (Dkt. No. 56, ¶¶ 63–64; *see also* Dkt. No. 144 at 4.) However, the equitable intervening rights defense was deferred until a possible bench trial after the jury trial. (Dkt. No. 148 at 2.)

The case was tried to a jury beginning on June 5, 2023. (*See* Dkt. No. 178.) Before the jury were the issues of direct infringement, willfulness, invalidity (obviousness), and ineligibility. (*See* Dkt. No. 158.) At the conclusion of evidence, Autel moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) regarding non-infringement, no willfulness, invalidity, and no damages. (Dkt. No. 183 at, *e.g.*, 4:12–13.) Orange made no Rule 50(a) motions. (*Id.* at 4:7–10.) The Court, after hearing oral argument on the Rule 50(a) motions, and "recognizing that [Rule

---

[1] Orange's Complaint alleged that "Autel has manufactured and sold Autel's TPMS products that infringe the Asserted Patent and which include at least, but not limited to, MaxiTPMS TS501, MaxiTPMS TS601, TS401, TS408, TS508, TS608, MS906TS, ITS 600, TS508WF, 1- Sensor (Press-in) M, 1-Sensor (Press-in) R, 1-Sensor (Screw-in) M, 1-Sensor (Screw-in) R, 315MHz MX-Sensor M, 433MHz MX-Sensor M, 315Mhz MX-Sensor R, and 433MHz MX-Sensor R." (Dkt. No. 1, ¶ 18.)

50(a)] on its face provides that the Court may act but is not required to act when a party has been fully heard in a trial before the jury and no reasonable jury could find to the contrary," denied each of Defendant's 50(a) motions. (*Id.* at 19:7–14.) The jury returned a verdict on June 8, 2023. (Dkt. No. 158.) The jury found that Autel willfully infringed both Asserted Claims, that the Asserted Claims were not invalid for obviousness nor directed to ineligible subject matter, and awarded $6,616,397 in damages. (*Id.*)

In light of certain evidence raised during the trial and related to the sale and importation of the accused devices into the United States, the Court found that post-trial briefing was appropriate. (Dkt. No. 166.) In a *sua sponte* Order issued the day after the jury's verdict, the Court ordered "briefing addressing such evidence and all legal issues related thereto . . . including [Autel's] allegation that it sells the accused products exclusively in China which defeats Autel as an infringer." (*Id.* at 1.) The parties were further ordered to address "whether Orange, in light of this allegation, was deprived of standing to bring this lawsuit." (*Id.*) The Court additionally ordered expedited post-trial briefing, and ordered the parties to undergo post-trial mediation. (*Id.* at 1–2.) Final judgment has not yet been rendered in light of these circumstances.

The parties filed the post-trial briefing on the U.S. sales and standing issues, and Autel filed its Rule 50(b) motions renewing its motions for judgment as a matter of law under Rule 50(a), in accordance with the expedited schedule set forth by the Court's *sua sponte* order.  (*See* Dkt. Nos. 173, 177.) Through their briefing, the parties agree there is no standing issue; rather, they focus on whether there was substantial evidence of any infringing activity in the United States on the part of Autel ITC (rather than its distributor, Autel U.S.). (*See* Dkt. No. 190 at 1 ("[The issue of standing] was a potential problem, but because Orange responded by limiting its allegations to just

those sales made by Autel U.S. (*see generally*, Orange's Brief, Dkt. 173) outside the United States, not those sales made by Autel U.S. in the United States, a standing issue has been avoided.").)

Autel filed an unopposed motion for leave to submit its equitable intervening rights defense by briefing, without a bench trial, which the Court granted. (*See* Dkt. Nos. 208, 209.) That issue has now been fully briefed. (*See* Dkt. Nos. 210–214.)

The Court ordered post-trial mediation, and the mediator's report was filed on December 4, 2023, explaining that an impasse was declared on December 1, 2023. (Dkt. No. 214.)

## II.   LEGAL STANDARD

Entry of judgment as a matter of law is appropriate when "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Guile v. United States*, 422 F.3d 221, 225 (5th Cir. 2005). The jury's verdict must be supported by "substantial evidence" in support of each element of the claims. *Am. Home Assurance Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004).

## III.   DISCUSSION

Autel argues that there is no direct infringement under 35 U.S.C. § 271(a) due to lack of sales of the Accused Systems in the United States. (Dkt. No. 177 at 3.) First, it contends that the evidence presented at trial shows that Autel sells the Accused Products only in China. (*Id.* at 4.) Second, Autel argues that even if the sales made by Autel could be said to occur in the U.S., the sales are not sales of the system; rather, they are sales of separate components of the system. (*Id.* at 7.) Lastly, it argues that the accused systems do not meet each element of the Asserted Claims. (*Id.* at 9.) Orange responds that there were infringing sales of the complete invention by Autel in the United States, such that there is substantial evidence supporting the jury's verdict of

infringement. (Dkt. No. 192 at 2.) It further contends that substantial evidence supports the verdict that the accused systems meet each element of the Asserted Claims. (*Id.* at 9.)

For the reasons discussed below, the Court finds that there is not sufficient evidence of a sale, offers for sale, or importation into the U.S. by Autel. Accordingly, it does not reach Autel's other noninfringement grounds.

## A. Direct Infringement Requires an Infringing Activity to Occur in the United States

Direct infringement, unlike induced infringement, explicitly requires acts of infringement to occur within the United States. *See* 35 U.S.C. § 271(a) ("whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent"); *see also Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 441 (2007) ("It is the general rule under United States patent law that no infringement occurs when a patented product is made and sold in another country."). "It is well-established that the reach of section 271(a) is limited to infringing activities that occur within the United States." *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1375 (Fed. Cir. 2005). Further, "[t]he presumption that United States law governs domestically but does not rule the world applies with particular force in patent law." *Microsoft*, 550 U.S. 437, 454–55.

## B. Relevant Federal Circuit Authority

The facts and evidence presented at trial are largely undisputed. The briefing largely focuses on case law. Consequently, the Court addresses the main cases discussed in the briefing.

***Litecubes, LLC v. Northern Light Products, Inc.***: In this case, plaintiff ("Litecubes") brought an action in federal court alleging patent and copyright infringement by a Canadian defendant ("GlowProducts"). 523 F.3d 1353, 1357 (Fed. Cir. 2008). The district court entered a

judgment against GlowProducts following a jury verdict of copyright and patent infringement. *Id.* GlowProducts filed a motion for JMOL arguing that Litecubes had failed to establish that any sale or offer for sale took place in the U.S., nor were products imported into the U.S. *Id.* at 1369. It was uncontested that GlowProducts sold and shipped the products directly to customers located in the U.S. *Id.* However, GlowProducts argued that these were not sales in the United States on the grounds that the products were shipped f.o.b., and thus title over the goods was transferred in Canada. *Id.*

The *Litecubes* Court extended its holding in *North American Philips Corp. v. American Vending Sales, Inc.* to reject this argument. *Id.* at 1369–70 (citing 35 F.3d 1576 (Fed. Cir. 1994)). In *North American Philips*, in the context of personal jurisdiction, the Federal Circuit "rejected the notion that simply because goods were shipped f.o.b., the location of the 'sale' for the purposes of § 271 must be the location from which the goods were shipped." *Litecubes*, 523 F.3d at 1369 (citing *North American Philips*, 35 F.3d at 1579). In *Litecubes*, the Federal Circuit explained that it saw "no basis for construing the location of a 'sale' differently when the issue is whether the plaintiff has established that the sale took place within the U.S. for the purposes of infringement." *Id.* at 1370 (internal citations omitted).

It was undisputed that GlowProducts sold the accused products directly to customers in the United States. *Id.* at 1371. The customers were in the U.S. when they contracted for the products, and the products were delivered directly to them within the United States. *Id.* The Federal Circuit held that there was substantial evidence of a sale within the U.S. such that the jury's verdict should be upheld as to infringement. *Id.*

**SEB S.A. v. Montgomery Ward & Co., Inc.**: In *SEB S.A.*, the foreign defendant ("Pentalpha") challenged the district court's jury instructions following a trial where the jury found

that it had willfully infringed the asserted patent. 594 F.3d 1360, 1365 (Fed. Cir. 2010). Pentalpha sold its accused products to three U.S. companies. *See id.* at 1366, 1375. Pentalpha argued that the court erred by instructing the jury that, in determining if a sale occurred in the U.S., it could consider "where the products were shipped from and where the products were shipped to."[2] *Id.* at 1375.

Finding that there was no fundamental error in the challenged instruction, the Federal Circuit noted that the "*only* evidence on which Pentalpha relie[d] to argue that its sales occurred overseas was that it delivered its products to [the three U.S. companies] f.o.b. Hong Kong or mainland China." *Id.* (emphasis added). The *SEB S.A.* Court then cited the prior *Litecubes* decision, explaining that shipping goods f.o.b. does not, by itself, make the location of the "sale" for purposes of § 271 the location from which the goods were shipped. *Id.* Aside from the f.o.b. terms, the Federal Circuit noted that "the record show[ed] that Pentalpha intended to sell its deep fryers directly into" the U.S. *Id.* Indeed, Pentalpha itself affixed the American trademarks of the three U.S. companies to the products, and manufactured them with North American electrical fittings. *Id.* The invoices between Pentalpha and those companies all identified delivery to United States destinations. *Id.*

**Halo Electronics, Inc. v. Pulse Electronics, Inc.**: In *Halo*, the District Court of Nevada granted summary judgment that the defendant ("Pulse") did not directly infringe patents because Pulse did not sell or offer to sell the products within the United States. 831 F.3d 1369, 1371–72 (Fed. Cir. 2016). The Federal Circuit affirmed.[3] *Id.* at 1373. Pulse designed, sold, and

---

[2] Pentalpha failed to timely object to this instruction such that the Federal Circuit reviewed the challenged instruction under the fundamental error standard. *SEB S.A.*, 594 F.3d 1360, 1375 (Fed. Cir. 2010).
[3] The United States Supreme Court vacated and remanded this case on a different issue, and the Federal Circuit reaffirmed the district court's finding of no direct infringement on remand. *Halo*, 831 F.3d 1369, 1371–73.

manufactured the accused products in Asia. *Id.* at 1374. These products were delivered outside the U.S. to contract manufacturers for companies "such as Cisco." *Id.* Those manufacturers incorporated the electronic packages Pulse supplied into end products overseas, which were then sold and shipped to consumers around the world. *Id.* All purchase orders were received at Pulse's sales offices abroad.[4] *Id.* Pulse engaged in a number of activities in the United States. Pricing negotiations with companies such as Cisco took place in the U.S. *Id.* Pulse also had employees meet regularly with Cisco design engineers, sent product samples to Cisco for pre-approval, attended sales meetings with its customers, and provided post-sale support for its products in the United State. *Id.*

The plaintiff ("Halo") argued that the district court erred in granting summary judgment with respect to the products Pulse delivered abroad. *Id.* at 1367. It contended that those products were sold and offered for sale in the U.S. "because negotiations and contracting activities occurred within the United States, which resulted in binding contracts that set specific terms for price and quantity." *Id.* Pulse responded that the sales and offers for sale took place outside the U.S. because those products were manufactured, ordered, invoiced, shipped, and delivered abroad. *Id.* It also argued that the pricing discussions with Cisco in the U.S. were merely forecasts rather than a guarantee that Pulse would receive any actual order from any of Cisco's contract manufacturers. *Id.* Pulse further pointed to the presumption against extraterritorial application of U.S. laws. *Id.*

---

[4] Cisco outsourced its manufacturing activities to foreign contract manufacturers, but negotiated with its component suppliers (such as Pulse) the prices that its contract manufacturers would pay when purchasing component parts. *Id.* at 1374. Pulse executed a general agreement with Cisco setting forth manufacturing capacity, low price warranty, and lead time terms; however, that agreement did not refer to any specific Pulse product or price. *Id.* at 1374. Cisco would typically send a request for quote to Pulse, which would respond with a proposed price. *Id.* After negotiation, Cisco would issue the agreed-upon price and projected demand to Pulse for the upcoming quarter. *Id.* Cisco then communicated price and allocation to its contract manufacturers in Asia, who were expected to apply the Cisco price and allocation when ordering components from Pulse and other suppliers. *Id.*

The Federal Circuit agreed with the district court that there were no sales or offers for sale in the United States with regard to the products which were delivered abroad. *Id.* at 1381. It first addressed whether sales were made in the United States, looking to the guidance of *North American Philips* and *Litecubes*. *Id.* at 1377. It explained that it "ha[s] not deemed a sale to have occurred within the United States for purposes of liability under § 271(a) based solely on negotiation and contracting activities in the United States when the vast majority of activities underlying the sales transaction occurred wholly outside the United States." Under these circumstances, the key is to determine whether the activities in the U.S. are sufficient to constitute a "sale" under § 271(a), "recognizing that a strong policy against extraterritorial liability exists in patent law." *Id.* The Federal Circuit concluded that:

> [W]hen **substantial activities of a sales transaction**, including the ***final formation of a contract for sale*** encompassing all essential terms as well as the ***delivery and performance*** under that sales contract, occur entirely outside the United States, pricing and contracting negotiations in the United States alone do not constitute or transform those extraterritorial activities into a sale within the United States for purposes of § 271(a).

*Id.* at 1378. (emphasis added).

In *Halo*, the products were manufactured, shipped, and delivered to buyers abroad. *Id.* Pulse received purchase orders for the products abroad. *Id.* Furthermore, Pulse was paid abroad by contract manufacturers, not Cisco, upon fulfillment of the purchase orders. *Id.* The Federal Circuit found that this constituted "substantial activities" of the sales transaction. *Id.* Though there was evidence of pricing negotiations and certain contracting and marketing negotiations within the U.S., "such pricing and contracting negotiations alone are insufficient to constitute a 'sale' within the United States." *Id.*

Turning to offers for sale, the Federal Circuit pointed to its prior holding that "the location of the contemplated sale controls whether there is an offer to sell *within the United States*." *Id.*

9

(citing *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1309 (Fed. Cir. 2010)) (emphasis added in *Halo* opinion). In order to make an offer for sale that constitutes infringement, "the offer must be to sell a patented invention within the United States." *Id.* (citing *Transocean*, 617 F.3d at 1309). Therefore, "[a]n offer to sell, in order to be an infringement, must be an offer contemplating sale in the United States." *Id.* In *Halo*, the Circuit concluded that Pulse did not directly infringe under the "offer to sell" provision by making an offer in the United States because the locations of those contemplated sales were outside the U.S. *Id.*

### C. There is not sufficient evidence to support the jury's verdict that infringing activity took place in the United States.

#### a. Party Arguments

Autel argues that the "entire body of evidence" at trial demonstrates with certainty that Autel sells the accused products outside of the U.S., in China. (Dkt. No. 177 at 4.) In particular, Autel emphasizes the testimony of Ms. Jieying Chen (Autel's sales operations manager) and exhibits JX-065 (Autel-Autel US distributorship agreement) and JX-066 (commercial invoices from Autel to Autel US).[5] (*Id.*) In Autel's view, this evidence demonstrated that: Autel undertakes its sales activities in China (Dkt. No. 181 at 124:15–25, 138:10–13); ⬛⬛⬛ ⬛⬛⬛ (*id.* at 123:13–16, 134:19–135:2), ⬛⬛⬛ ⬛ ⬛⬛⬛ (*id.* at 133:8–19, 138:19–139:6). (Dkt. No. 177 at 6.) Autel argues that no sales activities by Autel occur in the United States. (*Id.*)

Autel urges that *Halo* controls here. (*See id.*) It argues that where "substantial activities of a sales transaction" and "delivery and performance" of a sales contract occur entirely outside the United States, there is no sale within the United States for the purposes of § 271(a). (*Id.*) Unlike in

---

[5] No other evidence was introduced at trial concerning the location of Autel's sales. (*Id.*)

*Halo*, Autel argues that there were not even "pricing and contracting negotiations" in the United States for Autel's sales to Autel U.S. (*Id.*)

In discussing *Litecubes* and *North American Philips*, Autel acknowledges that the Federal Circuit in *Litecubes* saw no basis for construing a "sale" differently in the § 271(a) context versus in a personal jurisdiction context. (Dkt. No. 190 at 2 n.1.) However, Autel argues that there is a key distinction between the "sale" inquiries in these contexts—personal jurisdiction is subject to the "stream-of-commerce" test, but there is no equivalent concept for § 271(a). (*Id.*, citing *AFTG-TG, LLC v. Nuvoton Techn. Corp.*, 686 F.3d 1358, 1362–64 (Fed. Cir. 2012).) Autel argues that this must be the case; application of such a "stream of commerce" principle in the § 271(a) context would violate the "strong policy against extraterritorial liability [that] exists in the patent law." (*Id.*, quoting *Halo*, 831 F.3d at 1377.) Further, it argues that this distinction was irrelevant in *Litecubes*, where the defendant was not using a distributor. Here, however, a distributor was used, and the distinction is "crucial[.]" (*Id.*)

Autel also distinguishes *Litecubes* from the present case based on the lack of a distributor in that case. It argues that the district court in *Litecubes* made the same distinction. (*Id.* at 3, citing *Litecubes, L.L.C. v. Northern Light Prods.*, 2006 U.S. Dist. LEXIS 60575, at *9 (D. Mo. Aug. 25, 2006).) That court contrasted two cases finding no sales or importation into the U.S. with *Litecubes* because in those two cases "an intermediary company was acting as the importer." *Litecubes*, 2006 U.S. Dist. LEXIS 60575, at *9 (citing *Pfizer Inc. v. Aceto Corp.*, 853 F. Supp. 2d 104, 106 (S.D.N.Y. 1994); *Cybiotronics, Ltd. v. Golden Source Elecs., Ltd.*, 130 F. Supp. 2d 1152, 1175–76 (C.D. Cal 2001)). In *Litecubes*, however, it was undisputed that GlowProducts shipped the accused products directly to its U.S. customers. *See Litecubes*, 523 F.3dd at 1369–71.

Unlike *Litecubes*, Autel argues that it did not simply rely on ███████████ to prove that no infringing activity took place in the U.S.[6] (Dkt. No. 190 at 4.) Rather, the record in this case demonstrates that Autel exclusively sold the accused products to a distributor and that all of the essential activities of these sales took place in China, including (1) ████████████████████ ████████ (Dkt. No. 181 at 134:19–135:2), (2) ████████████████████████████ ██████████████████), and (3) ██████████████████████ (Dkt. No. 181 at 133:8-19). (Dkt. No. 190 at 4.) ████████████████████████████████████ ████████████████████████████████████████████████████ ██████████[7] (*Compare* JX-065.8 ("████████████████████████████████ ██████████████████████████████████████████.") *with Litecubes*, 2006 U.S. Dist. LEXIS 60575, at *9 (defendant directly shipped products to the customer's address following an order placed by phone).) Autel concludes that, ████████████████████████ ████████████████████ (Dkt. No. 190 at 4.)

Autel argues that Orange's importation and offers for sale theories fare no better. First, Autel characterizes itself as an "exporter" rather than an "importer." (*Id.* at 6, citing *Pulse Elecs., Inc. v. U.D. Elec. Corp.*, 2021 U.S. Dist. LEXIS 49101, at *45–46 n.12 (S.D. Cal. Mar. 15, 2021) (finding no importation under § 271(a) and noting that "if someone buys a product within the U.S. from Asia containing [defendant's accused products], the purchaser would be importing infringing goods, while the seller (whether the seller is a third-party or [the defendant]) would be exporting the goods.").) Further, Autel argues that the "offer for sale" inquiry rises and falls with the location

---

[6] Autel argues that *SEB S.A.* considered a similar issue to *Litecubes*, where "the only evidence on which [the defendant] relie[d] to argue that its sales occurred overseas was that it delivered its products to [its customers] f.o.b. Hong Kong or mainland China." (Dkt. No. 190 at 5, quoting *SEB S.A.*, 594 F.3d at 1375.)

[7] Ms. Chen testified that Autel U.S. is "████████████████████████████████████████ ████████" (Dkt. No. 181 at 128:15–24.)

of the sales themselves. (*Id.*, citing *Transocean*, 617 F.3d at 1309 ("the location of the contemplated sale controls whether there is an offer to sell within the United States.").)

Orange responds that "the law is clear that ███████████████████████████████ does not negate an otherwise infringing offer or infringing sale." (Dkt. No. 192 at 2.) It claims that "███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████." (Dkt. No. 173 at 1.) Orange relies heavily on the *Litecubes* and *SEB S.A.* opinions to contend that Autel cannot escape liability as a direct infringer. (*See id.* at 3–5.) In particular, Orange emphasizes the following language in *SEB S.A.*: "Pentalpha *intended* to sell its deep fryers directly into the United States.…Moreover, the *invoices* between Pentalpha and the three U.S. companies *all identify delivery to U.S. destinations*." (*Id.* at 5, quoting *SEB S.A.*, 594 F.3d at 1375) (emphasis added by Orange).

In reliance on that language in *SEB S.A.*, Orange appears to argue that Autel's "intent and awareness" that its products would end up in the United States indicates that there was a sale or offer for sale in the United States. (*See id.* at 5–6.) Indeed, it points out that the sample sale contracts are each titled "████████████" and ███████████████████████████ ████████. (*Id.* at 5, citing JX-066.4, JX-066.1.) It further argues that Ms. Chen confirmed Autel's intent and awareness through her testimony that Autel "██████████████████████████████ ███████████████████████████████████████████████████." (*Id.*, citing Dkt. No. 181 at 148:15–19; 143:6–14.)

Regarding the cases Autel cites to demonstrate the importance of a distributor, Orange attempts to distinguish such cases by arguing that the defendants in these cases "sold to true intermediary companies, i.e., companies located outside the U.S., and those intermediaries then

sold and shipped to customers in the U.S."[8] (Dkt. No. 195 at 1.) Orange goes on to argue that Autel U.S. is not a "true intermediary" pursuant to these cases because it is located in the United States and receives the products in the United States. (*Id.*) In *Halo* in particular, Orange argues that the intermediary companies were "the key reason why Pulse was not a direct infringer." (*Id.* at 3, citing *Halo*, 831 F.3d at 1374 ("Pulse received purchase orders from Cisco's foreign contract manufacturer.").) Therefore, Orange argues, "unlike *Cybrionics*, *Pfizer*, *MEMC*, and *Halo*, ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (*Id.*) (internal citations omitted).

Orange also argues that substantial evidence demonstrates that Autel imported accused products into the United States. (*See* Dkt. No. 173 at 6.) It notes that the Federal Circuit in *Transocean* held that an offer for sale occurred within the U.S. where the sales agreement was executed outside of the U.S. and contemplated that the U.S. purchaser would import the accused product into the U.S.[9] (*Id.*, quoting *Transocean*, 617 F.3d at 1309). Orange argues that "▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (*Id.* at 7, citing Dkt. No. 181 at 146:10-147:24.) She testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and that the contracts

---

[8] These cases are (1) *Halo*, (2) *Cybiotronics, LTD v. Golden Source Electronics, LTD.*, 130 F. Supp. 2d 1152 (C.D. Cal. 2001); (3) *Pfizer, Inc. v. Aceto Corp.*, 853 F. Supp 104 (S.D.N.Y. 1994); and (4) *MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369 (Fed. Cir. 2005).

[9] The relevant portion of *Transocean* states that "[n]either *Rotec* nor *MEMC* preclude our determination that an offer by a U.S. company to sell a patented invention to another U.S. company for delivery and use in the U.S. constitutes an offer to sell within the U.S." This Court notes that there, the seller was a U.S. company. Further, this case must be read in light of the more recent *Halo* decision, wherein the Federal Circuit held that the "substantial activities of a sales transaction, including the final formation of a contract for sale encompassing all essential terms as well as the delivery and performance under that sales contract" dictate the location of a "sale" for purposes of § 271(a). *See Halo*, 831 F.3d at 1377.

themselves ████████████████████████. (*Id.*, citing Dkt. No. 181 at 146:10-147:24; JX066.4.) Orange concludes that the ████████████████████████ ████████████ constitute new "offers to sell" infringing products. (*Id.*, citing *3D Sys. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1379 (Fed. Cir. 1998) (holding that "the price quotation letters can be regarded as 'offers to sell' under § 271 based on the substance conveyed in the letters, i.e., a description of the allegedly infringing merchandise and the price at which it can be purchased.").

Lastly, Orange argues that there was substantial evidence that Autel imported the accused products as well, pointing to a sales contract showing "████████████████" and Ms. Chen's testimony that ████████████████████████. (*Id.*, citing JX-066.4; Dkt. No. 181 at 145:15–20.)

In summary, Orange argues that "Autel ████████████████████ ████████████████████████████████████████ ████████████" (Dkt. No. 195 at 4, citing JX-066.4, JX-066.11; Dkt. No. 181 at 141:20-23, 143:6-14, 145:15-20, 148:15-19; JX-066.4, JX-066.11.) Therefore, Orange argues that there was substantial evidence supporting the jury's verdict of direct infringement under its theories of sale, offers to sell, and importation.

### b. Analysis

The Court agrees with Autel that substantial evidence does not support the jury verdict of infringement. The facts and evidence presented at trial are largely undisputed; the parties focus their analysis on the case law and what is sufficient to constitute a sale, offer for sale, or importation in the United States. The Court finds that *Litecubes*, *SEB S.A.*, and *Transocean* must be read in light of the more recent guidance of *Halo*.

First, there were no sales of the accused products in the United States by Autel. As an initial matter, it is true that ████████████████████████ does not, by itself, control this inquiry. As the Federal Circuit pointed out in the personal jurisdiction context in *North American Philips*, then reiterated in *Litecubes*, "to hold otherwise would exalt form over substance." *See Litecubes*, 523 F.3d at 1369 (quoting *North American Philips*, 35 F.3d at 1579). Subsequently, the Federal Circuit in *Halo* outlined the test to determine whether a "sale" takes place in the United States:

> Consistent with all of our precedent, we conclude that, when ***substantial activities of a sales transaction***, including the ***final formation of a contract for sale*** encompassing all essential terms as well as the ***delivery and performance*** under that sales contract, occur entirely outside the United States, pricing and contracting negotiations in the United States alone do not constitute or transform those extraterritorial activities into a sale within the United States for purposes of § 271(a).

*Halo*, 831 F.3d at 1378. (emphasis added). The location of a sale for purposes of § 271(a) considers "factors that include[] places of contracting and performance" and is determined by an analysis of "whether the activities in the United States are sufficient to constitute a 'sale' under § 271(a), recognizing that a strong policy against extraterritorial liability exists in the patent law." *See id.* at 1377 (internal citations omitted).

Here, the final formation of a contract for sale, encompassing all the essential terms, occurred in China.[10] (*See* Dkt. No. 181 at 134:19–135:2 ████████████████████████ ███████████████████████████████████████ *see also* JX-065.) The jury heard testimony that "█████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████." (Dkt. No.

---

[10] The distributorship agreement states that ████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████.



181 at 123:13-16.) It was further explained that Autel and Autel U.S. "████████████████,"

and that "████████████████████████████████. (*Id.* at 124:9–

10; 124:23–24.) Further, it was explained at trial that ████████████████████, as did

manufacturing and shipping. (*Id.* at 125:5-10 ("

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████.").)

      Delivery occurred in "████████████████" (*Id.* at 128:11–14.) Title to the products is

transferred "████████████████████████████████████

████████████. (*Id.* at 133:8–19.) JX-065 established that "████████████████

████████████████████████████████████████

████████"[11] (*Id.* at 127:25–128:21.) Performance of the sales contract also occurred in China,

where the ████████████████████████████" takes place. (*Id.* at 133:8-

19.) JX-066 is a "████████████████████████████████"

between the entities. (*Id.* at 138:2–9.) The place of issue is "████████" and such sales contracts

are FOB ████████████. (*Id.* at 138:16–139:6.) Notably, in *Litecubes* and *SEB S.A.*, no such

facts concerning the U.S. company's possession and control over bringing the goods into the

United States were present.

      In summary, Autel put on evidence at trial that the contract for the goods, delivery,

performance, and possession of the goods took place in China. Orange seems to dispute only that

---

[11] Orange cites Ms. Chen's testimony and asserts that ████████████████████████
████████████████████." (Dkt. No. 195 at 4–5, citing Dkt. No. 181
at 145:15–20.) In the cited testimony, Ms. Chen only stated that her group is responsible for "████████████████████
████████████." As Autel points out, Ms. Chen also clarified that "████████████████████████
████████████" *Id.* at 144:20-22. Autel U.S. takes delivery in China. *Id.*
at 128:5–19.

delivery occurred in China because Autel U.S. is in the United States, because Autel knew and intended that its products would end up in the United States, and because the ████████ do not control where a "sale" under § 271(a) occurs. Orange does not argue that actual contracting took place in the United States, nor does it plausibly argue that negotiations took place in the United States.

The only evidence that Orange points to in order to demonstrate delivery in the United States is Ms. Chen's testimony that her group at Autel ████████████████████ ████████████████████, where Autel U.S. is located. (*See* Dkt. No. 173 at 5–6, citing Dkt. No. 181 at 148:15–19; 141:20–23; 143:6–14.) It then argues that ████████ do not mean a sale takes place in China under *Litecubes*. However, *Litecubes* did not hold that ████████ are irrelevant to the "sale" analysis under § 271(a), and Orange points to no case that has held as such. Accordingly, while not determinative, ████████ should be considered in the "sale" inquiry. *See Halo*, 831 F.3d at 1377–78 (citing Article 2 Uniform Commercial Code guidance that "[a] 'sale' consists in the passing of title from the seller to the buyer for a price") (internal citations omitted); *see also Pulse Elecs., Inc. v. U.D. Elec. Corp.*, 530 F. Supp. 3d 988, 1012–13 (S.D. Cal. March 31, 2021) (considering ████████ in determining that no sale in the United States occurred at the summary judgment stage). The undisputed ████ ████ between Autel and Autel U.S. reinforce the conclusion that a sale took place in China, but they are not the only basis for that conclusion.

Further, the Court is not persuaded by Orange's arguments that a "true intermediary" must be located abroad. (*See* Dkt. No. 195 at 1.) Orange is correct that in each of *Cybiotronics*, *Pfizer*, *MEMC*, and *Halo*, the defendants sold to a foreign purchasing entity. However, the Court agrees with Autel that the difference between those cases and *Litecubes* and *SEB S.A.* lies elsewhere—

namely, that the defendants in *Litecubes* and *SEB S.A.* could only point to ▮▮▮▮ as the reason why sales allegedly occurred abroad. *See Litecubes*, 523 F.3d at 1369 (rejecting "the notion that ***simply because goods were shipped*** ▮▮▮ the location of the 'sale' for the purposes of § 271 must be the location from which the goods were shipped") (emphasis added); *SEB S.A.*, 594 F.3d at 1375 ("the ***only evidence*** on which [the defendant] relie[d] to argue that its sales occurred overseas was that it delivered its products to [its customers] ▮▮▮ ***Hong Kong or mainland China***.") (emphasis added). As explained above, Autel presented substantial evidence of much more than "simply" ▮▮▮ to demonstrate that its sales occurred in China.

Orange's "true intermediary" argument essentially reduces the sales inquiry to whether the customer or distributor receiving accused products is in the United States, such that the products end up in the United States. This is not the test; the corporate home of the purchasing entity does not determine the location of a "sale." In fact, Orange has pointed to nothing that Autel has done in the United States, nor did it introduce evidence of such at trial. Orange simply argues that Autel U.S. is a United States company (a fact which is not disputed) and that Autel knew and intended that its products would end up in the United States.[12] Applying precedent, this is not enough.

Here, as in *Halo*, the presumption against extraterritorial application of United States laws supports this Court's determination. As the *Halo* Court pointed out, the Supreme Court has stated "on multiple occasions [that] '[o]ur patent system makes no claim to extraterritorial effect; these acts of Congress do not, and were not intended to, operate beyond the limits of the United States, and we correspondingly reject the claims of others to such control over our markets.'" *Halo*, 831 F.3d at 1379 (citing *Microsoft*, 550 U.S. at 444 (quoting *Deepsouth Packing Co. v. Laitram Corp.*,

---

[12] Orange only cites to *SEB S.A.* for the idea that Autel's knowledge and intent has any bearing on the "sale" analysis. The *SEB S.A.* Court only noted that the foreign defendant intended its products to end up in the United States in finding that there was no fundamental error in the jury instructions, and *Halo* makes no mention of "knowledge" or "intent" in its more recent and extensive discussion of what constitutes a sale under § 271(a).

406 U.S. 518, 531 (1972) (quoting *Brown v. Duchesne*, 60 U.S. 183, 195 (1857))). Accordingly, the Court finds that substantial evidence does not support the jury verdict that an infringing sale occurred in the U.S.

The Court further finds that there is not substantial evidence that Autel offered products for sale in the United States nor that it imported products into the United States.

When determining if there was an "offer for sale" under § 271(a), the Federal Circuit has held that "the location of the contemplated sale controls whether there is an offer to sell *within the United States*." *Halo*, 831 F.3d at 1380 (quoting *Transocean*, 617 F.3d at 1309) (emphasis added in *Halo*). Therefore, "[a]n offer to sell, in order to be an infringement, must be an offer contemplating sale in the United States." *Id.* "If a sale outside the United States is not an infringement of a U.S. patent, an offer to sell, even if made in the United States, when the sale would occur outside the United States, similarly would not be an infringement of a U.S. patent." *Id.* For the reasons explained above, the accused sales did not occur in the United States, and any corresponding offers for sale therefore also did not occur inside the United States.

To support its allegation that Autel "imported" the accused products into the United States, Orange only points to Ms. Chen's testimony that her ███████████████████████████████ ██████████████████ (Dkt. No. 181 at 145:15–20.) However, the Court is persuaded that Autel is an "exporter," not an "importer." Autel U.S. causes the products to be shipped to the United States, and Autel U.S. owns the goods when they enter the United States. *See Pulse Elecs., Inc. v. U.D. Elec. Corp.*, 2021 U.S. Dist. LEXIS 49101, at *45–46 n.12 (S.D. Cal. March 15, 2021) (finding no importation under Section 271(a) and noting that "if someone buys a product within the U.S. from Asia containing [defendant's accused products], the purchaser would be importing

infringing goods, while the seller (whether the seller is a third-party or defendant) would be exporting the goods"). Accordingly, there is no infringing "importation" under § 271(a) by Autel. ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪[13] However, the totality of the circumstances demonstrates that Autel U.S. purchases the accused products from Autel in China. There is not substantial evidence in the record supporting the jury's verdict of direct infringement by Autel.[14]

## IV.    CONCLUSION

Having considered the Noninfringement Motion, the Court finds that it should be **GRANTED**. In light of this finding, the Court finds that Autel's motions for judgment as a matter of law that that there was no evidence of willful infringement and that the jury's damages award was unsupported are necessarily **DENIED AS MOOT**. Autel's motions for judgment as a matter of law that the Asserted Claims are directed to ineligible subject matter and are invalid as obvious will be addressed by separate order of this Court.

In light of this holding, the Court finds that Orange's Motion for Enhanced Damages and Attorneys Fees (Dkt. No. 174) premised on the jury finding of willful infringement necessarily should be and hereby is **DENIED AS MOOT**. For the same reasons, Autel's Motion for Equitable Relief Pursuant to 35 U.S.C. § 252 (Dkt. No. 210) (requesting the application of equitable intervening rights under 35 U.S.C. § 252 should the Court find that Autel is liable for any damages to [Orange]") should be and hereby is **DENIED AS MOOT**. Further, a final judgment shall be entered after the Court issues its opinion regarding Autel's motions regarding invalidity and ineligibility (both at Dkt. No. 177).

---

[13] ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪. (Dkt. No. 181 at 139:15–24.)

[14] Direct infringement was the only infringement theory Orange put forth at trial.

Lastly, the parties are directed to jointly prepare a redacted version of this Order for public viewing and to file the same on the Court's docket as an attachment to a Notice of Redaction within five (5) business days hereof.

**So ORDERED and SIGNED this 19th day of April, 2024.**

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE